# AFFIDAVIT

Under penalties of perjury, **DIANA J. KORESKI** swears and affirms that the following is true to the best of his knowledge:

1. I am a former employee of the U.S. Department of Education, Office of Special Education and Rehabilitative Services (OSERS), Rehabilitation Services Administration (RSA). My position was GS-0101-13 step 10 Vocational Rehabilitation Program Specialist in RSA Region X (Seattle).

2. My date of birth is September 10, 1950.  I have been with RSA for 33 years, always in the Seattle Regional Office.

3. My duties were as a Regional Rehabilitation Representative; that is, I monitored assigned states, performing on-site reviews of policies, procedures, and case records of individuals served; provided technical assistance in the form of responses to policy questions, implementation issues, reviewed and commented on draft state agency policies, and provided guidance on individual client services questions; reviewed and recommended approval of state plans for vocational rehabilitation and for the independent living programs; provided training on intent of the Rehabilitation Act, as amended, for both state agencies and discretionary grantees; monitored discretionary grantees including centers for independent living, projects with industry, long term and short term training grantees; provided training to and monitored the State Rehabilitation Councils and State Independent Living Councils in my assigned states; provided training and guidance to Regional Office staff, and grantees as the Regional Office functional specialist for Independent Living, Randolph-Sheppard Act, Client Assistance and Protection and Advocacy for Individual Rights programs, and supported employment and community rehabilitation programs.  And other duties as assigned.

4. I had anticipated being able to apply for the Assistant Regional Commissioner job during the last two years.  However, management decided to place the job in the San Francisco office, versus the Seattle office where it has been for the last ten years.  Since it was not feasible to move to San Francisco, there were no further options for upward mobility for me within RSA.

5. I therefore had planned to retire about January 1, 2007.  This would have garnered me about 66 percent of my high three years of salary; my high three salary would have been increased by approximately another six percent.  In the meantime, I would have finished paying off a car, and other financial impacts would have been resolved.



EXHIBIT 11

6. One of the largest of these impacts is the housing of my husband's parents, both of whom have some memory problems, and need us close to hand. We just moved them into a condo in November 2004, and they will need to stay there for three years. Our plan had been to finish work on our place, then move both them and ourselves to a less expensive area in 2007, after we had retired. Now, our plans to move to a less costly area are impacted by the need to remain close to our parents, who cannot move without undue financial impact for another two years.

7. The OSERS/ Rehabilitation Services Administration decided to re-organize using what management called a "consolidation of functions". They announced that all of the work previously performed in the regional offices would be moved to headquarters, and all the regional office staff will be separated. They indicated that this was different than a "transfer of functions" in that the current duties of Regional Office staff would not be continued, but that functions would be maintained and the same programs would be supported and administered.

8. During the process of implementing the buyout, I heard that some members of the management team said that it was important to get rid of the Regional Offices because many of the staff had been hired during the 1970s era of "do-gooder" public service. This is secondhand information, and cannot be attributed to anyone in particular. However, the failure to put in place a fair and equitable reduction-in-force procedure that would encompass both Region and Headquarters staff reinforces that perception.

9. The options made available by management during the precipitous closure of the regional office were limiting. I would not be eligible for a severance package because my full retirement date would have been September 10, 2005 (age 55). But leaving at that point would have caused financial issues since my plans were geared around retirement in another 18 months. The buyout incentive at least covered the reduced income for this year, even though the retirement pension itself is only reduced by approximately $55 per month. It did not appear that there would be any give in the management plan to pull all the functions into headquarters, nor did it appear that there would be any efforts to accommodate staff with telecommuting options. So the early out was the least onerous and least impact of the options provided.

10. I therefore retired effective July 2, 2005 because no other reasonable options were offered by management.

11. After I accepted the buyout, the announcements and position descriptions for the jobs that would be available in Headquarters came out. The job duties and "knowledge, skills, and abilities" requirements were essentially the same as those required for the current jobs in the Regional Offices.

       Management's explanation of was that the new jobs will be different due to the new structure, i.e., the performance of the same duties via a team process. This does not seem to be a legitimate rationale for determining the re-organization is not a transfer of functions.

12. The other reason provided for closing the Regional Offices was that the regional employees were unable to get our work done, i.e., we did not issue monitoring reports to our assigned state agencies, according to the Secretary of Education. However, I was able to get my monitoring reports out in a timely manner up every year until FY 2004. At that point, the process underwent numerous management-directed changes in format and approval processes. At least 10 changes in format occurred between May 2004 and February 2005. Reports that I had drafted for approval took up to a year to complete the new so-called "clearance process." Then, because the reports were not issued in a timely manner, I was told I would not get a positive performance assessment. This made it impossible for me to successfully compete for any of the "new" jobs in Headquarters.

13. Taking the "early out" has reduced my pension from my planned retirement date of January 2007, using an estimated calculation, by about $4,400 per year. The Voluntary Separation Incentive Package which I will receive does not fully ameliorate the impact of what is essentially my constructive discharge.

_____         _8/24/05_____
Diana J. Koreski                                       Date