# AFFIDAVIT

Under penalties of perjury, **BRIAN R. MILLER** swears and affirms that the following is true to the best of his knowledge:

1. I am an employee of the U.S. Department of Education, Office of Special Education and Rehabilitative Services (OSERS), Rehabilitation Services Administration (RSA). My position is GS-0101-12 step 2 Vocational Rehabilitation Program Specialist in RSA Region IX (San Francisco).

2. My date of birth is August 13, 1967. I am a person with a significant disability -- I am totally blind.

3. I began working for RSA on January 26, 2004 (eighteen months ago). I am an excepted status employee hired pursuant to Schedule A authority. I am eligible for conversion to competitive status on January 26, 2006.

4. When I applied for my job with RSA, I lived in Iowa City, Iowa, with my wife, who is also blind. I was then teaching history at the University of Iowa while completing my doctorate. I learned that RSA was hiring program specialists in their regional office in San Francisco. I had lived in the Bay Area before, and in San Diego prior to moving to Iowa to pursue my PhD. My wife and I had been discussing returning to California to live and work. So in August of 2004, I applied for a position with RSA. I applied under Schedule A authority. I had an interview via telephone in September, 2004. In November I was offered the job of Voc. Rehab Program Specialist, GS 12, step 1. I later discovered that OSERS senior staff engaged in a titanic struggle to keep the-then RSA Commissioner, Joanne Wilson, from hiring me due to my disability. Nonetheless, I was hired.

5. In January, 2004, I moved to the San Francisco Bay Area at my own expense to begin work with RSA. I spent approximately $7,000 of my own money to make this move. I started work on January 26, 2004.

6. I currently utilize the following accommodations in order to fulfill the functions of my job. 1. Text to speech screen reading software on the computer at my work station. 2. A reader, which I share with another blind employee in my office. 3. A Braille printer, which I also share with another blind employee in the office.

7. It took five months after I began work at RSA in January of 2004 before OSERS would hire a reader for myself and the other blind employee in the RSA Region IX office. Dr. Paul O'Connell of OSERS insisted that we try


EXHIBIT 15

to work with a contracted employee at first, and when we made a case that this was a poor way to accommodate our need for a reader, he finally relented after many months of resistance and allowed Ed personnel procedures to begin a search for a reader. OSERS would only allow one reader for the office which we would have to share. In addition to resistence from OSERS in making reasonable accommodations in the regional office, OSERS presented a substantial barrier to providing reasonable work accommodations when I was required to work away from the office in order to conduct on-site monitoring of our grantees, a major component of my position description. On several occasions I was forced to pay for my own reader in order to do my work because OSERS required extremely elaborate procedures for hiring and paying for readers while on the road.

8. As a Program Specialist I monitor for regulatory compliance all adult rehabilitation programs funded by federal dollars in California, Nevada, Arizona, Hawaii, and the Pacific Island territories. I also provide technical assistance to state vocational rehabilitation agencies which receive more than $500 million in federal formula and discretionary grants. I provide technical assistance to state VR agencies, Independent Living Centers, and discretionary grantees about best practices in the field that are compliant with regulations, but even more importantly, creatively meet the needs of the communities these grantees serve.

9. The Region I serve is the largest and most diverse in the nation. I work with grantees and their consumers in communities as large as California, and as small as the Northern Marianas Islands in the western Pacific. It is crucial to provide services that are culturally appropriate, and economically sound.

10. To effectively meet the diverse needs of the consumers I serve, I must draw on a wide range of resources. I routinely distill federal regulations, market analyses, longitudinal research, professional associations, and perhaps most importantly, the voices of consumer advocacy groups into policy recommendations, case management documentation, and technical assistance circulars.

11. The grantees I monitor serve hundreds of thousands of individuals with disabilities, and employ hundreds of VR counselors, job coaches, community rehabilitation program directors, and Independent Living Center staff. It is vital, therefore, that the guidance I provide is compliant with the law, practical to implement, and ultimately fruitful for the individuals whose lives can be positively changed by the programs the U. S. Department of Education funds.

12. As the Rehabilitation Services Administration's regional specialist on transition services to school-age youth with disabilities, I routinely provide

technical assistance to state VR agencies, school districts, community rehabilitation programs, and consumer groups and individuals to facilitate the implementation of best practices in service delivery and employment outcomes to young people with disabilities transitioning from school to work or post-secondary education. I am often required to provide mediation services between state departments of education and vocational rehabilitation programs to establish memoranda of understanding between the two agencies so that students are provided the services they are guaranteed by both the Individuals with Disabilities Education Act (IDEA) and the Rehabilitation Act of 1973.

13. I am also the Region IX specialist on matters pertaining to the migrant and season farm worker grants, the Workforce Investment Act, and the Blind Enterprise, or Randolph Sheppard program.

14. In January of 2005, we were informed by our Regional Commissioner via teleconference that OSERS was planning to close all regional offices. In mid-May, 2005, we received preliminary copies of the reorganization plan, and the buy-out proposals. By the end of May, 2005, we were notified by John Hager, via email, that those who did not take the buy-out or early retirements would be subject to a RIF. He also noted that some individuals might be offered jobs, after a competitive hiring process, in the central office in Washington, D.C., but none would be out-stationed, and most could not count on jobs. On June 6, 2005, all RSA staff was notified that OSERS had submitted a reorganization plan and the RIF authorization to the bargaining unit. The reorganization chart showed only central office employee names. It was to be assumed that only a very select few regional office employees would be offered jobs in DC.

15. During several conference calls, OSERS senior staff told regional office employees that no managerial reassignments were being considered, even to fill advertised vacancies in the Department; that those hired for central office work would not be allowed to telecommute; and that RSA would only reluctantly pay for moving costs for those who were offered work in D.C.. Most egregiously, senior OSERS staff informed regional office employees that if they had a disability that required an accommodation in the form of a reader, an interpreter, or a personal assistant, they would be counted as two FTE's, making the actual number of available positions in central office even fewer. Those regional office staff with disabilities such as myself are doubly penalized when applying for central office positions. There is a clear disincentive for OSERS to hire a regional office professional staffer with a disability.

16. The closure of the regional office in San Francisco would affect me very adversely. First, I would likely have to return to Iowa as I cannot afford to

       live here in the Bay Area without substantial income.  I am looking for other work, but with the relatively short timeframe of closure, and the total lack of cooperation on the part of OSERS, finding work has not been easy. OSERS could have offered managerial reassignement, which would have made securing a new position much easier, but the agency has refused to do this.  As a person with a disability finding employment is especially difficult -- 70 percent of all persons with disabilities of working age are unemployed in the U.S.

17.    Apart from the loss of income, the elimination of other benefits will be a great hardship.  My wife has chronic health issues that require quality insurance coverage, something we cannot buy on the open market due to her pre-existing conditions.  To keep my current medical coverage under COBRA (or the fed equivalent), I will have to pay approximately $1,000 a month just in premiums for the plan I currently hold.  My wife is a kidney transplant patient, and a Type 1 diabetic, and must have insurance, or we will be bankrupt in months.

_____      8-17-05
Brian R. Miller                      Date