**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

*Andersen et al*

Certain Regional Office Employees of          )
Rehabilitation Services Administration,       )
Office of Special Education and               )
    Rehabilitative Services,                  )          C.A. No. _____
U.S. Department of Education,                 )
Applicants                                    )
Plaintiff-Applicants                          )
v.                                            )
                                              )
                                              )
Margaret Spellings, Secretary,               )
U.S. Department of Education,                  )
Defendant                                     )
_____         )

## TABLE OF CONTENTS

**Item**                                                                                    **Page**

INTRODUCTION ........................................................................................... 1

RELIEF REQUESTED ................................................................................... 3

STATEMENT OF JURISDICTION ................................................................ 3

FACTS ........................................................................................................... 5
    I.     The Applicants' Backgrounds ............................................................ 7
    II.    The RSA ........................................................................................... 11
          A.    Regional Office Roles and Functions ...................................... 13

          Function 1: *State Plan Submission, Review, Approval, and Oversight* ............... 14
          Function 2: *Monitoring* ........................................................................ 15
          Function 3. *Technical Assistance* ......................................................... 16
          4.    Other Functional Areas .......................................................... 18

          B.    Grants and Programs Administered Solely by the ROs ............ 19
          C.    RO Workforce Profile ............................................................. 20
          D.    RO Performance ...................................................................... 25

    III.   THE AGENCY'S RECORD OF DISABILITY DISCRIMINATION ................. 26
          A.    Illegal Inquiries about Accommodations ................................. 30

B.    Opposition to Hiring Blind Persons ............................................. 31
C.    Opposition to Accommodating Blind Employees ........................ 33
D.    New ED Policy of Counting Readers and Other Assistive
Employees as FTEs ........................................................................... 34
E.    Requiring Competitive Service Employees with Disabilities
to Re-apply under Schedule A ............................................................ 35

IV.    THE REORGANIZATION AND REDUCTION IN FORCE ............... 35
A.    OSERS Management's Representations about the
Reorganization ................................................................................... 36

1.    Semantic Contortions to Avoid Using the Word "Transfer." ........ 36
2.    Terms of the Buyout ..................................................................... 38
3.    The New Structure ....................................................................... 40
4.    Staffing the Reorganized RSA ..................................................... 43
      1.    The RIF ............................................................................... 47

B.    Conflicting Rationales for the Reorganization ........................... 48

1.    An Alleged Need to Reduce Overall ED Headcount ................... 48
2.    Irrelevant Comparisons to Inapposite Programs ........................ 50
3.    A Groundless Belief that Half the Workforce Can Do All
      the Work ....................................................................................... 52
4.    "The Closures are Not Due to Problems with the Regions'
      Performance." ............................................................................... 54
5.    "The Closures ARE Due to Problems with the Region's
      Performance." ............................................................................... 55

V.    DOCUMENT DESTRUCTION ....................................................... 58

VI.    RETALIATION AGAINST THE REGIONAL COMMISSIONERS ........ 58

VII.    IMPACT OF THE RIF AND REORGANIZATION ........................... 60
A.    On RSA's Ability to Perform its Mission ................................... 60
B.    On Regional Office Employees Including Applicants ................. 62

1.    Generally ...................................................................................... 62
2.    Individually ................................................................................... 65

STANDARD FOR PRELIMINARY INJUNCTIONS ..................................... 77

ARGUMENT .......................................................................................... 80

I.    APPLICANTS HAVE AN EXTRAORDINARILY HIGH
      LIKELIHOOD OF SUCCESS ON THE MERITS. ................................. 80

      A.    The Agency Has Violated the Civil Service Law By Refusing To Transfer
      the Applicants to the Central Office with their Functions. .................................. 82
      1.    The So-called "Consolidation" at Issue is a Textbook Transfer of
      Function ...................................................................................................... 82
            a. RO Employees Currently Perform Functions Different
            From those Currently Performed in the CO. ............................................. 82

            b.  All Regional Office Functions are Moving to CO and
            Will Be Performed There, Effective October 1, 2005. ............................ 83
      2.    The Agency Must Offer Transfers to the Employees "Identified"
            with the Transferring Functions. ............................................................... 84
      3.    A RIF is Permissible Only After the Identified Employees
            Reject the Offer to Transfer from the Losing Area. .................................. 87
      4.    The Agency May Not Competitively Advertise or Fill the
            Positions Created at CO by the Transfer Because They
            Belong to the RO Employees By Right. .................................................... 88

      B.  Applicants Can Show By Direct Evidence that the Agency's Actions
          Are Motivated by Discrimination on the Basis of Disability. .......................... 89
      1.  The Closures and RIF Are Motivated By The Prejudice of
      OSERS' Executive Administrator Against Disabled People,
      Especially the Blind. ........................................................................................... 91

      C.  The Agency's Actions Will Adversely Impact Disabled
      Regional Employees On The Basis Of Their Disabilities. .................................. 96
      1.    The Reorganization and RIF will Disproportionately Harm
            the Regional Office Employees Because a High Percentage
            of Same are Disabled. ............................................................................... 97
      2.    These Actions Are Not Justified by Business Necessity. ......................... 99

      D.    The Reorganization and RIF Will Disproportionately Impact
            Applicants on the Basis of their Age.   ............................................... 100

      1. No Reasonable Factors other than Age Can Justify the Closures
      or the RIF. ........................................................................................................... 101

      E.    The Agency Has Already Retaliated Against One or More of the
            Applicants for Opposing the Discriminatory Reorganization
      and RIF. .............................................................................................................. 102
      1.    The Regional Commissioners Engaged in Conspicuous
      Protected Activity. ............................................................................................... 103

2.     The Agency Took Material Adverse Actions Against Two Of the Regional Commissioners. ............................................................ 103

3.     Any Non-Discriminatory Rationale Offered by the Agency is Pretextual. ............................................................................................ 105

II.     APPLICANTS AND THE PUBLIC WILL SUFFER MULTIPLE IRREPARABLE INJURIES IN THE ABSENCE OF AN INJUNCTION ........ 105

A.     Civil Rights Complainants have a Per Se Irreparable Injury. ................. 108

B.     The Applicants and their Families Will Suffer Extraordinary and Irreparable Harm if the Reorganization and RIF are Not Halted During the Pendency of their Complaint. .................................... 109

1.     The Loss of Income and Medical Insurance for Several Months or Years Will Be Catastrophic for the Disabled Applicants and Those with Disabled Dependents. ................................. 111

2.     The Caps and Limitations on Damages Will Prevent Applicants From Being Made Whole for their Non-Pecuniary Harm. ..................... 114

C.     In the Alternative, if the Reorganization is Not Enjoined and the Applicants' Positions Are Eliminated, They Cannot Subsequently Be Made Whole on their Discrimination Claims. .......................................................................................................... 115

1.     Reinstatement Is Not Available as a Remedy when the Position at Issue has been Eliminated. ...................................... 115

2.     Front Pay Cannot Make the Severely Disabled Applicants If Their Positions Are Eliminated in the Absence of an Injunction. ............................................................................................ 116

D.     The Selection Process for the Announced Vacancies Should Be Halted Because the "Ground Rules" Are Discriminatory and Retaliation is Likely. ......................................................................... 117

1.     The Disabled Applicants Are At A Terrible Disadvantage Under The New Policy on Counting Assistive Employees. .................... 117

2.     Even If The Process Were Not Biased, Retaliatory Non-Selections Are Likely. ................................................................. 118

E.     Applicants Will Be Irreparably Harmed if the Agency Is Not Enjoined from Destroying Records that are Relevant to the EEO and MSPB Cases. ...................................................................... 118

III.     AN INJUNCTION WOULD CAUSE LITTLE OR NO SUBSTANTIAL INJURY TO THE AGENCY ............................................................... 119

A.     The Agency Has No Legitimate Interest in Completing a Discriminatory and Poorly Conceived and Implemented Reorganization. ............................................................................... 119

-iv-

B.   Any Harm to the Agency is the Result of its Own
Discriminatory Actions. ........................................... 120

C.   The Agency Will Benefit From Retaining The Applicants,
Because They Will Continue To Perform Required
Monitoring And Technical Assistance Functions. .................... 121

D.   Compared to the Harm to the Applicants that Would Result
from a Denial, Any Harm to the Agency is Minimal and
Self-Inflicted. .......................................... 121

IV.   AN INJUNCTION WOULD CLEARLY SERVE THE PUBLIC INTEREST .. 122

A.   The Public Has A Strong Interest in Eradicating
Employment Discrimination. ........................................ 122

B.   Staying the Agency's Plans Will Benefit  People with
Disabilities who are the Beneficiaries of Aid Administered
and Monitored by the RSA. ................................ 123

V.   A NOMINAL SECURITY BOND WOULD SATISFY THE REQUIREMENTS
OF RULE 65(C) OF THE FEDERAL RULES OF CIVIL PROCEDURE. .................. 124

CONCLUSION ........................................................................... 126

REQUEST FOR HEARING ........................................................... 126

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

*Anderson et al.*

| | |
|---|---|
| Certain Regional Office Employees of | ) |
| Rehabilitation Services Administration , | ) |
| Office of Special Education and | ) |
| Rehabilitative Services, | )    C.A. No. _____ |
| U.S. Department of Education, | ) |
| Applicants | ) |
| | ) |
| v. | ) |
| | ) |
| Margaret Spellings, Secretary, | ) |
| U.S. Department of Education, | ) |
| Respondent | ) |

## MEMORANDUM IN SUPPORT OF
## APPLICATION FOR TEMPORARY RESTRAINING ORDER
## AND/OR PRELIMINARY INJUNCTION

### INTRODUCTION

COMES NOW twenty-four current and recently retired employees ("Applicants") of U.S.

Department of Education, the Office of Special Education and Rehabilitative Services

("OSERS"), Rehabilitation Services Administration ("Respondent," "RSA" or "the agency"), and

submit this Application for an Order enjoining the agency from taking actions that will (1)

irreparably harm the employees during the pendency of their administrative complaints and (2)

impede the prosecution of their claims that the agency's proposed closure of its ten regional

offices and the wholesale termination of the regional office employees violate the Age

Discrimination in Employment Act of 1967 ("ADEA") as amended, 29 U.S.C. § 633a et seq., and

the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 700 et seq., and is motivated by

discriminatory animus against people with disabilities.   Finally, all but two of the Applicants are

competitive service federal employees and seek to vindicate their rights under 5 U.S.C. § 3503 to

-1-

transfer with their continuing functions to agency headquarters pursuant to the agency's consolidation of all regional office functions there.

Applicants seek a temporary restraining order and/or an immediate preliminary injunction to prevent the Respondent from implementing a discriminatory Reduction-in-force (RIF) and job eliminations which will terminate all federal employment and related benefits for 65 regional office employees of the RSA, of whom 92% are over the age of 40 and 43% are qualified disabled persons entitled to the protection of the Rehabilitation Act.   The requisite Applications for same are appended hereto.

Applicants are likely to succeed on the merits of their pending EEO claims under the Rehabilitation Act and Age Discrimination in Employment Act because they are able to establish prima facie cases of both disability discrimination under both disparate impact and disparate treatment theories, and disparate impact age discrimination.  In addition, to the extent Respondent is able to proffer any legitimate, non-discriminatory reasons for targeting Applicants' positions for elimination, Applicants will show by strong direct and indirect evidence that disability unlawfully motivated the agency actions at issue.

The denial of an injunction will irreparably harm Applicants, while the agency has no legitimate interest in implementing a discriminatory RIF.  The imminent RIF also violates the civil service reform law, and any inconvenience to the agency resulting from the grant of an injunction would be the direct result of the agency's own discriminatory actions.  Finally, there is a strong public interest in eradicating age and disability discrimination in employment and enforcing the Civil Service laws.   The instant facts fall within the "extraordinary circumstances" exception articulated by the U.S. Supreme Court in <u>Sampson v. Murray</u>, 415 U.S. 61 (1974), to

the typical reluctance to enjoin government personnel practices, and Applicants respectfully submit that a balancing of the equities overwhelmingly favors the grant of an injunction.

## RELIEF REQUESTED

Applicants seek an Order enjoining the agency from the following specific acts:

1.    Separating the Applicants from federal service via a noticed Reduction in Force which will take effect September 30, 2005;

2.    Closing the regional offices of the RSA and transferring the functions performed therein to agency headquarters in Washington, D.C. without offering to transfer the employees who performed those functions;

3.    Relative to the closure of the regional offices, destroying documents and records

   (a)    vital to the performance of the continuing functions, whether in the regional offices or in Headquarters; or

   (b)    relevant to the pending EEO complaints of the Applicants, and thus protected by 29 C.F.R. §1614.302; AND

4.    Selecting individuals under competitive Vacancy Announcements to perform the functions transferring from the regional offices to agency headquarters, inasmuch as these positions should properly have been offered non-competitively to the agency's regional office employees who currently perform the transferring functions.

## STATEMENT OF JURISDICTION

Applicants have filed their formal consolidated EEO complaints with the agency; as of September 30, 2005 (the effective date of their RIFs), they will have 30 days in which to appeal

their separations from federal service to the Merit System Protection Board ("MSPB").   The

combined complaints and appeals are defined as "mixed cases", and appellants will have standing

to bring their claims before this Court when they exhaust their mixed case administrative

remedies.[1]  29 C.F.R. §1614.109(a)-(f), §1614.201(c).  The D.C. Circuit has held that "if the court

may eventually have jurisdiction of the substantive claim, the court's incidental equitable

jurisdiction, despite the agency's primary jurisdiction, gives the court authority to preserve the

status quo pending ripening of the claim for judicial review." Wagner v. Taylor, 836 F.2d 566,

571 (D.C. Cir.1987) (Spottswood Robinson, C.J.); Bonds v. Heyman, 950 F. Supp. 1202, 1207

(D.D.C.1997)(Lamberth, J.) (noting "the simple fact that a court does have the power to grant

injunctive relief in a civil rights case prior to plaintiff's exhaustion of administrative remedies").[2]

Applicants are entitled under these same principles to bring this Application, invoking the District

Court's eventual jurisdiction over their cases when they exhaust their remedies without having

obtained their requested relief administratively.

---

[1]  A "mixed case complaint" is a complaint of employment discrimination related to or
stemming from an action that can be appealed to the MSPB.  29 C.F.R. §1614.302.  After the
MSPB issues its decision, Applicants can appeal the MSPB's decision to the EEOC.  29 C.F.R.
§1614.303(a).  After the EEOC rules on the appeal, the employees may then proceed into federal
district court with the same claims.  29 C.F.R. §114.310(c)-(i).  However, Congress has provided
that the mixed case administrative process is exhausted in 120 days, as opposed to the 180 days
applicable to ordinary Title VII cases. Compare 5 U.S.C. § 7702(e)(1)(A) (mixed cases) with 42
U.S.C. § 2000e-16(c) (Title VII).

[2]  In Jordan v. Evans , the District Court found that

> in light of the Title VII's legislative history and "the broad statutory powers designed to
> effectuate and preserve the rights of Title VII claimants," our Circuit held in Wagner that
> Congress did not intend to foreclose courts from providing injunctive relief to plaintiffs
> facing irreparable harm while pursing their administrative remedies. [ ]  Accordingly, this
> Court is not barred from considering [an applicant's] claim for injunctive relief even
> though she may not have exhausted her administrative remedies under Title VII.

355 F. Supp. 2d 72, 76 (D.D.C. 2004)(Leon, J.) (quoting Wagner, supra, 836 F.2d at 572).

## FACTS

In enacting the Rehabilitation Act, Congress found, *inter alia*, that

(1) Millions of Americans have one or more physical or mental disabilities and the number of Americans with such disabilities is increasing;

(2) Individual with disabilities constitute one of the most disadvantaged groups in society;

    ...

(4) Individual with disabilities continually encounter various forms of discrimination . . . in critical areas [including] employment ...; and

(6) The goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to . . . (B) achieve equality of opportunity, full inclusion and integration in society, employment, independent living, and economic and social self-sufficiency, for such individuals.

29 U.S.C.§ 701(a).

Section 709 of the Rehabilitation Act (29 U.S.C. § 702) created the Rehabilitation Services Administration to administer programs and funds appropriated annually which provide vocational rehabilitation training for people with disabilities through a number of state and local grants, programs and initiatives.   Though the FY2006 funding bill for the U.S. Departments of Labor, Health and Human Services, and Education has not yet been enacted, the U.S. House of Representatives and Senate Appropriations committees have so far agreed with the requested funding levels and have even increased the funding for certain RSA-administered programs.  In so doing, the Appropriators show continuing bipartisan support, even in these tight fiscal times, of funding vocational programs which directly benefit people with severe disabilities, a population

estimated by the U.S. Census Bureau to number 11 million adults aged 21 to 64 in 2003.

Available at http://factfinder.census.gov/.

In its report to the full House, the House Appropriations Committee added the following

comment to the "Program Administration" line item (which includes payroll expenses) in the

appropriation for the Education Department ("ED" or "Department"):

> The Committee is aware that the Department of Education is taking steps to restructure the Rehabilitation Services Administration's system for providing oversight and monitoring of the Vocational rehabilitation Program. The Committee is interested in ensuring that the Department have a replacement system and plan in place for accountability, monitoring and technical assistance of these programs prior to the dismantling of the current system. **The Committee directs the Department to develop such a plan and discuss such a plan with state vocational Rehabilitation agencies and stakeholders in advance of further staffing reductions.**

Exhibit (Ex.) 1, Excerpts from H.R. REP. 109-143 at 189 (2005) (emphasis added). The Senate

Appropriations Committee expressed similar concerns in its report to the full Senate:

> The Committee understands that the Department is taking steps to implement the proposed reorganization of the regional office structure within the Rehabilitation Services Administration [RSA]. . . **the Committee is concerned about the impact that this proposal will have on regional office staff, as well as the ability of the Department to effectively administer RSA programs**. The Committee understands that the Department believes that its proposed reorganization will result in more consistent, timely and higher quality policy guidance, technical assistance and program monitoring. The Committee believes these are worthy goals, given the millions of individuals served through RSA programs. Therefore, **the Committee requests a report that describes the steps taken to reach out to stakeholder groups on this issue; a detailed plan for ensuring that policy guidance, technical assistance and program monitoring will be of higher quality than that currently available; and the specific performance goals under the proposed reorganization for frequency of monitoring visits and timeliness and relevancy of technical assistance, compared to the actual performance under the current administrative structure. The Committee expects to receive this report not later than 60 days after the enactment of this Act, but urges the Department to make it available as soon as possible.**

Ex. 2, Excerpts from S. REP. 109-103 at 289 (2005)(emphasis added).

The House and Senate Appropriators are correct to be concerned about the impact of the proposed RSA reorganization on both the regional office staff and RSA's ability to carry out its statutory functions.  The RSA regional offices employed approximately 65 people in January 2005.  Of these, 92% were over the age of 40 and at least 43% were disabled within the meaning of the Act.  Under the proposed reorganization, effective October 1, 2005, the ten regional offices will close.  The regional employees who did not take early retirement or buyouts under the punitive terms offered (discussed below) have each received notices that they will be separated from federal service.  As the following discussion of the RSA and its mission shows, the closure of the regional offices may well be the undoing of RSA's ability to perform its vital purposes – which are and remain clearly supported and fully funded by Congress – of enforcing the Act and other federal statutes intended to assist people with disabilities.  The imminent and severe harm to the individual employees, who are statistically likely to be both disabled and over the age of 40, is discussed as well.

## I.    The Applicants' Backgrounds

The Applicants are twenty-four current and former employees of the RSA:  Richard Anderson, Bryan Bashin, Keith Beichner, Joe Cordova, Mary Davis, Loerance Deaver, Michael Evans, Joseph Farrell, Marian Fuller, Martha Garber, Diana Koreski, Allen Kropp, Seymour Levy, Charles Linster, Brian Miller, Jeffrey Mitchell, John Nelson, Kathleen Niemi, Noel Nightingale, Ralph Pacinelli, Brenda Sue Rankin-White, Bruce Rose, Janette Shell, and Jacquelyn Tellier.[3]  All were stationed in the agency's ten Regional Offices.  Cordova, Deaver,

---

[3]  Affidavits are attached as Exhibits 1-25 to the Complaint herein, including the Affidavits of Richard Anderson (hereinafter "Anderson Aff"); Bryan Bashin ("Bashin Aff"); Keith Beichner ("Beichner Aff"); Joe Cordova ("Cordova Aff"); Mary Davis ("Davis Aff"); Loerance Deaver ("Deaver Aff") ; Michael Evans ("Evans Aff"); Joseph Farrell ("Farrell Aff"); Marian Fuller ("Fuller Aff"); Martha Garber ("Garber Aff"); Diana Koreski ("Koreski Aff"); Allen Kropp

Kropp, Nightingale, and Pacinelli are GS-101-15 Supervisory Vocational Rehabilitation (VR)

Program Specialists, and serve as Regional Commissioners (RCs). Each Commissioner is

responsible for two RSA regions: Kropp manages Regions I (Boston) & II (New York);

Pacinelli, Regions III (Philadelphia) and IV (Atlanta); Cordova, Regions V (Chicago) and VII

(Kansas City); Deaver, Regions VI (Dallas) and VIII (Denver); and Nightingale, Regions IX (San

Francisco) and X (Seattle). Assistant Commissioner Bashin manages the Region IX office in San

Francisco. Bashin Aff ¶ 4 . Former Assistant Commissioner Mitchell was the Assistant

Commissioner in Philadelphia prior to retiring in July 2005. Mitchell Aff ¶1. One Applicant,

Seymour Levy, is a GS-501-13 Fiscal Specialist stationed in Region V; another, Kathleen Niemi,

was a GS-343-01 Management and Program Analyst in the same region. The remaining

applicants - Anderson (in Region I), Beichner (Region III), Davis (Region IV), Evans (Region

VI), Farrell (Region I), Fuller (Region VIII), Garber (Region VI), Koreski (Region X), Linster

(Region V), Miller (Region IX), Nelson (Region I), Rankin-White (Region IV), Rose (Region

IV), Shell (Region V), and Tellier (Region I) - are or were GS-101-11, -12 or -13 Vocational

Rehabilitation Program Specialists.

   All of the Applicants except Brian Miller are 40 years of age or over. See Miller Aff ¶2.

Seventeen of the twenty-four Applicants are disabled within the meaning of the Act: Richard

Anderson (age 54) is disabled on one side of his body due to a traumatic brain injury at nine

months of age. Anderson Aff ¶ 2. This limits his ability to perform manual tasks. Bryan Bashin

(age 50) is totally Blind. Bashin Aff ¶2. Keith Beichner (age 64) is hearing-impaired and has

---

("Kropp Aff"); Seymour Levy ("Levy Aff"); Charles Linster ("Linster Aff"); Brian Miller
("Miller Aff"); Jeffrey Mitchell ("Mitchell Aff"); John Nelson ("Nelson Aff"); Kathleen Niemi
("Niemi Aff"); Noel Nightingale ("Nightingale Aff"); Ralph Pacinelli ("Pacinelli Aff"); Brenda
Sue Rankin-White ("Rankin-White Aff"); Bruce Rose ("Rose Aff"); Janette Shell ("Shell Aff");
and Jacquelyn Tellier ("Tellier Aff").

restricted visual fields in both eyes, a chronic lung condition which restricts his breathing, and a severe form of inflammatory arthritis called Ankylosing Spondylitis which restricts his ability to stand, bend, and kneel. Beichner Aff. ¶ 2. Joe Cordova (age 54) is Blind. Cordova Aff ¶ 2. Mary Davis (age 55 ) is legally Blind. Davis Aff ¶2. Michael Evans (age 64) has a record of being legally Blind, and currently has impaired vision and one functional eye. Evans Aff ¶3. Joseph Farrell (age 65) has Diabetes Mellitus with peripheral neuropathies and cardiac disabilities, which limit the manner in which he can eat and limit his ability to walk and perform physical tasks. Farrell Aff. ¶2. Marian Fuller (age 56) has been living with systemic lupus erythmatosis, a potentially fatal auto-immune disorder, for more than twenty years. Fuller Aff ¶ 2. Martha Garber (age 55) has multiple physical and mental disabilities, including one which limits her ability to perform manual tasks. Garber Aff ¶2. Charles Linster (age 55) has quadriplegia resulting from an accident in 1965. Linster Aff ¶ 2. Brian Miller (age 38) is totally Blind. Miller Aff ¶2. John Nelson (age 53) has quadriplegia resulting from an accident at age 14. Nelson Aff ¶2. Noel Nightingale (age 41) is totally Blind. Nightingale Aff. ¶2. Brenda Sue Rankin-White (age 58) has Post-Polio lower extremity paralysis and uses a manual wheelchair and long-leg bilateral braces. Rankin-White Aff. ¶ 2. Bruce Rose (age 53) has congenital Cerebral Palsy, which substantially limits his ability to speak and perform physical tasks. Rose Aff ¶2. Janette Shell (age 54) is a Type II diabetic and has an anxiety disorder, which limits the major life activities of eating and digestion. Shell Aff. ¶2. Jacquelyn Tellier (age 50) has a disabling spinal condition (scoliosis with compensatory curvature) and occupational asthma, which limits the major life activities of breathing and the duration for which she can sit or stand. Tellier Aff. ¶ 2.

Several of the Applicants (e.g., Bashin, Evans, Linster, Miller, Nelson, Nightingale, and Shell) were Schedule A hires, i.e, they were hired not through the competitive process but as excepted service appointees based on their targeted disabilities.  Bashin Aff.¶3; Evans Aff ¶2; Linster Aff ¶3; Miller Aff ¶3;  Nelson Aff ¶3; Nightingale Aff ¶3; Shell Aff. ¶2.  Except for Miller and Bashin, each of the Schedule A appointees in the Applicant group attained career competitive status after successfully completing two or more years of probationary status.[4]  Evans Aff ¶2; Linster Aff ¶3; Nelson Aff ¶ 3; Nightingale Aff ¶8; Shell Aff ¶3.  Mr. Miller and Mr. Bashin were hired in January 2004 and will be eligible to convert to competitive status on January 26 and 27, 2006, respectively.  Miller Aff ¶ 3; Bashin Aff ¶ 3.

Ms. Koreski, Mr. Linster, Mr. Mitchell, and Ms. Niemi took early retirement effective July 2, 2005, rather than be terminated and lose their health insurance.  Koreski Aff ¶¶9-10; Linster Aff ¶6; Mitchell Aff. ¶ 4; Niemi Aff ¶¶5,7.  Each of the retired Applicants regards his or her retirement as involuntary and a constructive adverse action, and has filed an EEO complaint with the Respondent.  See id.

The other 20 Applicants either are not eligible for early retirement or a buyout, or refused them because the offered terms were economically disadvantageous.  See, e.g., Fuller Aff

---

[4]  See 5 C.F.R. §3.1(b): "Upon recommendation by the employing agency, and subject to such requirements as the Office of personnel Management may prescribe, the following classes of handicapped employees may acquire competitive status without competitive examination: (1) a severely physically handicapped employee who completes at least two years of satisfactory service in a position excepted from the competitive service  . . (3) an employee with a psychiatric disability who completes at least 2 years of satisfactory service in a position excepted from the competitive service."

¶9(5)("I could not afford to accept the $25,000 Buy-out offer because the after-tax amount is less than the compensation I will earn by staying on the job until Sept. 30 when the Regional Office is scheduled to close"). Each non-retiree received a RIF notice on or after July 18, 2005. *See e.g.,* Anderson Aff ¶6; Bashin Aff ¶ 5; Cordova Aff ¶ 5; Davis Aff ¶5; Deaver Aff ¶4; Evans Aff ¶ 5; Farrell Aff ¶ 4; Garber Aff ¶ 3; Kropp Aff ¶ 5; Levy Aff ¶6; Miller Aff ¶ ; Nelson Aff ¶ 6; Nightingale Aff ¶ 5; Pacinelli Aff ¶ 5; Rankin-White Aff ¶ 5; Rose Aff ¶ 5; and Shell Aff ¶7.

## II.    The RSA

The RSA is a program component of the Department of Education's Office of Special Education and Rehabilitation Services (OSERS). OSERS' mission is

> [t]o provide leadership to achieve full integration and participation in society of people with disabilities by ensuring equal opportunity and access to, and excellence in, education, employment and community living.

Ex. 3, "Mission Statement," available at http://www.ed.gov/about/offices/list/osers/mission.html.

OSERS supports education and rehabilitation for both adults and children with rehabilitation. See id. Within OSERS, RSA specializes in providing funds to the States for the vocational rehabilitation of adults with disabilities. See 29 U.S.C. § 702 (2005)(" There is established in the Office of the Secretary a Rehabilitation Services Administration ... Such administration shall be the principal agency . . . of such Department for carrying out [the Rehabilitation] Act"). RSA administers and supports "a comprehensive array of formula and discretionary grant programs and projects that serve and assist individuals with disabilities."[5]

---

[5] "Formula grants" are allocations of money to States or their subdivisions in accordance with a distribution formula prescribed by law or administrative regulation for activities of a continuing nature not confined to a specific project. Available at

-11-

Available at http://www.ed.gov/about/offices/list/osers/rsa/programs.html. RSA administers

several formula grant and discretionary grant programs. The formula grant programs are: (1) the

Assistive Technology State Grant program; (2) Basic Vocational Rehabilitation State Grants; (3)

Client Assistance Program (CAP); (4) Independent Living Services for Older Individuals who are

Blind; (5) Independent Living State Grants; (6) Protection and Advocacy of Individual Rights

(PAIR); and (7) Supported Employment State Grants. Available at

http://www.ed.gov/about/offices/list/oders/rsa/formula.html. Discretionary Grant Programs

administered by RSA are: (A) the Alternative Financing Program; (B) Assistive Technology State

Grant Technical Assistance; (C) Centers for Independent Living (CIL); (D) Demonstration and

Training; (E) Migrant and Seasonal Farmworkers; (F) Recreation Program; and (G)

Rehabilitation Training. Available at

http://www.ed.gov/about/offices/list/osers/rsa/discretionary.html.

     In addition to the above grants, RSA administers other programs that provide services to

people with disabilities, and also provides technical assistance and evaluation to the participants

---

www.ed.gov/about/offices/list/osers/rsa/formula.html. "Discretionary grant programs," by

contrast, are established by Congress through authorizing legislation and appropriations

legislation. Available at http://www.ed.gov/about/offices.list/osers/rsa/discretionary.html.

Based on the authorizing legislation for each discretionary grant program, RSA writes program

regulations which describe how the programs will be administered. Id. After these are published

in final form and funds are appropriated for the program, RSA elicits applicants and awards

grants based on a competitive process. Id. RSA reviews applications in light of the legislative

and regulatory requirements established for a program. Id. RSA has discretion to determine

which applications are most worthy of funding. Id.

therein.  Id.  One such program is implementation of the Randolph-Sheppard Act, under which

Congress created a priority for qualified blind persons, individually licensed by State agencies, to

operate vending facilities on federal property.  See 20 U.S.C. §§ 107 et seq. Randolph-Sheppard

requires RSA to maintain a certain level of staffing to assure efficient administration: Congress

amended the statute in 1974 to direct the Secretary of Health, Education and Welfare to assign "to

the Office for the Blind and Visually Handicapped of the [RSA] ten additional full time personnel

(or their equivalent), five of whom shall be supportive personnel, to carry out duties related to the

Administration of the Randolph Sheppard Act."  P.L. 93-561, 89 Stat. 2-3, § 208 (a) of Randolph

Sheppard Act.[6]

Under the current (pre-reorganization) administrative structure, there is a clear division of

labor between RSA's regional offices (RO) and the central office (CO) at ED headquarters (HQ)

in Washington, D.C.  The CO provides policy guidance and manages certain discrete grant

programs.  As is shown in detail below, the regions are primarily tasked with (1) administration

of several hundred other grant programs, and (2) direct representation to and management of

RSA's relationship with the vocational rehabilitation agencies and other providers of services to

the disabled in the 56 States and U.S. territories.

    A.    Regional Office Roles and Functions

---

[6]  In 1981, the National Federation for the Blind (NFB) and several State agencies filed suit
against the then Department of HEW to compel compliance with the statutory staffing
requirements.  See Bell v. Miller, Civil Action No. 80-3234 (D.D.C.).  In response, on May 19,
1981, the agency's  Deputy Commissioner assigned ten individuals in the ten RSA regions to
"devote a minimum of twenty-five percent of his/her time to carrying out . . . duties related to the
administration of the Randolph-Sheppard Vending Facility Program in his/her Region."  See Ex.
4.  On September 16, 2005, the NFB filed suit in this Court on behalf of blind Randolph-Sheppard
vendors and opposed the reorganization of RSA on grounds that it violates the statutory regional
staffing requirements.

The "functional statement" on the Department's website provides the following explanation of the ROs' distinct functions:

> These offices provide leadership, technical assistance, consultation, monitoring and evaluation services and coordinate RSA and other resources used in providing services to eligible individuals with disabilities through state-federal administered formula grant programs and through grantees receiving discretionary project funds under the Rehabilitation Act and the Randolph Sheppard Act. . . . Regional offices provide information for and contribute to the development of national rehabilitation policies; establish regional program goals, objective and priorities; **exercise approval authority for state plans; [and] possess approval/disapproval authority for selected discretionary grant programs** . . .

Ex. 5, available at http://www.ed.gov/about/offices/list/osers/rsa/ro.html (emphasis added).

The ROs dedicate the great majority of time, resources and efforts to certain primary tasks critical to federal oversight of the VR and other RSA programs. Ex. 6, Regional Office Functional Statement (ROFS)[7] at 1. Those functions include the following.

<u>Function 1</u>: *State Plan Submission, Review, Approval, and Oversight*

The Act authorizes three State/Federal grant in aid service programs: Vocational Rehabilitation under Title I of the Act; Supported Employment under Title VI, Part B of the Act; and Independent Living Services under Title VII, Part B of the Act. Ex. 6 at 2. In order for a State to participate in these programs, an agency designated by the State must agree to administer each in conformity with the purposes, conditions, and relevant requirements set forth in the Act, its implementing regulations, and applicable policies. <u>Id</u>. The formal mechanism by which a

---

[7] In December 2004, the five Regional Commissioners prepared a second, highly detailed functional statement for the regional offices for newly confirmed Assistant Secretary of OSERS John Hager. See Ex. 6. It is important to note that at the time the second Functional Statement was prepared, the Regional Commissioners were not involved in any litigation or EEO complaints, but prepared this document in their official capacities.

-14-

State assures that it will administer the programs in this fashion, and details the methods it will use to implement certain program requirements, is called the "State Plan." Id.  The State Plan serves as the legally binding commitment by a State to expend Federal funds appropriately. Id.; see also 29 U.S.C. § 721.

RSA Regional Commissioners are the delegated Federal officials charged with approving State Plans. Ex. 5; Ex. 6 at 2.  Each Regional Commissioner determines through a comprehensive review process, which often involves negotiations with high-level State officials, (1) whether a plan complies with applicable requirements, (2) the point at which all elements are in place, and (3) whether the plan can be approved (authorizing the release of federal funds).  Ex. 6 at 2.  The annual State Plan approval process serves as the basis and cornerstone for implementation of the VR program in each State and is a critical mechanism for ensuring accountability on the part of State expending Federal funds under the Act.  Id.  Moreover, as questions arise from the State, consumers, or other program stakeholders, the RO must regularly assess the State's conformity to the State plan and advise the State regarding the need for amendments to the plan.  Id.

Function 2:  *Monitoring*

RSA is charged by Congress with an explicit and comprehensive monitoring responsibility for purposes of ensuring accountability for the expenditure of Rehabilitation Act funds by RSA grantees. Ex. 6 at 2; see also 29 U.S.C. §727 (§107 of the Act).  With regard to the VR program, § 107(a) directs the RSA Commissioner to conduct an "annual review and periodic onsite monitoring" of each State VR program to determine whether the State is complying substantially with the provisions of the State plan and with evaluation standards and performance indicators for the VR program. Ex. 6 at 3. The purpose of such reviews is to ensure

-15-

the review of State policies and procedures; guidance materials; due process decisions; goals and progress in reaching those goals; performance reports; consumer satisfaction reviews; information provided by the State Rehabilitation Council; and budget, financial management and other data. Id. Procedurally, the Regional Offices must conduct each review through onsite visits, public hearings, information collection strategies, individual case file reviews, meetings, and other forums. Id. Ultimately, the ROs are responsible for the completion of annual reviews of each State VR program that results in RSA's report of findings related to the State's administration of the VR program, the need for technical assistance in identified areas (to be subsequently provided by the RO), a record of compliance with the Act and Department of Education accountability standards, and a database of information to inform the Congress and others analyzing trends and facilitating improvements to the VR system. Ex.6 at 3.

The scope of the RSA Commissioner's monitoring function (via the Regional Commissioner) regarding the VR program is, by itself, both critical and exceedingly time-consuming. Id. Additionally, the ROs also have responsibility for the monitoring of other RSA grant programs, including Centers for Independent Living (see § 706(c) of the Act), the American Indian VR Services program, and Projects With Industry projects (§ 611(f)(3) of the Act). Each requires a similarly comprehensive assessment of grantee operations and requires extensive planning, on-site review, information assessment, and reporting effort on the part of the RO. Id. Each year ROs typically conduct reviews of 1 – 2 grantees in each of these discretionary program areas. Id.

### Function 3. *Technical Assistance*

Under Section 107(b) of the Act, the RSA Commissioner shall

(1)  Provide technical assistance to programs under this title [29 U.S.C. §§ 720 et seq.] regarding improving the quality of vocational rehabilitation service provided; and

(2)  Provide technical assistance and establish a corrective action plan for a program under this title if the Commissioner finds that the program fails to comply substantially with the provisions of the State plan, or with evaluation standards or performance indicators established under section 106, in order to ensure that such failure is corrected as soon as practicable.

29 U.S.C. §727(b)(1)- (2).  The ROs' technical assistance and consultation function takes a wide variety of forms and is a constant aspect of office operations.  Ex. 6 at 3.  Like monitoring, this function is grounded in § 107(b) of the Act which requires the Commissioner to "provide technical assistance to programs under [title I of the Act] regarding improving the quality of vocational rehabilitation services" and to address the performance of any agency failing VR program performance measures.  Id.

In practice, State VR agency personnel, as well as CILs, discretionary grantees, consumers, and other groups, seek technical assistance from RSA ROs on a daily basis.  Ex. 6 at 3.  Their questions relate to the proper interpretation of VR program requirements, best practices in VR counseling and service delivery, methods for ensuring fiscal accountability, and countless other topics.  Id.  Often, Regional Commissioners or program specialists are asked to meet with multiple parties to address common issues and educate parties as to their attendant obligations, requirements, and ways to resolve differences and partner effectively.  Id.  The ROs' technical assistance role is constant and is targeted to the specific needs of the agency, grantee, organization, or consumer.  Id.

-17-

RSA's pre-service, long-term, and in-service rehabilitation training grants are issued and administered by the ROs. Ex. 6 at 4. As such, the RO training specialists release grant funds, collect and assess grantee progress reports, provide technical assistance on questions or issues related to training, and regularly consult with State VR agency Directors, State training liaisons, and grantee institutions of higher education to ensure that RSA-funded training programs are meeting the needs of prospective and existing rehabilitation personnel. Id.

As an example, for the IL Specialist, the IL specialist in the ROs fulfills a variety of administrative functions related to IL activities at the State agency level and throughout the State's statutorily-required network of Independent Living Centers. Id. The RO reviews the State agency's IL State plan, issues all discretionary grants to IL Centers, conducts on-site monitoring reviews of at least one CIL in the Region each year, conducts training and coordinates forums among independent living professionals, and provides related technical assistance to various stakeholders. Id.

### 4. Other Functional Areas

In conjunction with RSA's Division of Blindness and Visually Impaired, the RO provides technical assistance to State agencies administering the Randolph Sheppard program, the Committees of Blind Vendors in each State, and to related organizations. Ex. 6 at 4. The RO also monitors the progress of the program in each State, prepares periodic assessments, and reports its findings to the State agency and RSA's Central Office. Id. Finally, the office is called upon to intervene in staff negotiations with State Vending Facility programs and related groups when controversial or highly technical issues impede the resolution of problems. Id.

Regional staff must attend a wide range of conferences, meetings, forums, and other events that are held by RSA and its grantee agency partners. Ex. 6 at 5. The Regional Commissioners regularly participate in such sessions, oftentimes by speaking or presenting on the RSA Commissioner's behalf, including national conferences held by RSA (e.g., National Employment Conference, National Fiscal Conference, etc.), the Council of State Administrators of Vocational Rehabilitation (CSAVR), the National Council of State Agencies for the Blind (NCSAB), and the National Council of Rehabilitation Educators Conference (NCRE). Id. The regional offices time are also expected to lead or participate in numerous Regional and State events, including Advisory Committee and other meetings of Regional Continuing Education Programs, Regional Employment and Educators forums (following the related RSA national conference and initiative), and other events focused on certain disability populations or professionals. Id. "All of these outreach activities are viewed as crucial opportunities for the Regional Commissioners or staff to educate stakeholders and build the capacity of RSA grantees and other parties." Id.

B.    Grants and Programs Administered Solely by the ROs

RSA administers 21 different formula and grant discretionary programs, which include 1,417 grants and $2,964,247,592 in FY2005. See Ex. 7, RSA Restructuring Proposal, February 2005 at 1. As noted above, on the formula grant side, the ROs have complete responsibility for approving or disapproving State Plans (the agreements between the State VR agencies and the federal government as to how funds allocated under the Act will be spent). Ex. 6 at 2. The ROs perform this function for 80 State and territorial VR agencies. Ex. 7 at 13. They also prepare several monitoring reports required under the governing statutes for each program area and each State VR agency, including 56 Part I 704 reports and 334 Part II 704

-19-

reports. Id.

Due to limited staff resources in central office, RSA has historically *competed* all discretionary grant competitions in central office, but the ROs *administer* 593 of 852 such programs. Id. at 12. These include 252 training grants; 7 special demonstration grants; and 334 CIL grants. Id. at 13.

C.    RO Workforce Profile

The professional Staff of the ROs include Regional Commissioners and Deputy Commissioners (GS-101-14 and 15s); Vocational Rehabilitation Program Specialists (GS-101-11, -12 and -13s); Financial Management Specialists (GS-501-13); and Grants Management Specialists (GS-343-12). Ex. 6 at 6.

**Regional Commissioners** act at the direction of the RSA Commissioner in leading and supervising each of the wide range of RO tasks described above. Ex. 6 at 6. Regional Commissioners are responsible for administering delegated and assigned functions related to the VR, Client Assistance, Supported Employment Independent Living and discretionary grant programs and are directly responsible to the Commissioner of RSA for providing leadership and oversight of these programs within two Regions. Ex. 6 at 6. In practice, all State Plan review, monitoring development and reporting, technical assistance, grants administration, functional area participation, field and other activities are conducted at the direction and with the oversight of the RC. Id. The RCs are responsible for hands-on management of the daily operations of the two regional offices in their jurisdictions. Id.

The **Vocational Rehabilitation Program Specialist/State Representative** is the key staff position for facilitating accountability and improved performance among State VR agencies. Ex. 6 at 6. Each program specialist serves as the direct liaison for all matters concerning

assigned VR agencies.  Id.  For that reason, the Program Specialist also carries the informal title

of "State agency representative" ideally for 2-3 VR agencies, although several current specialists

are assigned to additional agencies due to staffing limits.  Id.  The Program Specialist/State

Representative assesses the technical accuracy of all State Plans for their assigned State agencies

or functional areas of responsibility (e.g., Independent Living, Randolph Sheppard, CAP, PAIR,

etc.) Id. at 7.  As such, the Program Specialist must negotiate necessary changes to plans and

provide related technical assistance to key State VR agency officials and staff.  ROFS at 7.

Program Specialists also lead RSA's extensive on-site monitoring reviews of the programmatic

and fiscal operations of State VR agencies and other funded rehabilitation programs.  Id.  As

Team leader, the Program Specialist leads review teams; plans the review approach; trains and

orients team members; organizes assignments; and determines the intensity of the review.  Id.

Afterwards, the Program Specialist must negotiate and elicit from key agency officials workable

agreements or acceptable corrective actions where long-standing weaknesses or unique problems

are identified and conduct follow-up reviews to determine if improvements have been

implemented.  Ex. 6 at 7.  Program Specialists also carry out the ROs' technical assistance

function depending on the needs of their assigned agencies.  Id.  Through the stimulation and use

of innovative approaches and best practices, specialists are relied upon extensively by their

assigned state agencies with regard to developing and improving upon performance targets,

service delivery methods, quality of employment outcomes, and consumer satisfaction.  Id.

Program Specialists are also required to research and analyze vast amounts of information,

both to assist individual agencies and the RSA CO in developing national policies, guidelines,

strategic and operational goals and objectives, and monitoring and evaluation methodologies.  Ex.

6 at 7.  Program Specialists also develop and maintain liaisons with established professional and

consumer advocacy groups and respond to requests from such organizations, as well as individual consumers. Id. Finally, each specialist is assigned to a series of the functional specialties listed above (e.g., Transition, Randolph-Sheppard, WIA, Social Security, Independent Living, etc.) which require the specialist to handle that subject matter as it relates to Regional Activities or inquiries and to serve on national workgroups to develop national program policies and guidelines. Id. The specialist is required to keep abreast of legislative and policy developments in these areas and advise agencies on how best to address related aspects of the VR program, whether at the Federal or State level. Id.

**Financial Management Specialists** in the Regions perform fiscal monitoring, information analysis and reporting and provide technical assistance on financial management to State VR agencies and other components of the rehabilitation services delivery system. Ex. 6 at 7. Major areas of responsibility include: financial management and accountability, audit resolution, information analysis and reporting. Id. In effect, the Financial Specialist serves as the principal technical advisor in the RO on all matters pertaining to financial management of RSA-funded programs and projects, including technical requirements of formula and project grants, cost sharing and matching requirements and budget development, accounting systems and procedures, cost allocation, Federal Fiscal reporting requirements and other federal requirement and procedures for grants and contracts. Ex. 6 at 7. The Fiscal Specialist also acts as primary liaison to the ED regional office of the Inspector General for Audit, the Government Accounting office, and other Federal and State audit agencies which review VR agencies and other RSA grantees. Id. at 7-8. They review audit reports, coordinate the development of the RO's responses to audits, and resolve audit findings with the agency or project under review. Id.

**Grants Management Specialists (or "Management and Program Analysts")** perform analysis and advisory assignments relating to the effectiveness of RSA programs, particularly RSA training and Independent Living programs, whose administration has been delegated to the ROs. Ex. 6 at 8. Grants management specialists also execute release of grant funds, conduct detailed analyses of grantee reports and expenditures, investigate administrative or technical issues both internally (within the Department) and externally (within grantee operations), and make recommendations for improvements. Id. In their capacity as experts on the Departments' grant processes and electronic system, Grants management specialists counsel and advise program managers on procedures, surveys, reports, and control techniques related to fiscal accountability. Id. These specialists also typically oversee RO budgets and expenditures and ensure proper reporting and use of allocated funds needed to perform RO functions. Id. A comparison of the staffing patterns of the ROs and the CO illustrates the different staffing requirements of the differing functions performed in each competitive area. Of the 66 FTEs in the ROs in January 2005, 59% were GS-101s, 17% were GS-501s and 11% are GS-343. Ex. 8, Regional Staffing Roster, January 2005. By contrast, in April 2005, of 70 FTEs in the Central Office, 23% were GS-101s, 24% are GS-343 and 3% are GS-501 3%. See Ex. 9, OSERS-RSA Reorganization Plan delivered to the Union, May 12, 2005 ("May 2005 Plan") at Tab D.

The workforces of the regional and central office competitive areas are further distinguishable in that, though they appear to utilize employees in the same Occupational series (e.g., GS-101, -501 and -343) with the RO, the position descriptions (PDs) for RO employees specify that their positions are located the regional offices, and identify distinctly regional duties. For example, the PD for a RO GS-13 VR Program Specialist actually carries the title "*Regional VR Program Specialist*" and states that the incumbent

-23-

> serves as a Regional Vocational Rehabilitation (VR) Program specialist with geographic and functional assignments and, in this role, is the primary regional representative of RSA to the assigned areas of responsibility. Geographic assignments involve two or more state agencies.

See Ex. 10 and 11, PDs for Regional GS-101-12 and –13. Similarly, the PD for GS-501-13

Financial Management Specialists stationed in the ROs specifies its location and states that

the incumbent

> serves as senior Financial Management Specialist, with geographic and functional assignments and, in this role, is the primary external representative of RSA in the assigned areas of responsibility. Geographic assignments involve the financial management operations of all formula grants in the region (or paired regions).

Ex. 12. The "Major Duties" of the fiscal position include serving as the regional expert in all

matters pertaining to financial management of RSA-funded programs and projects; assuming

leadership in monitoring the financial management performance of State VR agencies and other

grantees, and providing technical assistance to these agencies. Id.

Applicants do not have access to CO PDs but presumably these do not specify that the

incumbents have state representative duties because these are strictly RO functions.

Case Study: Current CO/RO Functions Associated with the Randolph-Sheppard Act

In the Regions, the Randolph-Sheppard-assigned Specialists monitor 51 programs;

conduct periodic on-site reviews; coordinate annual State Licensing Agency and blind vendor

training (regional and bi-regional); review 51 RSA-15 reports; provide technical assistance to

blind vendors, 51 elected committees, 51 state licensing agencies; and multiple grantor agencies;

and consult with federal property managers. Ex. 7 at 18. By contrast, the CO Randolph

Sheppard Specialist recommends policy changes; collects and analyzes national program data;

prepares reports; responds to written, electronic and telephone inquiries; drafts policy

interpretations; review and approves state rules and regulations; provides technical assistance to

-24-

SLAs and federal property managers; provides information to consumers; liaises with federal

grantor agencies; coordinates with other programs providing food services and/or concessions on

federal property; participates in interdisciplinary teams to address issues that impact multiple ED

programs; participate in and occasionally coordinate national meetings; conduct training and

presentations to blind vendors, state agency staff and other federal employees.  Id. at 19.  The

February Proposal notes that

> If the Regional Randolph Sheppard specialists were no longer available it would be
> necessary to add personnel in the central office to maintain an acceptable level of service.
> Increased workload at CO without an increase in staffing would result in reduced
> accessibility to the multiple entities the program serves including federal partners. Many
> problems, including costly arbitrations, are currently avoided by the ability of the program
> specialists in the regions, and the central office to provide mediation and respond to
> inquiries and problem promptly.  All of the regional specialists are classified as VR
> program specialists and have broad professional experience.

Id.

D.     RO Performance

A 1996 Government Accounting Office report, "Education and Labor: Information on the

Departments' Field Offices," quoted ED officials as stating that

> an OSERS regional presence encourages interactions with states and providers of services
> and provides unique insights into the issues involved in the rehabilitation of people with
> disabilities.  It enables federal-state interactions closer to the point of service delivery
> where the unique circumstances ad considerations of each state and grantee are best
> understood.  Regional office staff  have more frequent and extended contacts with state
> agency staff and other grantees, resulting in long-term, customer-oriented relationships
> and trust.

Ex. 13, GAO/HEHS-96-178 at 66-67.

Similarly, the May 1998 "External Assessment Final Report" conducted by

OSERS concluded

•  "Technical assistance provided through the  Regional Offices is very responsive to

specific state needs.  However, RSA headquarters gets in the way of timely Regional

-25-

Office response as regions are required to clear information and responses through Washington."

- "Communication between RSA and the states is good, primarily because of the RSA regional office structure. Regional offices are more responsive to state inquiries and requests for information than RSA headquarters. However, a decision or guidance is not considered official unless it comes from Washington."

- "RSA Regional offices are [Human Resources] assets. Regional Staffs give timely, effective technical assistance and constructive monitoring. Most regional office staffs possess a solid knowledge of federal requirements and state issues."

Ex. 14, AFGE Letter to Senator Richard Durbin at 3(March 30, 2005)(citing May 1998 OSERS External Review).

## III.    THE AGENCY'S RECORD OF DISABILITY DISCRIMINATION

Because of RSA's mission to implement the Rehabilitation Act, its leadership team has traditionally been very conscious of the Act's Congressional mandate to federal employers to take affirmative action to hire people with disabilities.    The three most recent RSA Commissioners were Blind, and a relatively high percentage of RSA's current employees - 33% - are "qualified disabled persons" within the meaning of the Act. See Affidavit of Joanne M.Wilson (Wilson Aff.) ¶ 7 (Included in Appendix of Affidavits). The concentration of disabled employees is much higher in the regional offices (43%) than in central office (25%).    See Ex.15, Agency Response to Union Information Request.

Despite its explicit mission to provide services to people with disabilities through RSA and its other components, OSERS has frequently manifested a distressing hostility toward its own disabled employees.  Based on the testimony of former RSA Commissioner Wilson, at least one

root cause of this problem is Dr. Andrew Pepin, Executive Administrator in the Office of the

Assistant Secretary for OSERS.  Wilson Aff. ¶ 5.   In his capacity as Executive Administrator, Dr.

Pepin is

> The principal assistant to the Assistant Secretary with responsibility for coordination and direction of program operations of the office, supervision of the five staff offices and oversight of cross-cutting program activities.

Available at http://www.ed.gov/about/offices/list/osers/ea.html.   As the official description

makes clear, Dr. Pepin is in charge of the daily operations of OSERS and its program

components, including RSA.  As a career employee, he has provided institutional continuity as

chief of staff for several Assistant Secretaries, going back at least as far the Honorable Judith

Heumann, who headed OSERS during the first and second Clinton Administrations.   Wilson Aff

¶7.  Ms. Heumann, herself a significantly disabled person, put in place many initiatives within

the Education Department and other federal agencies to encourage the hiring of disabled people,

consistent with the directive in the Rehabilitation Act that the federal government serve as a

"model employer" of the disabled.[8]  Id.

---

[8]   29 U.S.C. § 791(b) requires "each department, agency and instrumentality" in the Executive

branch of the Federal government, within 180 days of the enactment of the Rehabilitation Act in

September 1973, to "submit to the EEOC an affirmative action program plan for the hiring,

placement, and advancement of individuals with disabilities . . . Such plan shall be updated

annually, and shall be reviewed annually and approved by the Commission, if the Commission

determines . . . that such plan provides sufficient assurances, procedures and commitments to

provide adequate hiring, placement and advancement opportunities for individuals with

disabilities."  See also 29 C.F.R. §1614.203(b): "The federal government shall become a model

employer of individuals with handicaps."

Dr. Pepin has a list of the initiatives spearheaded by former Assistant Secretary Heumann, and told Dr. Wilson more than once that, following the departure of Assistant Secretary Heumann, he now has an opportunity to "straighten out," i.e., eliminate, these policies one by one. Id. Dr. Pepin openly opposes hiring disabled people and openly opposed the Commissioner's hiring of people with disabilities to staff the ROs, especially Blind applicants. On numerous occasions, Dr. Pepin told Dr. Wilson in front of witnesses that there were "too many blind people" on staff at RSA. Id. ¶8. He has opposed hiring people with disabilities, especially Blind people, and prepared charts to demonstrate this "problem" to the Commissioner, who is herself Blind. Id. ¶¶ 8, 3.

Dr. Pepin's dislike of people with disabilities is evidenced by his stated conviction that they "have it much too easy and get breaks" unavailable to non-disabled federal employees. Id. ¶6. He and his subordinates in OSERS have a marked tendency to resist hiring readers, sign language interpreters, and other assistive employees as accommodations for disabled employees, due perhaps to the aforementioned belief, but also due to a stated reluctance to allow these assistive employees to enter federal service through non-traditional routes, as if this were somehow illegitimate. Wilson Aff ¶10. OSERS routinely characterizes the hiring of disabled employees as a zero-sum game wherein every disabled person is a detriment to the agency's mission (to assist people with disabilities to become skilled and economically self-sufficient). During the 1990s, former Assistant Secretary Heumann fought for and brought about a change to this policy, which violated both the spirit and the language of the Rehabilitation Act. See Wilson Aff. ¶ 7. Under the Heumann policy, salaries for assistive employees were paid out of a pool of funds administered by the Department's Office of Management instead of the individual programs.

-28-

As is discussed in greater detail below, when OSERS announced the plan to close the regional offices and require regional employees to compete for the few vacancies that would be created at the CO as a result, it also informed the RSA regional employees that the Department has now reverted to a policy requiring each ED program to pay the salaries of any assistive employees required as accommodations by their disabled employees.  See e.g., Miller Aff ¶ 15. This backsliding represents a resurgence of Dr. Pepin's view that disabled employees are an economic liability to OSERS.

As another example of Dr. Pepin's animus toward people with disabilities, Dr. Wilson recounts that, after September 11, 2001:

> There was a lot of talk about how to evacuate people from the Department's building in the event of an emergency, and the question arose of how to make sure that people in wheelchairs exited quickly and safely in the vent of elevator shutdowns or other contingencies.  The immediate reaction of Mr. Pepin and the other panel members was to decide this issue without consulting anyone who is actually wheelchair-bound and who would know anything about this issue.  When I and others in RSA and OSERS pointed out that the people who were the subject of the proposed policy should be consulted at least for informational purposes, the reaction from OSERS management, i.e., Mr. Pepin, was to reject the input of people with disabilities and to allow the policy development process to grind to a halt rather than concede that anyone in a wheelchair might have anything valuable to contribute to a policy for people in wheelchairs.  We went for years without a workable emergency evacuation policy because of this unwillingness to let disabled people into the room [to] be part of the discussion about issues concerning them, and I would be surprised of any such policy was ever issued.

Wilson Aff ¶ 11.

Dr. Pepin's well-known prejudices, coupled with his *de facto* position at the head of OSERS, have created a poisonous environment within OSERS for Blind employees and job applicants, to the point that OSERS Director of Management and Support Services Paul O'Connell told Dr. Wilson that RSA job applicants would have trouble getting past OSERS' screening if their resumes showed that they were either Blind or members of the National

Federation for the Blind.  Wilson Aff ¶ 9. Mid-level OSERS staff feel comfortable telling their

blind colleagues that most RSA staff in the CO do not believe that Blind people can handle the

technical work of a State VR representative, and that the Blind would be better employed in "non-

technical" occupations like public relations or communications. Bashin Aff ¶10.  Perhaps most

disturbing of all, an OSERS staff person told a Blind colleague in 2004 that there was already a

"backlash" in OSERS against the Blind Commissioner for hiring so many Blind people, and

confidently predicted that

> it would probably result in the punitive collapse of the existing structure and a transfer of
> VR operations to the Department of Labor.

Bashin Aff ¶11.

Specific examples of disability discrimination against the Applicants include:

A.    Illegal Inquiries about Accommodations

In August 2004 the agency made an illegal inquiry regarding Janette Shell's need for

reasonable accommodations, in direct violation of her right to medical privacy.  Shell Aff. ¶ 12;

see also 29 C.F.R. §1630.13 ("Except [as required by business necessity], it is unlawful for a

covered entity to require a medical examination of an employee o to make inquiries as to whether

an employee is an individual with a disability or as to the nature or severity of such disability").

An OSERS staff member called Ms. Shell one day in August 2004 to ask what her disability was.

Id.  When she inquired why OSERS was asking, the staffer replied that OSERS did not have a

record of her disability, only that she had been hired under Schedule A.  Id.  When Ms. Shell

asked again why OSERS needed information about her medical condition, the OSERS employee

explained that OSERS was trying to project the costs of employee accommodations for the next

fiscal year's (FY2005) budget.  Id.  Ms. Shell, who is diabetic, has never requested any kind of

accommodation for her condition. Id. OSERS' inquiry was gratuitous, invasive and harassing, and not justified by business necessity. See 29 C.F.R. §1630.14.

### B.    Opposition to Hiring Blind Persons

OSERS has established a invidious pattern of delaying or short-circuiting the hiring process for Blind applicants for Schedule A appointments, sometimes with a lag of almost a year between interviews and job offers or rejection notices. Nightingale Aff ¶ 6, 7. The agency has made illegal inquiries in at least three hiring situations which involved Blind selectees. In one case, the agency refused to hire a Blind selectee, instead cancelling the vacancy. Cordova Aff ¶ 8. Regional Commissioner Cordova recalls:

> When I submitted Shirley Wright's name (a blind applicant) as the individual I selected to fill a VR Program Specialist position in the Kansas City regional office, the OSERS personnel specialist called me to inquire what Ms. Wright's disability was. Soon after I submitted Ms. Wright's name as my recommended selection for this position, I was informed by OSERS leadership that I could no longer fill this position.

Id. In two other cases, Blind selectees were eventually approved by OSERS, but only (1) after months of delay and (2) due to the direct intervention of the former Commissioner herself. Nightingale Aff ¶7. One such hire was Applicant Brian Miller, who is a Schedule A excepted service employee. Miller Aff ¶ 3. RC Nightingale's account of trying to hire Mr. Miller is similar to that of RC Cordova in the Wright case:

> [A]fter I submitted Brian Miller's name as the individual I selected to fill a VR program Specialist position in San Francisco, and before his selection was approved by OSERS, the OSERS personnel specialist called me to inquire what Brian's disability was. When I asked her why she was inquiring, she indicated that OSERS leadership wanted to know. I believe that my selection of Brian Miller would have been rejected by OSERS if the RSA Commissioner herself had not at that time been adamant with OSERS and strenuously rejecting the notions that she was hiring too many blind people and that she should discriminate against the Blind.

Nightingale Aff ¶7. The other delayed hire was Bryan Bashin, also in San Francisco, who applied

twice for a position with RSA and was approved by OSERS only after he "de-emphasized" his "connection with blindness" in his resume. Bashin Aff ¶¶ 7,8. Mr. Bashin received an interview after his first application in 2002, but never heard back from the agency. Id., ¶7. He re-applied in 2003 with an edited – though still accurate - resume. Id. It took eleven months for him to eventually hear back, this time that he was hired. Id. Mr. Bashin reports, "Much later I learned that the RSA Commissioner herself had to take the matter of comparatively slow hiring of blind employees to top [OSERS] leadership in order to move the stalled hiring of several blind individuals forward." Id.

OSERS management, i.e., Dr. Pepin, also strongly disfavors employing persons who are openly affiliated with the National Federation for the Blind (NFB), a large and active advocacy organization which serves a constituency to whom a sizeable amount of RSA-administered grants and services are dedicated. Wilson Aff ¶ 9; Nightingale Aff ¶ 6, 7; Cordova Aff ¶¶6, 7 ; Bashin Aff ¶¶ 8-9. Mr. Bashin attended the NFB convention in 2003 and attended a plenary session where he heard a speech by then-Assistant Secretary of OSERS Robert Pasternack which was

> rude and . . . hostile to members of the organized blind . . . the remarks uttered by Pasternack and the tone that afternoon startled me and left me with the distinct impression that the OSERS chief was actively hostile to the nations largest group of disabled consumers, the NFB. It left me with the feeling that my blindness and my membership in NFB might be something which could injure my career success.

Bashin Aff ¶9. Importantly, it was only after Mr. Bashin removed references to the NFB from his resume that he was hired. Bashin Aff ¶8. Similarly, Noel Nightingale chose not to disclose her membership and office in the Washington State chapter of the NFB until her selection as commissioner for Regions IX and X was approved; then, as required by ethics rules, she disclosed these relationships and resigned from her NFB office. Nightingale Aff ¶ 6.

RC Cordova, who served as president of the New Mexico chapter of the NFB for several years, applied for the position of Deputy to the RSA Commissioner when it became available in 2002. Cordova Aff ¶¶ 9.   The selection process was controlled by OSERS officials. Id. Mr. Cordova, the only Blind applicant for the position, has several years of experience as a manager and in the VR field, and served as the director of the RSA Division for the Blind in CO for several years prior to becoming the RC for Regions V and VII. Id. ¶ 9, 11.   Despite this, he did not make the Best Qualified list and was not interviewed. Id. ¶9.   The person eventually selected to act as Dr. Wilson's deputy was Troy Justesen, whose managerial and VR credentials are observably inferior to those of Mr. Cordova.

C.    Opposition to Accommodating Blind Employees

In addition to (a) dragging its feet in hiring or (b) rejecting several highly qualified Blind job applicants because they are Blind, OSERS has delayed hiring readers as accommodations for blind employees. Miller Aff. ¶7. In Mr. Miller's case, it took five months for the agency to provide a full-time reader after he was hired. Id. Furthermore, though there are two Blind employees in the San Francisco office, OSERS refused to hire more than one reader, with the result that Mr. Miller and Mr. Bashin must share the services of one reader in performing their distinct duties in and out of the office. Miller Aff ¶7; Bashin Aff ¶ 10.

As a final example of OSERS' contempt for the needs of its Blind employees, the agency has refused to allow readers hired to assist blind employees in the ROs to travel with them. Bashin Aff. ¶ 11; Miller Aff ¶ 7. This policy means that individual disabled employees, who by virtue of their regional monitoring duties are constantly traveling to perform on-site reviews and confer with state clients, must hire their own readers while on the road. Bashin Aff ¶11. In order

-33-

for the readers to be paid by the government, each must go through the laborious process of becoming an individual federal contractor prior to rendering services. Id. Far from helping to make this laborious process easier for their colleagues, OSERS staff at CO did nothing to help and much to obstruct the efforts of the RSA employees and the contract readers to move the contract-approval process along, and often have delayed or refused to pay readers after the fact. Id. Mr. Bashin became so frustrated by the process that he eventually sought and obtained approval to pay readers out of his own pocket and then seek reimbursement after the fact. Id. OSERS' deliberate imposition of barriers to its own employees' need for such basic accommodations shows the depth of its hostility toward its blind employees and their needs. Id.

D.    New ED Policy of Counting Readers and Other Assistive Employees as FTEs

OSERS officials have announced that a new ED policy for FY 2006 will require program offices to include readers for blind employees, sign language interpreters for deaf and hard-of-hearing employees, and personal assistants for physically disabled employees as FTEs against their total allowed headcount, and to pay their salaries. Miller Aff ¶15; Bashin Aff ¶ 17; Nightingale Aff ¶12. Previously, employees hired as accommodations for disabled employees were paid out of a pool attributable to the ED Office of Management. Wilson Aff ¶ 14. The new policy is a powerful disincentive for ED program offices to hire any further disabled persons, because those who may require a person to be hired as an accommodation will harmfully impact the program's bottom line and FTE ceiling during a time of staff reductions, and because by law the selecting official cannot inquire about the need for accommodations prior to making a job offer. Id. This is particularly disadvantageous for the RO employees,

-34-

many of whom do need the accommodation of assistive readers and are being forced – albeit improperly – to compete with their non-disabled colleagues and with any other Departmental employee who chooses to apply for the few vacancies that will be available at RSA's CO after the reorganization.

      E.    <u>Requiring Competitive Service Employees with Disabilities to<br>Re-apply under Schedule A</u>

In a May 27, 2005 email from Assistant Secretary Hager, OSERS instructed RSA regional office employees with disabilities to apply for vacancies through the EdHIRES website, and specified that the names of those who qualified for the available positions will be referred to the selecting official on a non-competitive Schedule A "certificate of eligibles." Ex. 16, Hager email of May 27, 2005.  This directive has the effect of channeling all disabled employees toward a special certificate, regardless whether they are or were ever Schedule A hires.  This policy imposes discrete requirements on disabled job applicants and is therefore discriminatory. Furthermore, in light of the new ED policy on counting "accommodation" positions against program office FTEs discussed above, this relegation of all disabled employee-applicants to Schedule A for positions at HQ will clearly remove any incentive on the part of program office selecting officials to hire this class of employees.

## IV.    THE REORGANIZATION AND REDUCTION IN FORCE

Commissioner Wilson was not consulted about or even informed of the plan to close RSA's regional offices and to slash RSA's work force by half until it was leaked in January 2005. Commissioner Wilson resigned on February 7, 2005, effective March 1, 2005, because, in her words,

> I could not support the plans of the Department of Education and the Office of
> Special Education and Rehabilitative Services to close the RSA's Regional

Offices. *The plan was hatched without consulting me or requesting input from my staff...*

Wilson Aff ¶4 (italics added).

### A.    OSERS Management's Representations about the Reorganization

1.    <u>Semantic Contortions to Avoid Using the Word "Transfer."</u>

In November 2004, John Hager was confirmed as ED Assistant Secretary for OSERS. The Applicants learned through a leak on January 27, 2005 that the agency was planning a reorganization that would result in the closure of all of the Regional Offices, and a "consolidation" in agency headquarters of the work performed therein. Shell Aff ¶ 10. In an agency wide teleconference on February 3, 2005, Hager told the assembled RSA CO and RO employees that

> The consolidation of the regional offices has nothing to do with personalities, has nothing to do with the past. It is not throwing any criticism into the work of the regional offices and the importance of the functions that take place there. What it is (sic) a straight business decision that there is a way to save some significant overhead and to **consolidate** the functions of the work here with similar functions that is (sic) being performed.

RSA All-Hands Video Teleconference, February 3, 2005 (broadcast to all regions)(emphasis added). Later in the same meeting, Hager said,

> I don't think we have all the details but the idea of consolidating each of the functions of the work that goes on the regional offices. And I recognize there are multiple functions. All will come together with the parallel functions that are already taking place here in the home office. And through the advances in technology. And you know and I know that technology is changed tremendously in the last five years, the last ten years. You know, when I went to college, I used the slide rule. And most people now the young generation don't know what a slide rule is. So this thing about the giant leaps in technology that have taken place in our lifetime.

<u>Id</u>. On March 8, Hager sent an email to all RSA employees which announced the formation of three committees "to facilitate the steps and processes needed to consolidate the functions and

-36-

work of the RSA offices into RSA headquarters." Ex. 17, Hager email of March 8, 2005. He wrote:

> The Workplace committee, *chaired by Andy Pepin*, is performing an analysis of work in the regions and headquarters to determine how regional office functions can best be consolidated into headquarters and how the RSA headquarters staff will be reorganized and re-energized to accomplish these functions.
>
> The Personnel committee, chaired by Paul O'Connell, is focusing on the personnel and other administrative matters required by the consolidation, including various approached to support the employees such as providing "buyout" and "early out" incentives.

Id. (italics added). Dr. Pepin also sits on the Steering Committee, whose purpose includes

> monitoring the progress of the overall project and providing support, guidance and assistance. . . the Steering Committee will serve to help guide the effort and reassure those most affected that the process is inclusive, objective and professional.

Id.

On March 8, 2005, Troy Justesen, who was appointed to act as Commissioner after Dr. Wilson's departure, ran another all-staff teleconference. He noted that the RCs had sent him an email asking for clarification on the steps for the regional offices to take between then and "when we **relocate** all functions here to Central office." RSA All-Hands Video Teleconference, March 8, 2005 (broadcast to all regions)(emphasis added).

In a March 17 teleconference, Paul O'Connell was asked whether any staff out in the regions were going to be pulled in or offered jobs in headquarters. O'Connell replied, "The best way to think about it is whether the Department will have vacancies and encouraging all people in the Regional offices to apply for vacancies." RSA Video Teleconference, March 17, 2005 (broadcast to all regions). Dr. O'Connell was asked whether from a personnel standpoint the closure of the ROs and movement of the work to CO was not a transfer of function. Id. He replied that this is actually classified as a "consolidation of functions." Id. When it was noted that in a transfer of functions, the agency must transfer the personnel who want to move with the

jobs. Dr. O'Connell said, "I don't think we need to get into the semantics."

A Fact Sheet entitled "A 21st Century Rehabilitation Services Administration (RSA)"

posted on the OSERS and RSA website says it best: RSA will be "moving the work of the ROs

into RSA's HQ in Washington, D.C." Ex. 18, Available at

http://www.ed.gov/about/offices/list/osers/rsa/rsa_consolidation_fact_sheet.pdf. The Fact Sheet

emphasizes that

> *RSA will continue to provide the same important programs and services to individual with disabilities across the nation.* The new structure of RSA will strengthen programs without compromising services for individual with disabilities by ensuring [b]etter [s]ervices for Individuals with Disabilities.
>
> Modernizing RSA will mean individuals with disabilities *will continue to receive the same services* from the states, but now more effectively . . . *Moving the work of regional RSA offices into HQ* will mean that operations are not being duplicated. Eliminating the duplication of tasks will strengthen and streamline monitoring, technical assistance, fiscal management, and program implementation.

Id. (italics added). It concludes: "The *consolidation of the regional and HQ functions* will result

in savings without compromising the services provide to the states, which serve individuals with

disabilities." Id. (italics added).

        2.   Terms of the Buyout

In mid-May 2005, the agency finally produced a written plan for the reorganization for

review by the Union. See Ex. 9 at 1-2 May 12, 2005 Letter to AFGE Council 252 President

Jennifer Harris-Reid. The letter to Ms. Harris-Reid admitted that

> [e]limination of the regional offices may result in adverse impact on unit employees (i.e., involuntary separation, transfers or reassignments). However, OSERs is seeking OPM approval to offer voluntary separation incentive program (VSIP) and voluntary early retirement authority (VERA) to affected employees who are eligible. At this time we are unable to predict whether any such actions will be necessary and, if so, how many non-temporary employees might be affected.

Id. at 2.

-38-

On May 20, Paul O'Connell sent an email to all RSA employees which included as an attachment the official buyout package. Ex.19, O'Connell Email of May 20, 2005. The window for accepting the incentives extended from May 23 to June 15, 2005. Id. The attached memorandum by the director of the Department's Human Resources services division specified that the buyout payments of $25,000 offered to eligible employees would be taxable. Ex. 20, Trietsch Memorandum at 1. To be eligible for a buyout, employees had to separate from federal service by July 2, 2005, and either voluntarily retire, take an early out or resign. Id. Additional requirements included:

(a) To voluntarily retire, an employee must meet the requirements for same under the Service Retirement System (CSRS) or the Federal Employees Retirement System (FERS);

(b) To take an early out, employees must have completed at least 20 years of creditable service and be fifty years old, or have completed twenty five years of creditable service regardless of age; have been continuously employed by ED since February 28, 2005; and not be approved for disability retirement.

(c) To resign, do so no later than July 2, 2005, and not be approved for disability retirement and not be a re-employed annuitant.

Ex. 20 at 2. Employees who accepted the buyout may not accept employment with the federal government nor enter into a personal services contract with the government for a period of five years after the date of separation unless the employee repays to ED the gross amount of the buyout. Id at 5. For employees who retire and accept a VSIP, OPM waived the requirement that the last five years of service have been covered under the Federal Employees Health Benefits in order to continue such coverage. Id. at 6. Employees who resign are entitled to continue health

insurance under Temporary continuation of coverage for up to 18 months - at their own expense. Id. at 6.

3.    The New Structure

On May 27, 2005, Hager sent out another email which included as attachments an Executive Summary and a functional statement for the proposed reorganization of RSA. See Ex. 21, Executive Summary and 22, Functional Statement. These documents indicate that after the proposed reorganization takes place, RSA will consist of 81 employees (down from 146) and two divisions: the State Monitoring and Program Improvement Division and the Training and Service Programs Division.

a.    State Monitoring and Program Improvement Division (SMPID)

SMPID will carry out "major activities" related to the following programs:

(a)  Basic Vocational Rehabilitation (VR) state grants
(b) Supported employment state grants
(c) Independent Living state grants

(d) Centers for Independent Living discretionary program
(e) Independent Living Services for Older Individuals who are Blind
(f) Client assistance program (CAP)
(g) Protection and Advocacy of Individual Rights (PAIR)
(h) Protection and Advocacy for Assistive Technology Program (PAAT)
(i) Program Improvement
(j) Evaluation

Ex. 22 at 2. The Functional Statement indicates that SMPID is organized around "Functional Units" and "State Teams," and that each person in the division participates in both kinds of group. Id. at 3. There are five functional units reflecting the following areas of focus:

(1) data collection and analysis
(2) fiscal
(3) VR program
(4) Independent Living (IL)
(5) Technical Assistance (TA)

-40-

Ex. 22 at 6-7 ("Attachment A")(specifying the functions that will be performed by the above functional units). Id. at 3. The State teams will be made up of one or more persons from each of the five functional units. Id. A State team will be assigned to every state and is responsible for all of the SMPID's formula and Center for Independent Living Discretionary program grantees that operate in that state. Id.

Under the plan, a designated State team member (the State Liaison) will chair the work of the State Team relative to a given State. Id. Each person in the division is assigned responsibility as the State Liaison for one or more States. Ex. 22 at 3. The state liaison leads and organizes the activities of the State Team. Id. The state liaison is the single point of contact with the state agencies, but will bring in expertise from other functional units and Department personnel as needed. Id.

According the agency, the State Teams Coordinator works with all the State teams to assist them in carrying out all of their activities "in a timely and effective manner." Id. The Teams will work collaboratively with VR consumers, disability advocates, community partners, state agencies, state rehabilitation councils, Consumer Control Commission Boards, and other interested parties. Id. The State teams will carry out the following activities:

(1)     implement a continuous process of performance-based program and fiscal monitoring to identify areas of improvement as well as areas of noncompliance that require corrective action by the grantee;

(2)     develop and issue annual reports, carry out periodic on-site reviews and other monitoring activities required by statute;

(3)     provide technical assistance to all grantees to assist them to make the improvements and take corrective actions identified in the monitoring process;

(4)     review and approve VR and IL state plans including preparing state plan

-41-

approval letters and providing appropriate technical assistance to states to ensure consistency with federal requirements and a timely release of federal funds;

(5)     provide policy guidance to grantees;

(6)     review and approve CAP, PAIR and PAAT state assurances; and

(7)     carry out audit resolution activities including single audits, inspector general audits, grantbacks and primary and collateral determinations.

Id.

b.     Training and Service Programs Division (TSPD)

The second division in RSA's new organizational structure is the TSPD, which

Administers the following programs and comprises the Training Programs Unit and the Service

Programs Unit. Ex. 22 at 4. The two units are responsible for programs as follows:

**Training Programs Unit**
Rehabilitation Training
Demonstration and Training

**Service Programs Unit**
Migrant and Seasonal Farm Workers
Projects With Industry
American Indian Vocational Rehabilitation Services
Recreation Program
Helen Keller National Center
Randolph-Sheppard Vending Facilities Program
Alternative Financing Program/Telework
AT National Activities Technical Assistance Program
AT State Grant Program

Id. The TSPD Units will carry out the following activities:

- Monitor grants, including required on-site reviews of grants under the Projects With Industry program, and provide technical assistance;

- Conduct discretionary grant competitions and make grant awards;

- Review and analyze data;

-42-

- Prepare reports, including the annual summary of the vendors and vending facilities;

- Work with grantees to develop program performance measures, which are used to evaluate and monitor grantees;

- Review and approve AT State Plans and State Agency Licensing Agreements; and

- Coordinate arbitrations for the Randolph-Sheppard program.

Id. In short, the two new divisions will distribute the functions performed in the ROs differently, but the same functions will be performed. And, as noted above, management has confirmed that no services will be cut and all the same programs will continue to be administered. Ex. 18.

4.    Staffing the Reorganized RSA

OSERS officials have repeatedly assured both the agency employees and concerned constituents, as well as Congressional oversight committees, that there are no plans to eliminate any of RSA's current programs. They insist that the reorganization should not affect the delivery of services, all of which will continue without interruption in FY2006 out of the CO. Agency management said throughout Spring 2005 that they wished to avoid a RIF. However, for months management could not – or would not - state with any specificity, how many positions would be available at the CO after the reorganization.

In the February 3, 2005 teleconference, Paul O'Connell of OSERS indicated that the Department had applied to OPM for permission to offer buyouts and was considering running a RIF. RSA All-Hands teleconference, February 3, 2005 (broadcast to all regions). Assistant Secretary Hager was asked whether anyone could explain why the Department, in seeking cost savings, decided to seek all of them at the expense of the RSA regional offices and employees. Id. Union representative Jerry Doyle followed up on this question, noting:

> With all due respect, I think the impression that is left with RSA folks in the region is that, it may not be all on their backs, and you may have information that gives you that

indication, but it does come across to RSA employees in the regions that there is a disproportionate impact on them per se.

Id. Mr. Hager replied, "That's probably a fair statement. I agree with it." Id.

In a teleconference on March 1, the date the Commissioner's resignation took effect, RO employees again asked OSERS management for more details about the reorganization. RSA All-Hands Video-teleconference, March 1, 2005 (broadcast to all regions). Assistant Secretary Hager told RSA employees that OSERS wanted to be "particularly sensitive to doing what we can to retain these talented people. Perhaps we can work it out such that you have opportunities in other arms of the Department in the field." Id.

In a March 17 teleconference, Paul O'Connell was asked whether any staff out in the regions were going to be offered jobs in headquarters. RSA All-Hands Video Teleconference, March 17, 2005 (broadcast to all regions). O'Connell replied, "The best way to think about it is whether the Department will have vacancies and encouraging all people in the Regional offices to apply for vacancies." Id. Dr. O'Connell also stated that buyout authority is limited to the RSA CO and ROs, a policy which would ensure that RSA bore the full burden of the Department's alleged need to reduce headcount. Id.

Because the regional offices barely managed to get their work done with 65 flexible and expert employees, management's repeated assertions that there would be no program cuts gave the regional employees hope that a significant number of them would be transferred to headquarters or that if, as Paul O'Connell insisted, they would have to apply competitively (in violation of their right to transfer with their functions), at least there would be a reasonable number of vacancies in the CO. Barring these options, the employees hoped to be able to transfer non-competitively to fill existing vacancies within other ED programs in the Department's regional offices, which have not only remained open but have continued to hire. In

-44-

previous staff reductions, even where positions have been eliminated, the affected employees have routinely been allowed to stay in their home regions via management-directed transfers to fill vacancies in other ED offices.  ED has mitigated the impact of previous RIFs by these mechanisms, and the RSA regional employees expected to receive the same consideration.

Mr. Hager's May 27 email disabused the regional employees of any lingering notions that they would receive fair and equitable treatment:

> The Department has decided that *there will be no management directed reassignments of regional staff to other Department Principal Offices (PO) within or outside the commuting area.  In addition, the Department has concluded that there will not be any management directed transfers from the regional offices to RSA headquarters positions* because there is no transfer of functions between the regional offices and Headquarters.  Therefore, we intend to fill vacancies through the Department's Merit Promotion Plan and will maintain strict adherence to competitive process rules and other applicable personnel policies.

Ex 16 (italics added).  Mr. Hager also directed <u>all</u> "employees with a disability" to apply for vacancies though the Department's job page, EDHires, so that "the names of those who qualify for the positions will be referred to the selecting official on a non-competitive Schedule A certificate of eligible (sic)." <u>Id</u>.

Only in late June – *after* the deadline for accepting the buyout or early out offers outlined *supra* - did the agency post the following Vacancy Announcements on EDHires:

- Vocational Rehabilitation Specialist, GS-101-13 (OSERS-2005-0016);

- Supervisory Vocational Rehabilitation Program Specialist, GS-101-14/15 (OSERS-2005-0018);

- Management/Program Analyst, GS-343-14 (OSERS-2005-0025);

- Supervisory Management/Program Analyst, GS-343-14/15 (OSERS-2005-0017 and OSERS-2005-0021); and

- Financial Management Specialist, GS-0501-13 (OSERS-2005-0024).

See Ex. 23-28. Each vacancy opened June 27, 2005 and closed July 12, 2005. Id. Each

position is stationed at RSA's CO. Id.

There can be no question that the above advertised positions are intended to staff the new

functional units and state teams, because the main body of each vacancy announcement is

headlined by the following note or similar language:

> A reorganization is planned in the Rehabilitation Services Administration. When the
> reorganization is approved and implemented, these positions will be located in the VR
> Program Unit and Technical Assistance Unit. (Multiple Selections will be made from
> this announcement.)

See e.g., Ex. 23 (Vacancy Ann. OSERS-2005-0016) at 1. The description of the advertised GS-

101-13 Program Specialist position lists the following duties:

> **The incumbent assures that assigned State VR agencies and other grantees operate
> in conformity and compliance with applicable Federal laws, regulations and policies
> derived from the Rehabilitation Act of 1973, as amended, the Randolph Sheppard
> Act; the Workforce Investment Act of 1998; the Ticket to Work and Work
> Incentives Improvement Act of 1999; the Technology Related Assistance for
> Individuals with Disabilities Act of 1998; the Individuals with Disabilities Education
> Act; and the American Indian with Disabilities Act. He/she recognizes and
> stimulates the development of innovative approaches used by State agencies and
> other formula grantees; identifies and works to resolve conflicts and negative effects
> of differing eligibility requirements of rehabilitation and employment programs
> funded by other federal agencies; and interprets new regulations and advises State
> agencies on their compliance efforts.** The incumbent serves on state teams and national
> policy workgroups to develop national program policies and guidelines. **He/she
> provides leadership and assures technical accuracy of all state plans required by the
> Rehabilitation Act for assigned states and recommends approval or disapproval to
> the unit chief. The incumbent serves state teams to conduct on-site monitoring
> reviews of the programmatic, administrative and internal management operations
> of State VR agencies and other funded rehabilitation programs. The incumbent
> provides and/or arranges and coordinates appropriate technical, programmatic and
> management assistance and oversight to assigned state agencies and other
> rehabilitation programs he/she analyzes and synthesizes information and data
> available from assigned State agencies to assist in the development and monitoring
> and valuation methodologies relating to collaborative initiatives.** The incumbent may
> perform independent research studies related to disability problems/issues, develops
> national guidelines, position and options for resolving complex programmatic problems.

Id. at 1-2 (emphasis added).   The bolded portions of the advertised GS-101-13 position are the same as those currently performed in the regional offices by GS-101 VR Program Specialists, which supports Applicants' argument that the functions currently performed by Applicants in the ROs will be transferring to and performed from CO after October 1, 2005.

1.    The RIF

Hager's May 27, 2005 email to RSA employees noted that few requests had been made to sign the VSIP agreements provided to employees a week earlier.  Ex. 16.  He warned RO employees who were disinclined to take the buyout that their options were very limited:

> We anticipate that there will be insufficient VSIP and VERA regional applicants to allow OSERS to close the regional offices by September 30, 2005 without resorting to involuntary separations (i.e., reduction in Force-RIF) of the remaining RSA regional employees. . . .As provided for by Department policy, the competitive areas for the RIFS will be OSERS components in each regional office.  Assignment rights are limited to each competitive area and there will be no "bump or retreat" right to occupied position in other program components, regional office or in Headquarters.  As a reminder, if you are eligible for an immediate annuity (i.e., voluntary retirement, discontinued service retirement, or early out retirement) and separated through RIF procedures, you are not eligible for severance pay or, because the buyout authority will have ended, a $25,000 incentive payment.

Id.

By RIF notices issued July 18 and received July 21, agency management notified all remaining employees of the ten RSA Regional Offices (ROs) that they will be terminated effective September 30, 2005 because their positions are being "abolished."  See e.g., Ex. 29, RIF Notice to Janette Shell (July 14, 2005). The notice stated that the RIF is necessary because all agency ROs will close on that date. Id. at 1.

The seven regional commissioners and assistant commissioners filed a consolidated formal EEO complaint on June 27, 2005.  Ex. 30.  The bargaining unit employees filed a second

-47-

consolidated complaint on July 20, 2005. Ex. 31.[9]  The Commissioners' consolidated complaint

was accepted on September 8, 2005.  Ex. 32.  The Bargaining Unit employees' complaints have

not yet been accepted or dismissed.

Under the Commission's rules, the agency has 180 days from filing of the formal

complaint to investigate the complaint and determine whether it finds its actions discriminatory.

29 C.F.R. §1614.108(e).  Only after 180 days have elapsed can the Applicants request a hearing

before an administrative Judge of the Commission.  29 C.F.R. §1614.108(g).  Therefore,

Applicants can reasonably expect that their claims will take several months at minimum to be

finally resolved.

B.    Conflicting Rationales for the Reorganization

The Department has provided several conflicting reasons for the closures and the RIF,

none of which withstand scrutiny and all of which beg the question why, in the absence of

discrimination, the RO employees were not offered transfers to CO with their functions.

1.    An Alleged Need to Reduce Overall ED Headcount

RSA is a small agency within the smallest federal department.  It has become particularly

small in the last few years because of previous staff reductions at the Department of Education

which have been borne entirely by RSA.   RSA currently has approximately 120 employees,

approximately half of whom are stationed in the regional offices.

In December 2004, OSERS, RSA's parent office, had 352 FTEs.  Ex. 33, AFGE Budget

and Headcount summary.  Under the President's FY 2006 budget, OSERS will receive an

additional $436 million.  Id.  Despite this, ED's Budget office determined that OSERS must be

---

[9]    Please note that Ex. 31 erroneously lists Jacquelyn Tellier as filing a formal complaint.  Ms.

Tellier instead opted to challenge the RIF through the negotiated grievance process.

reduced by 66 people, a feat that will be accomplished by closing the RSA's ROs and terminating the regional employees, of whom 92% are over the age of 40 and 43% are severely disabled. See id.

The Department cites the FY2006 headcount ceiling as a basis for terminating half of the RSA's workforce. Yet at the end of 2004, ED had 4,386 employees – 68 fewer than its permissible FY2005 headcount of 4,454. Ex. 33. Overall ED FTE headcount in the FY2006 budget will be 4,394. In other words, given the January 2005 staffing levels, no ED employees needed to be terminated in order for the Department to stay within the employment levels budgeted for FY2006. However, since January, ED has been hiring in other programs and did not request sufficient program operation funds to pay its current and new employees. Wilson Aff ¶ 15; Ex 34 (Vacancy Ann. OIG-2005-0084, open August 1, 2005 to August 15, 2005, for GS-511-14 Auditor stationed in Chicago metropolitan area ED regional office). Had ED requested adequate program operations funding, Congress would most likely have approved it. See Exs. 1-2. Instead, the Department failed to request adequate funding and now claims that its reduced payroll necessitates terminating the RSA regions as a whole. In sum, the Department's alleged need to reduce headcount is manufactured. If there is any kind of FTE overage at this point, it is because ED hired new employees in non-RSA areas and did not request sufficient operating funds to cover payroll for RSA plus any employees over the ceiling. Even if it was the result of poor planning rather than design, there is no reason that the burden of these manufactured headcount reductions should be borne solely by the disabled and older RSA employees. For example, the Department could have offered buy-outs nationally or held off on hiring in other components. The excuse of a need to reduce headcount does not justify the destruction of the RSA Regional offices.

This is especially the case in light of Acting Deputy Commissioner Jennifer Sheehy-Keller's recent comment to dumbfounded employees in a recent teleconference that if it turns out that the 81 employees stationed at the CO are insufficient to perform the RSA's statutory functions, the agency will simply hire more people in FY2007, when management apparently anticipates that it will have sufficient funds to do so.  RSA Staff Meeting, August 11, 2005 (broadcast to all regions).  Agency management is clearly unsure that the reduced staff can do the job, despite repeated assurances to Congress and the disability community that the new structure can perform as well as if not better than the current.  Furthermore, agency management is apparently confident that RSA and OSERS funding will be sufficient in FY2007 to hire as many additional employees as are required to perform RSA's duties.  This begs the question why the agency seeks to decimate its own (disabled and older) expert regional workforce instead of seeking the necessary short-term budget cuts from other sources, e.g., by closing the regional offices but permitting employees to telecommute from home.  Management's casual attitude about whether the reduced workforce can actually get the job done gives the lie to all prior rationales for the reorganization, and supports the inference that the true motivation for this reorganization is to get rid of the regional employees.

2.    Irrelevant Comparisons to Inapposite Programs

On March 8, 2005, a group of U.S. Senators on the Health, Education, Labor and Pensions Committee wrote to Secretary Spellings about the reorganization.  Senators Mikulski, Kennedy, Reed, Jeffords, Dodd, Murray, Bingaman and Harkin wrote:

> We understand that the Department is in the process of eliminating the regional offices and downsizing the RSA by approximately 60 staff positions, and are concerned that the RSA will not be able to carry out its monitoring and technical assistance efforts without these offices and the local staff who make them possible, RSA has already been downsized by 20 positions over the past four years and by 43% since 1988, and we urge you to reconsider the current drastic proposal.

Ex. 35, Letter to Secretary Spellings from U.S. Senators (March 8, 2005).   In her response, the

Secretary described the reorganization as "consolidat[ing] the work of RSA's regional offices at

RSA's Washington, D.C. headquarters." Ex. 36, Letter to Senators from Secretary Spellings,

April 8, 2005 at 1.  She then stated that

> [A] preliminary analysis of FY2004 workload data indicated that a total of 81.5 regional
> and headquarters FTE in RSA are assigned to the Vocational Rehabilitation State Grants
> program.  By comparison, 39.7 FTE are assigned to the IDEA Special Education Grants to
> States program, a program with a federal appropriation several times larger.  By way of
> comparison, outside of OSERS, key elementary and secondary education programs
> including Impact Aid, Grants to Local Educational Agencies, 21st Century community
> Learning Centers, State Assessments, Reading First, Educational Technology, Improving
> Teacher Quality, and Migrant State grants together are administered by roughly the same
> number of staff currently assigned to RSA State grants.  Approximately two-thirds of the
> RSA regional FTE are assigned to the VR State Grants program.

Id. at 2.

In other words, the Secretary suggests that other ED programs that administer much larger

grants do so with fewer employees than RSA and with no regional office presence.  This

comparison might be compelling if it was apt; however, it is not.  As the Regional Commissioners

explained in response to the Secretary's above assertions, the programs cited by the Secretary are

state-administered:  "the grant funds are distributed to a state education agency, with the state

administering the funds to local education agencies but not delivering any direct services." Ex.

37, Commissioners' Memorandum to Acting RSA Commissioner Anthony at 2.   By contrast,

> RSA-administered formula grants are distributed directly to state vocational rehabilitation
> (VR) agencies which then deliver VR and independent Living (IL) services.  RSA
> monitors the compliance of direct service delivery with applicable laws, rather than
> monitoring a state education agency that monitors local service delivery.   Therefore, the
> analogy of RSA formula grants to OSEP and OESE formula grants is an apples-to-oranges
> comparison, in that RSA functions in the same role as the state education agencies with
> respect to its administration of formula grants.  Federal monitoring of the local
> administration of federal funds requires a significantly greater degree of oversight than the
> U.S. Department of Education performs for state –monitored OSEP and OESE formula
> programs.

Id. at 2-3.   The Regional Commissioners concluded by noting that although OSEP and OESE are responsible for larger grants than RSA, "those grants are predominantly of the same type and are governed by identical statutory requirements" – unlike the diverse programs with complex reporting requirements managed by RSA – "allowing OESE and OSEP to administer more grant funds with fewer employees."  Id. at 3.

Given the relative complexity of the VR statutes and programs, RSA is incredibly efficient at what it does – especially in light of the fact that the RO staffs have been making do with reduced manpower due to vacancies that the agency has failed to fill.  See Ex. 8, RO Staffing Roster;  see also Ex. 13, GAO Report.  As the regional commissioners noted in their functional statement, the ideal distribution of agencies among state representatives is that each would liaise with 2-3 agencies.  However, because of staffing constraints that have been in place for the last few years, most of the current VR program specialists are each actually handling relations with at least 5-6 state agencies.   The RO Staffing Roster shows how many vacancies exist, with the result that many of the Applicants now must handle the workload of two or three employees.

3.    A Groundless Belief that Half the Workforce Can Do All the Work

Management has been at pains to assure the RO employees and concerned stakeholders in Congress, in the States, and in the disabled community, that no programs will be cut and no services reduced because of or related to this reorganization.  It is unclear to all concerned how this is possible with the 81 employees who will remain after the RO employees are RIF'd.   See Ex.38,  Brian Friel, Ex-Chief Protests Changes for Disabled, NAT'L J., March 11, 2005; Ex.39, Brian Faler, Disabled Program Changes Decried, WASH. POST. April 25, 2005 at A17.

In particular, given that RSA's primary mission is to deliver federal funding to VR agencies and other grantees in fifty states and six territories and the regional the means by which

this is done, observers have asked why RSA's regional offices alone are being closed, instead of spreading the impact of the mandatory headcount reduction across ED as a whole.   Management has no good answers for these questions, and in truth its entire approach to this exercise has been detached from reality and devoid of any factual basis.

As proof of this, under intense questioning from RO employees at the March 8 teleconference, Justesen readily admitted that management has no impact studies or work plans which would support the theory that all of RSA's work can in fact be done better by half of the workforce.  RSA All-Hands Video Teleconference, broad cast to all regions (March 8, 2005). He said:

> The decision was made by the entire chain of command, including the two Secretaries. And it is OMB-approved.  It is in the president's budget.  But this closing does not require Congressional approval or presidential budget approval.  *This is purely a management decision with respect to the conclusions and beliefs of management that the best manner to serve customers under RSA is through a consolidation of functions to the Central Office.*

Id. (emphasis added).  In August, the agency held a conference for State VR officials and other interested groups which was intended to gain the belated input of these important stakeholders into how RSA will perform its extensive and complex monitoring functions.   While this conference was euphemistically characterized as a "Redesign Initiative," in fact it is a desperately urgent last-ditch effort to figure out how the remaining RSA employees, none of whom have State representative experience or expertise, are going to be able to perform the duties of the regional employees in terms of producing hundreds of in-depth reports based on reviews and on0site visits RSA management has already started seeking reinterpretations of its statutory obligations and has lowered three important standards in an effort to reduce the crushing workload which will shortly settle on the 81 CO employees who by virtue of their geographic location are not slated to be RIF'd.   In a series of increasingly grave teleconferences

during August and September, it has been brought home to management that the SMPID may not be able to function with only 41 people, none of whom have previously performed State Representative duties or know what that entails. The SMPID will have to approve 56 state plans for each of the formula grant programs, provide continual technical assistance to 80 state VR agencies, administer several hundred discretionary grant programs and monitor the grantees' performance, all without any of the institutional or local knowledge or expertise that the RO employees have accrued by specializing in their assigned geographic and functional areas. In short, RSA has a disaster looming, and it was entirely predictable. This entire appalling situation turns out to be just another of this Administration's faith-based initiatives.

4.    "The Closures are Not Due to Problems with the Regions' Performance."

Under repeated questioning by Union representatives and RO employees, management officials from the Assistant Secretary on down have repeatedly assured RO employees verbally and in writing that they are not being eliminated due to any concerns about or problems with their performance. In agency staff meetings on February 3, March 1, March 8, March 17, May 19, June 2, June 30, July 14 and July 28, 2005 agency officials, including Assistant Secretary Hager, former Acting Commissioner Troy Justesen, Acting Deputy Commissioner Sheehy-Keller, Current Commissioner Edward Anthony, and OSERS Director of Management and Support Staff Paul O'Connell, have repeatedly stated that the reorganization and the RIF are no reflection on the performance of the RO employees.[10] Rather, these moves were undertaken as

---

[10]    These RSA "All-Hands" central and regional office staff meetings took place via video-teleconferencing and were recorded as part of the routine business practice of the agency regional offices to which they were broadcast. Upon information and belief, these meetings have not been transcribed, but Applicants will seek the tapes and any transcripts through the

the result of "a straight business decision," i.e., the need to save $7 million (despite bipartisan Congressional support for funding RSA at levels exceeding those for FY2005). See Ex. 1, H.R. REP. 109-143 at 171-174 (2005) and Ex. 2, S. REP. 109-103 at 261-267(matching or exceeding FY2005 appropriations for each RSA line-item/program request).

In the March 8 teleconference, Union representative Jerry Doyle asked whether RSA was one of the 150 "failing programs" that the president had targeted for elimination in the State of the Union speech several days earlier. Justesen said that RSA itself was not being reduced – only RSA's "administrative overhead." He said, "RSA is not one of the 150 – we have success in our PART ratings." This is correct. See Ex. 40, PART Ratings of ED Programs Assessed to Date, Available at http://www.ed.gov/about/overview/budget/budget06/summary/appendix2.pdf.

     5.    "The Closures ARE Due to Problems with the Region's Performance."

Notwithstanding the above "reassurances" that the RO employees are being terminated solely for business reasons, in response to the eight U.S. Senators who wrote her in March 2005 to ask her to reconsider the plan to eliminate the ROs, the Secretary wrote:

> We have examined how those functions have been carried out in the regional offices and the problems we noted are a major reason for consolidating these functions into headquarters. For example, in the past two years, the regional offices have conducted many monitoring trips but have yet to issue numerous monitoring reports. Centralized control is necessary to provide the Department clear accountability for building a truly consumer responsive program.

Ex. 36 at 1-2.

The Regional Commissioners responded to the Secretary's criticism in their memo to the Commissioner as follows:

---

discovery process when that is eventually initiated. Applicants have already placed the agency on notice that these tapes must be preserved as evidence under 29 C.F.R. §1602.14.

The statement about the failure of the regional offices to "issue numerous reports" is misinformed. It overlooks the one-time implementation of a two –year monitoring review cycle that covered FYs 2004-2005, thus making reports of monitoring conducted in both 2004 and 2005 due for completion at the end of the current fiscal year. It further lays blame on FTE-depleted regional offices for the adverse consequences of a series of decision made by OSERS in the last year. First, OSERS did not permit critical vacancies in the regional offices to be filled, depriving RSA of employees that would typically be responsible for conducting monitoring and writing reports, and stretching other regional staff to the point of constantly putting out fires rather than methodically conducting monitoring activities and writing reports. Second, last spring, OSERS altered longstanding practice that had allowed Regional Commissioners to directly issue monitoring reports, instead requiring clearance of all monitoring reports and other significant issuances, through OSERS.

Ex. 37 at 1-2.    The Commissioners concluded:

During our meetings with OSERS Assistant Secretary John Hager about the plan to close the regional offices, he conveyed to RSA employees that the decision to close the regional offices was a business decision and was not based on the performance of the 66 affected regional office employees. However, statements in the Secretary's letter contradict Assistant Secretary Hager's earlier statements. OSERS leadership has not raised concerns about regional office performance, and if concerns exist, we regret that steps have not been taken to alert us to said concerns and to collaborate with us to address them. We have on many occasions in the past raised with OSERS leadership our concerns over OSERS' failure to fill critical positions in the regional offices. We also raised these concerns continually during meetings of RSA's senior leadership, and the former RSA Commissioner in turn raised them with Assistant Secretary Hager and his predecessors.

Id. at 2. Despite the Regional Commissioners' forceful and strictly factual rebuttal in May 2005

of the Secretary's assertions, OSERS management continues to cast bogus and hypocritical

aspersions on the Regional employees in their vain attempts to justify the reorganization. At a

meeting with the Consortium of Citizens with Disabilities Employment and Training Task Force,

David Esquith – a member of the management team in the restructured RSA – reportedly made

the following statements to the audience:

1.    RSA had still not issued some 2003 monitoring reports; although some of

the 2004 reports had been issued. Most of the reports were still sitting in the

regional office or they had not been able to produce the reports.

-56-

2.      Regional office staff had been encouraged to send in reports, not to hold them. Regional staff used to send out reports without central office reviews, and that central office became concerned about the quality of the reports. In past years, reports went out sooner because they were not reviewed. RSA wants to do things consistently and there was value in doing things for headquarters.

3.      "The culture of RSA is about to change significantly, imbedded (sic) in the reorganization. *Everyone in the organization will be working very hard and held accountable for high quality work in a timely manner.*"

Ex. 41, Council of State Administrators of Vocational Rehabilitation (CSAVR) News Update for Friday, August 5, 2005 at 4-7 (emphasis added).

Applicant and Regional Commissioner Loerance Deaver accurately describes the Secretary's letter and comments like Esquith's as "unfounded attacks on me as a manager, my employees and other regional office personnel, by officials in OSERS and the Department of Education seeking to justify their decision and tactics used to close regional offices." Deaver Aff ¶ 6. Applicant Michael Evans sums up the situation:

> For the first time in RSA history the regional offices were unable to complete the required program audit reviews and reports because of a new layer of headquarters review constructed by management for the purpose of blocking the issuance of reports. The employees have been unable to perform their duties because of roadblocks intentionally erected by OSERS in part to justify the decision to eliminate the regional offices. The Regional Commissioners were in practice removed from the chain of command in setting the guidelines and standards for the [section] 107 report formats . . . Management's actions are among the most vicious in my memory.

Evans Aff ¶ 8, 11.    The fact that OSERS management is reduced to citing delays caused by new management-imposed procedural roadblocks as a justification for closing the RSA regional offices, crippling RSA and destroying the livelihoods of half of its workforce shows the factual bankruptcy of the entire reorganization, from conception to execution.

-57-

## V. DOCUMENT DESTRUCTION

Consistent with its plan to close the regional offices, agency management initiated a document retention and destruction policy which threatened many records which are vital to the applicants' ability to make both their EEO case and the "transfer of function" argument.  Upon learning of the document destruction plan, undersigned counsel immediately requested that the agency's EEO group chief issue an order preserving all records relevant to the pending EEO complaints and MSPB appeals.  Ex.42, Letter to EEO Director James R. White, July 22, 2005.

After a great deal of damage was done, agency management belatedly issued an order to halt the document destruction.  In the interval between receipt of undersigned counsel's letter and issuance of the agency's stop order, dumpsters full of documents were discarded and destroyed by the agency's private contractors in several regions.  The extent of the damage is unknown, and Applicants cannot rely on the agency's self-restraint in protecting the evidence relevant to their own and other EEO cases and MSPB appeals.

## VI. RETALIATION AGAINST THE REGIONAL COMMISSIONERS

In awarding Quality Step Increases (QSI) at the end of FY2005, the Department violated its own policies by granting QSIs to CO employees who are not entitled to them, while bypassing a Regional Commissioner who was qualified.   Under the U.S. Department of Education Personnel Manual Instructions, there is a mandatory requirement that the recipient employee not have "received a QSI during the preceding 52 weeks."  Ex. 43, Excerpt from PMI 451-1 (Oct. 17, 1997).  RC Allen Kropp, who met this requirement and was otherwise eligible, did not receive a QSI.  Ex. 44, "2004-2005 QSI Distribution."  It is important to note that in addition to performing at the Outstanding level, Mr. Kropp has conspicuously opposed the discriminatory reorganization and RIF: he was a signatory with the other regional commissioners

in several memoranda to the RSA Commissioner which refuted the criticisms that have been bandied about by OSERS and the Department to justify the closures. Mr. Kropp also pointed out early on, with the other commissioners, that the closures will have a disparate impact on the regional office staffs, which are both disproportionately disabled ad older workers. Undersigned counsel wrote three letters between March and May 2005 to the Secretary which expressed the Commissioners' concerns and pointed out the discriminatory impact and motivation for the reorganization. See Ex. 45, 46, and 47, Letters to Secretary Spellings sated Mar. 22, 2005, May 6, 2005 and June 16, 2005. Finally, on June 26, 2005, Mr. Kropp and the other Commissioners filed a consolidated EEO complaint. Ex. 30. Less than a month later, OSERS management chose to award the available QSIs to headquarters staffers who had received QSIs the previous year and who were thus ineligible under the Department's rules. See Ex. 44

Interestingly, if the 52-week rule is no longer operative, there was a second RC who was otherwise eligible for a QSI but did not receive one. See id. RC Nightingale was similarly a signatory to the memoranda opposing the discriminatory reorganization, and she filed a complaint the same date as RC Kropp. Because of the proximity in time between the Commissioners' complaint and the denial of the QSI and the violation of the Department's rules to give the available Step Increases to employees who were not otherwise eligible, Applicants reasonably believe that this is evidence of retaliation by the Department.[11]

---

[11] One regional office employee, Applicant Martha Garber, did receive a QSI in FY 2005. However, Ms. Garber filed her EEO complaint with other members of the bargaining unit employees on July 20, 2005 – much later than the Commissioners - and thus presumably eluded the detection of the QSI deciding officials.

## VII.  IMPACT OF THE RIF AND REORGANIZATION

### A.      On RSA's Ability to Perform its Mission

Despite its own prior assessment that the ROs are a necessary and highly functional aspect of the federal-State VR partnership, ED has now determined to close them.

Former Commissioner Wilson resigned from RSA rather than stand by while it is destroyed.  She explains

> The plan was hatched without consulting me or requiring input from my staff, consumers, public or private providers.  This plan will greatly harm RSA's ability [to] perform its mission of administering billions of dollars specifically earmarked by Congress to provide vocational rehabilitation and supported employment at the state and local levels to people with disabilities.

Wilson Aff ¶ 4.   State VR agencies and the disabled community had similar responses to the news of RSA's closure.  Their reaction is another powerful indication of the Regional Offices' vital role in the delivery of service to the disabled nationwide.  Since news of the planned closure of the RSA offices came to their attention, the directors of several state VR agencies and members of the disability community have written in protest to the Secretary and/or to their congressional delegations   See attached <u>Appendix of State and Disability Community Opposition to Regional Office Closures</u>, including Letter from Oklahoma Rehabilitation Council to Rep. John Sullivan (Feb. 15, 2005) ; Resolution of the Board of the National Council on Rehabilitation Education Opposing Elimination of the Rehabilitation Services Administration's 10 Regional Offices, adopted Feb. 17, 2005;  Letter from RehabACTion of Rhode Island to Sen. Lincoln Chafee (Feb. 18, 2005); Letter from New Hampshire State Rehabilitation Council to Sen. Judd Gregg (Feb. 22, 2005); Letter from California State Independent Living Council to Secretary Spellings (March 25, 2005); Letter from Oregon State Rehabilitation Council to Sen. Gordon Smith(April 4, 2005);  Resolution of the New Mexico Commission for the Blind

Opposing Elimination of the RSA Regional Offices, adopted May 1, 2005; Letter from Four

Former RSA Commissioners to Congress (May 25, 2005); Letter from Vocational

RehabVermont to Secretary Spellings (May 31, 2005); Letter from Advocacy, Inc. CAP

Coordinator Karen Stanfill to Secretary Spellings (June 15, 2005). Protests have also taken

place, including one outside of ED headquarters in Washington, D.C. Ex. 45, Stephen Barr,

*Plan to Reorganize Agency Serving Disabled Draws Protests*, WASH. POST, May 27, 2005 at

B02; see also e.g., Ex.46, Gordon Y.K. Pang, *Plan could endanger rehab services*, HONOLULU

ADVERTISER, May 20, 2005, available at

http://the.honoluluadvertiser.com/article/2005/May/20/ln/ln03p.html. The State VR agencies

and constituent groups are legitimately concerned first that the services RSA provides and the

grants it administers are now in jeopardy; second, they have protested the impact of the closing

on the RO employees themselves; and third, they are disturbed that the reorganization was

planned without consulting them.[12]

As was previously noted, both the House and Senate Committees charged with

determining funding levels for RSA have expressed their concern about the plan to halve the

RSA's workforce, and the Senate has asked for a report explaining how exactly RSA can

continue to provide the same level of services to State and other constituents without the regional

office employees, who possess all such expertise. See Exs. 1-2.

As of August 19, 2005, the agency has no plan in place that will allow it to carry out its

statutory duties with respect to the Regional office functions. It lacks sufficient staff and the

staff it has retained lacks sufficient expertise relative to the State VR agencies that RSA funds,

monitors and advises to provide accountability for $3 billion in taxpayer dollars and to ensure

---

[12]    This omission is particularly striking because the States contribute approximately 21% of
VR funding under the Rehabilitation Act. See e.g., 29 U.S.C. §720(b), §727(c)(3).

that VR services for the disabled in fifty states and six territories do not devolve into inefficacy, fraud, waste and abuse. *Compare* Ex. 9 (Reorganization Plan) at Tab D *with* Ex. 8 (Regional office Staffing Roster). Unless the RIF is halted to allow the Commission, Board or Court to rule on the discriminatory motives underlying the decision to eliminate the half of RSA's workforce that can perform with these obligations, effective October 1, 2005 RSA will be rendered ineffective and sorely needed services to severely disabled people across the country will be plunged into a crisis.

**B.    On Regional Office Employees Including Applicants**

    **1.    Generally**

The RO employees, including Applicants, are placed in a terrible bind by the impending RIF and the lengthy administrative process they must exhaust before they can go to court to seek relief. Four of the Applicants accepted early retirement in order to avoid being terminated. Because prior to their retirement the agency flatly denied that out-stationing or telecommuting would be allowed would be allowed for the positions advertised at CO, they were unable to apply because they are bound to their current commuting areas by needs of dependent family members. The agency is now telling the non-disabled interviewees for the advertised positions at headquarters that telecommuting may be available after all. (The threat that telecommuting was not available turns out to have been one more scare tactic aimed to encouraging the regional employees to leave the agency through early retirement.)

Many of the Applicants are severely disabled and can anticipate that they will have great difficulty obtaining new employment. While few job searches these days are easy, the disabled Applicants can expect that it will be months if not years before they can locate suitable employment elsewhere, by virtue of their need for accommodations and the undeniable fact of

continuing discrimination against hiring people with disabilities.  Several of the most severely disabled Applicants are the sole or primary breadwinners for their families, and they and their families are placed in jeopardy by the loss of their positions if the RIF is not stayed pending the outcome of the EEO complaints.

At least two of the Applicants who are not eligible to retire have disabled children or spouses whose health and safety are jeopardized by the loss of access to health insurance and thus health care, to say nothing of the loss of the household's primary income.  The disabled Applicants themselves require regular access to specialized health care and the lives of those who are not eligible to retire or who cannot afford to do so are endangered by the certain loss of these benefits if the RIF takes effect on October 1, 2005.

The Applicants who are not eligible to retire can only apply for the few positions that are available, and hope that they are selected for these or private sector jobs for which they have applied.  The disabled Applicants are operating under a severe disadvantage in this respect because, as discussed above, under the rules put in place by management, all disabled employees have been channeled toward Schedule A, regardless whether they were ever Schedule A before, and regardless whether they are currently career-competitive employees.  The "new" policy of counting assistive employees against the RSA's FTE ceiling of 81 will seriously disadvantage the disabled Applicants chances of being rehired.    Indeed, of the selectees for the non-supervisory fiscal unit position, none is Blind or otherwise requires any accommodation.

Further, OSERS has already retaliated against RC Kropp by failing to give him a QSI when he was clearly entitled to same.   Given that retaliation has already taken place, OSERS is likely to retaliate against the Applicants by failing to select them even if they are the best

-63-

qualified for the available positions, because each Applicants has filed an EEO complaint or grievances against the reorganization and the RIF.

At time of filing, only two of the Applicants - Seymour Levy and Janette Shell - had been offered positions at headquarters after October 1, 2005. Neither Mr. Levy nor Ms. Shell requires any kind of reasonable accommodation.

Any Applicants competitively selected for one of the few positions in CO will be required to report for duty in D.C. in short order, because they my must accept any job offered in order to mitigate their damages. Applicants are challenging, *inter alia*, the decision to advertise these positions competitively when it is clear that the regional employees were entitled to transfer without competing to D.C. under the transfer of function rules. Permitting the selections to go forward under the vacancy announcements will expose the Applicants to the necessity of moving their families across the country, only to have their selections vacated by order of the Commission, the Board or the Court several months later when they prevail.

Finally, in the event Applicants are successful in challenging their terminations as discriminatory but not the elimination of their positions, they will be denied reinstatement as a remedy because the regional offices will have closed in the interim and their positions will no longer exist. Thus, permitting the agency to close its regional offices while the EEO and MSPB appeals are pending will deny the Applicants the remedy of reinstatement. There is case law suggesting that front pay is an adequate remedy in most cases where reinstatement is not available due to a RIF, but front pay cannot make whole the disabled Applicants who have overcome every physical, social and medical barrier placed in their ways in order to become economically self-sufficient and contributing and functional members of society. Relegating these employees, who have triumphed over their physical limitations in order to perform

-64-

demanding and technical work as public servants, to their homes to receive regular government checks will not make them whole for the loss of jobs they have performed with expertise and dedication for years.

In light of the above, including the damage already done to the professional reputations of the Applicants, the harm to their individual physical and emotional conditions resulting from the agency's harassing, threatening and demeaning tactics throughout this ordeal, and the blatantly discriminatory nature of the entire appalling exercise, Applicants individually may have non-pecuniary harm substantially in excess of the statutory cap of $300,000.

**2.     Individually**

**Richard Anderson** (State Rep to New York State) is the primary wage earner for his family. Anderson Aff. ¶7. His wife teaches at a local community college. Id.¶8. He has a son in college for whose expenses he is totally responsible. Id. Mr. Anderson also has an elderly mother who lives in the New York area to whom he provides regular assistance. Id. Mr. Anderson is disabled and can only use the right side of his body to type and perform other duties. Id. ¶2. He uses Dragon Dictate software as an accommodation and expects that his disability and age will lengthen his job search. Id. ¶¶2 , 8. Mr. Anderson has investigated the local job market for rehabilitation services and has found that the salaries for comparable positions that make use of his thirty years of VR experience require a decrease in salary of $50,000 to $60,000. Id. ¶ 8. He owns a coop apartment and could not afford to maintain that and a residence in D.C. if stationed there. Id. ¶ 9.

**Bryan Bashin** (Deputy RC, San Francisco) is a Schedule A probationary employee. Bashin Aff ¶¶2, 3. He will not be eligible to convert to competitive status until January 2006. If he secures another federal job, his two year probationary period to obtain career competitive

status will have to start all over again and he will end up having to work four rather than two years as an excepted serve employee. Id. ¶16. Mr. Bashin is fifty years old and totally Blind. Id. ¶¶2. As such he "will have increased difficulty securing employment and the sudden closure will likely lead to an extended period of unemployment." Id. ¶6. He also has other medical conditions, including high blood pressure (which has been aggravated by the stress of the agency's campaign to force out the RO employees and close their offices). Id. ¶15. Because of his preexisting medical conditions, Mr. Bashin is uninsurable and will have to rely on COBRA for health insurance, which will absorb an enormous percentage of his income from unemployment insurance. Id.

**Keith Beichner** is the State Rep for the District of Columbia and West Virginia. Beichner Aff. ¶ 4. Mr. Beichner's overall health is poor (restricted vision, hearing, ability to bend, ability to breathe). Id. ¶2. He is the sole breadwinner for his family, as his wife is retired. Id. ¶14. He and his wife still owe a considerable sum on their home mortgage and do not have enough to live on until it is paid off. Id. Mr. Beichner's daughter and grandson live with him, such that the potential loss of his home places three generation in jeopardy. Id. He has been so upset by the way management has handled the closure of the ROs that he is now under the treatment of a psychiatrist and a clinical counselor. Id. ¶13. He is taking several prescribed medications and undergoing regular counseling. Id.

**Joe Cordova** (RC for Chicago and Kansas City) is Blind and 54 years old. Cordova Aff ¶¶ 1, 2. He is the sole breadwinner for his family, which moved to Chicago within the last few years in order for him to take over the Regional Commissioner job there. Id. ¶¶ 11. Mr. Cordova's home is mortgaged and the loss of his income will deprive his family of its normal living expenses. Id. ¶12. Mr. Cordova is also diabetic, and the stress of losing his position and

uncertainty about the future has resulted in elevated blood-sugar ratios detected during recent doctor visits.  Id. ¶13.  Mr. Cordova has experienced previous discrimination in employment and expects to have significant difficulty finding new employment.  Id. ¶14. As support for this fear, he notes that the department of Labor reports that 70% of all working age Blind adults are unemployed.  Id.

Mary Davis, State Rep for North Carolina, Alabama and Mississippi, is legally blind. Davis Aff ¶3.  She cannot drive and has support structures based in and around her home in rural Georgia.  Id. ¶3.  Ms. Davis has a telecommuting arrangement that allows her to work from home and make only bi-monthly trips to the RSA regional office in Atlanta, five hours away. Id. ¶6.  Ms. Davis has received high performance ratings and her "customers" are very happy with the arrangement.  Id.  Ms. Davis suffers from clinical depression and severe arthritis.  Id. ¶8. Her husband is 70 years old and in frail health.  Id.  They recently refinanced their home in the expectation of her continuing to work until retiring when she reaches thirty years of federal service in December 2006.  Id. ¶4.

Loerance Deaver  (RC for Dallas and Denver) is sixty-three years old.  Id. ¶2.   RSA's attacks on the reputation and performance of  Mr. Deaver and his colleagues have been so stressful and debilitating that he now is prescribed medications to control his blood pressure and anxiety.  Id. ¶6.

Michael Evans (State Rep to New Mexico, Louisiana and Montana) has impaired vision but because of surgery on his remaining eye, is no longer legally blind. Evans Aff. ¶3.  Mr. Evans, who just finished putting his second child through college, had planned to retire in two years.  Id. ¶12. This would have allowed him to recoup some of the cost of his children's education and get his financial house in order.  Id.   Instead, he finds himself shortly to be

unemployed and with little in the way of savings. Mr. Evans is 64 years old and disabled (in that he has a record of blindness). Id. ¶¶2, 3. He entered federal employment in 1977 as a Schedule A appointee. He converted to competitive status two or three years afterward. Id. ¶2. Despite the fact that he has been a competitive service employee for over twenty years, Management has pressured him and other disabled RO employees to apply for positions in headquarters under Schedule A, requiring them to forfeit their civil service status and rights in order for their disability to be taken into account at all. Id. ¶9.

**Joseph Farrell**, age 65, has Diabetes mellitus with peripheral neuropathies and cardiac problems, which required him to undergo an angioplasty several years ago. Farrell Aff. ¶ 2. Mr. Farrell has worked in VR for 42 years. Id. ¶ 5. In June, he and his wife adopted their three grandchildren (ages 11, 10 and 4) and he and his wife need to continue to work in order to support their new dependents. Id. ¶ 6. The three grandchildren were adopted out of necessity after having a great deal of instability in their lives, and are just beginning to put down educational, social and medical roots in their grandparents' community. Id. ¶ 6. One of the grandchildren is disabled, and needs the supports that are available in the family's community. Id. Mr. Farrell and his wife also rely on community supports in managing their own medical problems. Farrell Aff ¶ 6. Finally, the family has an elderly parent who is dependent on them for support. Id. Despite his 42 years of VR experience, Mr. Farrell is not being given the chance to continue to work via a telework arrangement, nor is he being allowed to bid to transfer with his functions to the Central Office despite the lack of expertise in the CO to perform his and other RO duties. Id. ¶5.

**Marian Fuller** (Team leader and State Rep for 3 state agencies) is a lupus survivor and has never applied for disability status based on this condition, though she has suffered

-68-

several flares of her condition in the last decade and deals with the side effects of long terms use of the medication she uses to stabilize her condition.   Fuller Aff. ¶2.   At age 56 and with 17 years of federal service, Ms. Fuller falls within the exceptions to all of the protections that are in place to limit the impact of the closure and RIF.   Id. ¶9.   She does not qualify for severance because she is eligible to retire under FERS.   However, if she retires, she will be penalized 5% per year that she is under age 62 – reducing her monthly annuity amount to $510 after taxes and medical insurance premiums.   Id. ¶9(6).   She does not qualify for retirement under the early out rules because she does not have 20 years of service.   Id. ¶9(2).   Similarly, she does not qualify for a supplement to her reduced annuity check based on her involuntary separation until she reaches age 62 and qualifies for social security because she does not have 20 years of service. Id. ¶9(3).   If she "voluntarily" leaves federal service, i.e, retires, she will not qualify for unemployment insurance.   Id. ¶ 9(4).   She could not accept the $25,000 buyout offer in early July, 2005 because she earned more than that by continuing to work until October 1.   Id. ¶9(5). She will not qualify for health insurance if she is RIF'd on September 30 because she must retire for it continue.   Id.¶9(6).  Due to her life threatening auto-immune condition, she cannot be without health insurance.   Id.   Even assuming that Ms. Fuller and her fellow applicants eventually prevail in their EEO and MSPB complaints but have accepted retirement in order to preserve their health insurance, they will barely be able to make ends meet in the meantime, and many will have to make irrevocable and financially disastrous decision to retire in order to avoid losing their access to health insurance.   If selected for a position in D.C. without a telecommuting arrangement, Ms. Fuller would have to sell her home in Colorado and move away from an aging parent and parent-in-law that she and her husband regularly assist.   Fuller Aff ¶6.   Her medical condition is exacerbated by stress.   Id.

-69-

**Martha Garber**, (Team leader for Region VI/Dallas) who has multiple physical and mental disabilities, is three years from her planned retirement date. Garber Aff ¶8. Ms. Garber's husband is in private practice in Dallas and she has a child living at home. Id. She has applied for positions at CO because losing her job will create a financial hardship for her family, but moving to D.C. for a position that will be revoked due to the instant litigation would interrupt her husband's practice and her family life. Id.

**Diana Koreski**, took retirement in order to avoid being RIF'd. She was thus constructively discharged and has filed an EEO complaint including this issue.

**Allen Kropp** (RC for Boston and New York City) is the sole breadwinner for a family of five. Kropp Aff ¶6. He took this job at headquarters' urging a few years ago and left a secure policy position to do so. Id. ¶7. His children are aged 10, 7 and 2. Id. ¶6. One child has congenital heart disease and has required three open-heart surgeries so far. Id. He continues to need regular medical attention from specialists near his home who have treated him since infancy. Id. Mr. Kropp's son has access to health care through Mr. Kropp's federal employment. Id. Mr. Kropp's salary pays the mortgage on his family's home and their other living expenses. Id. Without his income, the family is in imminent danger of losing their home. Id.

**Seymour Levy** (Team Leader and Financial Management Specialist in Chicago) has twin sons in college, and will have to go into great debt to finish paying for their educations if he loses his salary. Levy Aff ¶7. Mr. Levy (age 58) has spent his entire career in government service. Id. ¶2. He was drafted while in graduate school and served as a medic in South Vietnam from January 1970 - February 1971. Id. Mr. Levy received four medals for his service, including the Bronze Star. Id. He has worked for the Department of Education since its

-70-

inception. Id. ¶3.  Mr. Levy, who is not disabled,  has been offered one of the positions at headquarters.

**Charles Linster** (former State Rep for Illinois, Indiana, and Michigan) is fifty-five years old and quadriplegic as a result of an accident at age 16.  Linster Aff ¶¶ 2, 4.  He took early retirement in order to ensure continued access to health insurance and his pension, though his annuity was significantly reduced by taking early retirement.  Id. ¶ 6.  Mr. Linster may be entitled to reinstatement but if the reorganization and RIF proceed as planned his position will not be available by the time reinstatement is ordered.

**Brian Miller** (State Rep for California, Nevada, Arizona, Hawaii and the Pacific Island territories) is totally Blind.  Miller Aff ¶¶ 8, 2.  Mr. Miller is a Schedule A employee and will be eligible for conversion in January 2006.  Id. ¶3.  Mr. Miller and his wife, who is also Blind, moved to the San Francisco Bay Area from Iowa specifically in order for him to work for RSA in the Region IX office.  Id. ¶¶ 4, 5. Without his income they will most likely have to move back to Iowa because the Bay Area is a high-cost housing market.  Id. ¶16.  Because of Mr. Miller's blindness, he expects that a lengthy job search will be necessary.  Id.  Mr. Miller's wife has chronic health issues, including Type I diabetes, and is a kidney transplant patient; she must have access to quality health insurance coverage, which is currently available through Mr. Miller's federal job.  Id. ¶17.  Because of his wife's pre-existing conditions, she and Mr. Miller will rely on COBRA for coverage, which will cost $1,000 a month in premiums.  Miller Aff ¶ 17.  Without Mr. Miller's income, this expense will swiftly become prohibitive and his wife's health will be placed in jeopardy.  Id.  Without insurance, Mr. Miller estimates that he and his wife will be bankrupt within months of his termination.  Id.

-71-

**Jeffrey Mitchell**, age 65, retired effective July 2, 2005 from his position as Assistant Regional commissioner for Region III (Philadelphia). Mitchell Aff. ¶ ¶ 1, 3, 4. Mr. Mitchell has a prior pending EEO complaint alleging age discrimination from a prior attempt by the agency to make his working conditions so unpleasant that he would retire. Id. ¶¶ 5, 6. The previous attempt (via threats of unwanted geographic transfers) to constructively discharge Mr. Mitchell was unsuccessful, but the 2005 reorganization and RIF were more than he could tolerate, and he left for the sake of his emotional health and to preserve his health insurance. Id. ¶¶5, 4. Mr. Mitchell intended to work until age 70 and his finances were not in a condition where retirement was optimal, e.g., he and his wife have a substantial home-equity loan that they must now repay with half of their former income. Id. ¶7.

**John Nelson**, age 53, suffered a spinal cord injury at age 14 which led to the loss of feeling or movement below the breastbone. Nelson Aff ¶2. Mr. Nelson uses an electric wheelchair. Id. He has worked for the federal government for 22 years, and for RSA for 18. Id. ¶¶3, 4. Mr. Nelson just purchased a home in Massachusetts. Id. ¶7. His elderly mother (age 90) lives in Newport, Vermont, where Mr. Nelson can easily visit her on a day trip. Id. Mr. Nelson is the only remaining relative close to his mother and is in the process of taking responsibility for her financial affairs under a power-of-attorney. Id. If Mr. Nelson took retirement at this point, his monthly income would decrease by $6,000. Id. ¶ 10. His wife suffers from Lyme disease, arthritic joints degenerated discs in her back, and Fibromylagia and her ability to work is severely limited. Nelson Aff ¶10. If she was required by the loss of Mr. Nelson's income to increase her workload, it could be very damaging to her long-term health. Id. Mr. Nelson cannot access his Thrift Savings Plan for another seven years. Id ¶8. The loss of his income means that he will not be able to pay his mortgage, taxes and personal attendant,

nor to provide food and medicine.  Id.  Mr. Nelson has had substantial periods of
unemployment each time he completed a degree and tried to return to employment.  Id. ¶9.  He
notes, "Even with ADA and more work experience, I am not guaranteed anything but a
challenge."  Id.

**Kathleen Niemi** (former Management and Program Analyst, Chicago) took the early
retirement option in order to protect her health insurance.  Niemi Aff ¶ 1, 5.  Ms. Niemi is 51
and expected to retire at age 55.  Id. ¶5.  If she did not accept the early out option, she would
have to wait until age 62 to retire and would lose her medical insurance.  Ms. Niemi was
diagnosed with rheumatoid arthritis in 1998 and is prescribed expensive medications that she
cannot afford without insurance.  Id.   Ms. Niemi is a 33 year federal employee, and worked her
way up to GS-343-12, Step 10 from Clerk Stenographer, GS-4.  Id. ¶3.  She has worked for RSA
since March 1975, and became a Grants Management Specialist in September 1986.  Id.  Had
Ms. Niemi been permitted to continue working and retire at age 55, she would have been entitled
to an annuity of 70% of her earnings instead of the 54% to which she is currently entitled.  The
decrease in her income will sharply limit her ability to afford housing, food and other necessities
over time as prices rise.  Id. ¶7.

**Noel Nightingale** (RC for San Francisco and Seattle), is 41 years old and totally Blind.
Nightingale Aff ¶¶ 1, 2.  Ms. Nightingale joined RSA through Schedule A but converted to the
Competitive service in July 2005.  Id. ¶ 8.  Ms. Nightingale has applied for positions in RSA's
CO but will require the accommodation of a reader, which places her at a significant
disadvantage because of the new Department policy which counts assistive employees against
RSA's FTE ceiling of 81.  Id. ¶12.  Ms. Nightingale is the sole breadwinner for a family of four,
including her three children, ages six months, two and half years, and five and a half.  Id. ¶10.

-73-

Her husband quit his (night) job when Ms. Nightingale joined RSA in order to care for their children because she travels frequently as is required by her job. Id. Ms. Nightingale's income pays for their home, food, clothing, car insurance, the children's pre-school education and all of the family's other costs of living. Id. Seattle is a high-cost housing market and Ms. Nightingale's mortgage is approximately $540,000. Nightingale Aff ¶ 10. The loss of her income means that they will be unable to make payments and may lose their home. Id. It will cost approximately $800 per month to buy health insurance for the family. Id. Ms. Nightingale has previously experienced discrimination because of her blindness, and may have difficulty finding a position which will allow her to support her family because of her condition. Id.

**Ralph Pacinelli** (RC for Philadelphia and Atlanta) is seventy years old and has been with the federal government for over 34 years, 33 at RSA. Pacinelli Aff ¶¶ 1, 2. Dr. Pacinelli could have retired but did not do so because of commitments to his family, his organization, and his supervisees. Id ¶6. Work is important to Dr. Pacinelli's psychological make-up and he did not wish to walk away and leave his heavy workload for others to have to take up suddenly. Id. ¶6. Dr. Pacinelli 's chances of obtaining comparable employment are slight given his age and salary history. Id. Dr. Pacinelli is the only child and sole provider for his aged mother who requires daily services at an assisted living facility and he is responsible for her health and well-being. Id. Since January 2005, Dr. Pacinelli has suffered the strain of not only losing his own job but also had to bear a "steady stream of unfounded and unwarranted attacks on me and my work and the work of the offices and the people that I supervise, which has contributed a high level of anxiety, uncertainty, stress and concern." Id. ¶7. In trying to help his staff deal with this situation Dr. Pacinelli has been placed under great pressure, which has altered his temperament and negatively impacted his home life. Id. He explains

-74-

A steady stream over the past five to six months of unfounded and unwarranted attacks on me and my work and the work of the offices and the people that I supervise jas contributed to a high level of anxiety, uncertainty, stress and concern and these malicious and harmful action s threaten my general health and overall well-being. I spend an inordinate amount of time currently in providing counseling to staff who feel frightened, threatened and saddened by the callous treatment from their employer. Their problems become my problems, adding to my level of stress and discomfort. I am told at home that I am more abrupt, less tolerant, less attentive, more insensitive and more irritable as a function of what is happening at work. Without question the quality of my family life has truly suffered due to the announced closure and the RIF notice.

Pacinelli Aff ¶7.

**Brenda Sue Rankin-White** (State Rep for Florida and Tennessee) has the disability of post-polio partial lower extremity paralysis. Rankin-White Aff ¶¶ 4, 2. Ms. Rankin-White is a manual wheelchair user and relies on long-leg bilateral braces. Id. ¶2. She has sixteen years of federal service and is the primary source of income in her household. Id. ¶5. Ms. Rankin-White is not eligible for a severance payment because she I technically eligible for optional retirement. Id. However, because she is 58 years old and there is a 5% penalty for every year the retiree is under age 62, her annuity will be $500 per month – insufficient to cover the costs of COBRA, let alone her family's other monthly expenses. Id. If Ms. Rankin-White defers her annuity until age 62, her medical benefits will not continue. Id. Because of her medical condition, she must have insurance, yet COBRA will devour all of her income and her husband's health plan will not take effect until a year after she begins paying premiums, due to her preexisting condition. Id. ¶5. Ms. Rankin-White is willing to move to D.C. from the Atlanta area if necessary. Id. ¶7. She anticipates difficulty in finding employment given her age and medical condition, and if she cannot locate suitable employment within a short time after the RIF takes effect, she will have to use her savings for living expenses and may have to sell her home to meet basic living expenses until she is old enough to qualify for Social Security retirement benefits. Id. ¶¶ 6-7.

**Bruce Rose** has the disability of congenital cerebral palsy. Rose Aff ¶ 2. Mr. Rose is stationed in Atlanta and is a GS-11 Step 8 State VR Program Specialist. Id. ¶¶1, 8. Because of his grade he cannot apply for the recently posted RSA CO positions, which are all GS-13 and up. Id. ¶8. He has 17 years of federal service. Id. ¶3. Mr. Rose's medical condition limits him from performing any task that requires significant physical strength Id. ¶2. He has many medical expenses, and COBRA will be both temporary and prohibitively expensive without his current income. Id. ¶7. It is also likely that Mr. Rose will need to undergo major cervical (neck) surgery in the near future. Id. Because he is 53 years old and has significant physical limitations, Mr. Rose is unlikely to be able to find employment in the private sector that includes health insurance. Id. ¶7. For Mr. Rose, the effects of the RIF go far beyond the monetary loss:

> In fact, no amount of money can make me whole for the loss of my position. This is also about dignity and self-worth as a person. I have had many, many struggles throughout my life to accomplish independence and overcome the barriers posed by my disability. I have achieved economic self-sufficiency, and am a highly skilled and contributing member of society and the federal service. I attained this at great cost and years of hard work, and being able to work is more than just income to me. Being relegated to unemployment or Social Security Disability at this stage in my life eliminates more than my income and expectations – it undoes everything I have strived for: personal independence and helping to advance vocational rehabilitation for people with disabilities.

Rose Aff ¶9.

**Janette Shell** (State Rep for Ohio, Minnesota and Wisconsin) is 54 years old and has Type II diabetes and a general anxiety disorder. Shell Aff ¶¶ 4, 2. This combination of conditions entitled her to be hired under Schedule A. Id. ¶2. She converted to competitive service in February 2003, and with credit from a VISTA volunteer position, has 6 years of federal service. Id. ¶3. Because of her medical conditions, Ms. Shell will be unable to afford health insurance under COBRA after she is terminated and will not be able to afford the

medication and treatment that make it possible for her to be a successful job applicant and employee. Id. ¶10. Ms. Shell recently purchased a home in Gary, Indiana on the shore of Lake Michigan, and has a son in college for whose education loans she is responsible. Id. ¶11. Ms. Shell was selected for one of the two announced positions in D.C. for which she is eligible, and will have to sell her new home to move the D.C. area and then may be reinstated to her Chicago area position when the Applicants eventually prevail in their EEO complaints. Id. ¶¶ 8, 11.

**Jacquelyn Tellier** (State Rep for Connecticut) is 50 years old and has scoliosis with compensatory spinal curvatures and occupational asthma, as well as recent back injuries resulting from a recent motor vehicle accident. Tellier Aff ¶¶ 8, 2, 3. Ms. Tellier has a telecommuting accommodation which allows her to minimize her exposure to triggers for her asthma. Id. ¶2. Her health care providers are in Boston and a move to D.C. would interfere with her ability to continue under their care and to undergo likely surgeries on her neck. Id. ¶3. Ms. Tellier relocated to the Boston area in 2004 after 5 years with RSA to be closer to the office, and if she was forced to sell her new home at this point to move to D.C. or to cover living expenses, it would be a financial hardship. Id. ¶5. Ms. Tellier is responsible for her mother who has dementia, and has a power of attorney to manage her affairs. Id. ¶6. Ms. Tellier is a retiree of the Massachusetts Rehabilitation Commission and as such cannot return there or to any other state agency to work. Id. ¶9. She must be able to work from home several days per week, and as such is likely to have a difficult time finding employment in the private sector. Id. ¶7.

## STANDARD FOR PRELIMINARY INJUNCTIONS

A preliminary injunction is an extraordinary equitable remedy to preserve the status quo until adjudication of the case on its merits. Sampson v. Murray, 415 U.S. at 92 n.68. The Plaintiff must show the court that an irremediably deteriorating condition threatens to undermine

the Court's ability to render a proper final judgment on the merits.   Canal Authority of State of Florida v. Callaway, 489 F.2d 567, 573, 576 (5th Cir.1974). In evaluating a motion for preliminary injunction, the court shall balance: (1) the likelihood of the plaintiffs' success on the merits; (2) the threat of irreparable injury to the plaintiff in the absence of an injunction; (3) the possibility of substantial harm to the other interested parties from a grant of injunctive relief; and (4) the interests of the public.  See Wagner v. Taylor, 836 F.2d 566, 575-76 (D.C. Cir.1987) (Spottswood Robinson, C.J.); Randolph-Sheppard Vendors of America v. Weinberger, 795 F.2d 90, 110 (D.C. Cir. 1986); Washington Metropolitan Transit Commission v. Holiday Tours, Inc., 559 F.2d 841, 842-43 (D.C. Cir.1977); Saunders v. George Washington Univ., 768 F. Supp.843, 844 (D.D.C. 1991).   The D.C. Circuit has held that these factors interrelate on a sliding scale and must be balanced against each other.  Serono Labs, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C.Cir.1998).    Plaintiffs meet all four of the applicable criteria, and can show that they are entitled to the protection of the Court's equitable powers.

        Because injunctions are equitable in nature and preserve the *status quo* in order to prevent irreparable harm that may be suffered by the delays inevitably associated with litigation, federal courts may issue preliminary injunctions on the basis of less formal procedures and on less extensive evidence than are required in a trial on the merits.  Cobell v. Norton, 391 F.3d 251, 261 (D.C. Cir.2004) (*citing* Natural Resources Defense Council v. Pena, 147 F.3d 1012 (D.C. Cir.1998)).  The court may rely on the sworn declarations and other credible evidence in the record that might not be admissible at trial.  See AFGE v. District of Columbia, 2005 U.S. Dist LEXIS 8326, *10 (May 2, 2005) (Bates, J.) (*citing* University of Texas v. Camenisch, 451 U.S. 390, 395 (1981)).   However, where genuine issues of material fact are raised in opposition to an Application for a preliminary injunction, an evidentiary hearing is required before the

Court can decide the Application.  Id. (*citing* Prakash v. American University, 727 F.2d 1174, 1181 (D.C. Cir. 1984)).

# ARGUMENT

## I.    APPLICANTS HAVE AN EXTRAORDINARILY HIGH LIKELIHOOD OF SUCCESS ON THE MERITS.

To obtain a preliminary injunction, Applicants need only show a substantial case on the merits. See AFGE v. Callaway, 398 F. Supp. 176, 196 (N.D. Ala. 1975) (*citing* Wright and Miller, Federal Practice and Procedure (Civil) Section 2948 at 452).

> To justify a temporary injunction, it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of the hardships tips decidedly toward the plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.

WMATC v. Holiday Tours, 559 F.2d at 844 (quoting Hamilton Watch Co. v Benrus Watch Co., 206 F.2d 738, 740 (2d Cir.1953)).  The D.C. Circuit criticized the tendency of some courts to require applicants to establish a "50% plus probability" of success on the merits as contrary to the language and spirit of its seminal decision in Virginia Petroleum Jobbers, 259 F.2d 921, 925 (D.C.Cir.1958), which established the flexible "sliding scale" rule in this Circuit when it held that "injury [ ] sufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits." Based on Virginia Petroleum Jobbers, the D.C. Circuit concluded in WMATC that

> An order maintaining the status quo is appropriate *when a serious legal question is presented,* when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant.  There is substantial equity, and need for judicial protection, *whether or not movant has shown a mathematical probability of success.*

559 F.2d at 844 (italics added).   Accordingly, applicants must show only that they have a *likelihood* of success in setting forth a prima facie case and overcoming any legitimate reasons proffered by their employer in explaining its actions. See Jordan v. Evans, 355 F. Supp. 2d 72,

78 (D.D.C. 2004); <u>Segar v. Civiletti</u>, 516 F. Supp. 314, 319 (D.D.C.1981); <u>Bonds v. Heyman</u>, 950 F.Supp. 1202, 1208-1210 (D.D.C.1997).

In Argument Sections I (A) – (E), *infra*, Applicants establish a prima facie cases for each cause of action by strong direct and indirect evidence.   In particular, Applicants have direct evidence that their terminations are the result of the OSERS Executive Officer's open and well-established dislike for people with disabilities, a high percentage of whom (43%) are employed in the regional offices.  The Executive Officer was instrumental in the agency's discriminatory actions, which include:

    (a)     closing the regional offices, which employs a workforce with a high percentage of disabled and older workers;

    (b)     denying that the closure of the regional offices and the transfer of their functions to agency headquarters is a "transfer of function" according to the civil service law;

    (c)     conducting a RIF solely of the regional office employees;

    (d)     channeling all of the disabled regional employees who are applying for positions at headquarters toward a separate, non-competitive certificate regional disabled employees, regardless whether they are currently competitive-status or excepted service; and

    (E)     establishing a new policy for FY2006 under which assistive employees hired as accommodations for disabled employees will count against the headcount ceiling and payroll for program offices rather than the Office of Management, which previously managed a salary pool for assistive employees.

Based on the strong direct and indirect evidence presented herein that these actions are

motivated by discrimination, Applicants will likely prevail on the merits.

A.    The Agency Has Violated the Civil Service Law By Refusing To
Transfer the Applicants to the Central Office with their Functions.

1. The So-called "Consolidation" at Issue is a Textbook Transfer of Function

5 U.S.C. §3503 provides that

when a function is transferred from one agency to another, each preference eligible
employee in the function shall be transferred to the receiving agency for employment in a
position for which he is qualified before the receiving agency may make an appointment
from another source to that position.

A function is "all or a clearly identifiable segment of an agency's mission (including all

integral parts of that mission), regardless of how it is performed."  5 C.F.R. §351.203.  A

transfer of function occurs when a continuing function is moved from one competitive area to

another.  5 C.F.R. §351.203(h)(1).  "Competitive areas" must be defined solely in terms of the

agency's organizational units and geographical location.[13]  5 C.F.R. §351.402(a).  OPM's

regulations at 5 C.F.R. Part 351 are applicable to transfers of function and reductions in force

regardless whether they are made pursuant to statute, Executive Order, reorganization plan, or

other authority.  5 C.F.R. § 351.301(a).

a.  RO Employees Currently Perform Functions Different From
those Currently Performed in the CO.

As discussed above, under the current (pre-reorganization) administrative structure of the

---

[13]    In the RIF notices at issue, the agency identified each of its ten ROs as a
competitive area.   Therefore, the agency has waived any argument that the movement of
functions from the ROs to HQ is not a movement between competitive areas.

RSA, there is a clear division of labor between the regional offices and the central office at ED headquarters in Washington, D.C.   The ROs have complete responsibility for approving or disapproving State Plans (the agreements between the State VR agencies and the federal government as to how funds allocated under the Act will be spent).   ROFS at 2.   The ROs perform this function for 80 State and territorial VR agencies.   Feb. 2005 Proposal at 13.   They also monitor each State VR agency's performance in each program area, and provide daily Technical Assistance to the States and other grantees.   Id.   The ROs administer 593 of RSA's 852 discretionary grants.   Id. at 12.

The Regional Employees serve as the RSA's representatives to the states, and have complete responsibility for monitoring and providing technical assistance as needed to State VR agencies and other grantees.   Each VR Program Specialist is assigned to one or more State, for whose VR grantees the Specialist is totally responsible.   Each RO employee is also a subject matter expert in one or more of RSA's formula grant programs and serves as a resource within his or her region for other Specialists in providing technical support to their assigned agencies. RO employees thus perform functions that are not performed in the CO and have subject matter and regional/State expertise in areas that is distinct from the national and policy-development expertise which resides primarily in the CO.   In short, the RO functions constitute "clearly identifiable segment[s] of [the] agency's mission (including all integral parts of that mission)." 5 C.F.R. § 351.203

b.  All Regional Office Functions are Moving to CO and Will Be Performed There, Effective October 1, 2005.

In every statement to RSA staff and constituents, the agency has emphasized that none of the Regional Office functions will be discontinued.   See, e.g., Ex.18, Ex. 36.   The Secretary has

responded to Congressional inquiries with reassurances that services RSA provides will not be compromised by the RIF – indeed, according to the Secretary, "Services to individuals with disabilities under the vocational rehabilitation and related programs will be improved rather than diminished." Ex. 36 at 2.   Given the fact that all current grant programs are funded for FY2006 and the expressions of serious concern about the RIF by Members of Congress from both parties, it is clear the imperative to eliminate half of RSA's staff is not the result of Congressional mandate but rather is internal to ED.   This situation is therefore much simpler than that in <u>Biter and Giovanetti v. Interstate Commerce Commission (ICC)</u>, where the ICC was abolished by an Act of Congress, and its functions were dispersed.  76 M.S.P.R. 82, *1-2 (1997).  In that case, the Merit Systems Protection Board found that

> Some of the ICC's functions were transferred to the Federal Highway Administration, while other functions were transferred to the newly-created Surface Transportation Board.  The ICC's remaining functions were eliminated.

<u>Id</u>.  In the instant reorganization, *all* of the RO functions are being "consolidated," to use the agency's preferred terminology, in RSA CO.  This reorganization is a transfer of function, and the agency's denials cannot obscure this simple fact.

2.      <u>The Agency Must Offer Transfers to the Employees "Identified" with the Transferring Functions.</u>

Where, as the agency alleges here, a transfer of function requires a reduction in force in the losing competitive area (the regional offices), the employees identified with the transferring functions must be afforded the opportunity to transfer with their functions to the gaining area. <u>Certain Former Community Services Administration Employees v. Department of Health and Human Services</u>, 21 M.S.P.R. 379; 1984 MSPB Lexis 1784, *23, *aff'd*, 762 F.2d 978 (Fed. Cir.1985), (hereinafter "Certain Former CSA Employees").  **Eligible employees must be identified before any functions transfer or any reduction in force**.  <u>Id</u>. (emphasis added).  It

-84-

does not matter that a large number of employees may be entitled to transfer under this rule: the MSPB specifically noted in <u>Certain Former CSA Employees</u> that "A transfer of function may well result in the transfer of an entire staff of an organization." <u>Id</u>. at *22.

The proper identification of employees in a transfer of function is vital to the entire scheme established by the regulations, in that the rights of the individual employees for retention are established at this stage. <u>Certain Former CSA Employees</u>, 21 M.S.P.R. at *26. There is an obligation placed upon the agency to ensure the propriety of the identification process and to be particularly sensitive in identifying employees with a continuing function. <u>Id</u>. (citing <u>Hurley v. United States</u>, 575 F.2d 792, 797 (10th Cir.1977)).

Clearly, based on the above authorities, the agency has undertaken this reorganization and RIF illegally. After announcing in February that it would close the regional offices and "transfer" all regional functions to the central office, agency management apparently discovered that their plan would require transferring the regional employees who performed the continuing functions to CO with their functions. Agency management clearly did not wish to do this, for reasons discussed in section I.B, *infra*.

The U.S. Office of Personnel Management has specified two acceptable methods for identifying the employees who perform transferring functions. 5 C.F.R. §351.303(a). Under Identification Method One, a competing employee is identified with a transferring function if

(1)     the employee performs the function during at least half of his or her work time; or

(2)     regardless of the amount of time the employee perform the function during his or her work time, the function performed by the employee includes the duties controlling his or her grade or rate of pay.

(3)     In determining what percentage of time an employee performs a function in the employee's official position, the agency may supplement the employee's official position description by the use of appropriate records (e.g., work reports, organizational time logs, work schedules, etc.)

5 C.F.R. §351.303(c).

Identification Method Two is applicable to those employees who perform the transferring functions during less than half of their work time and who are not otherwise covered by Identification Method One. 5 C.F.R. §351.303(d). Under this method, the losing competitive area must first identify the number of positions it needed to perform the transferring function. Id. Then, to determine which employees are identified for transfer, the losing competitive area must establish a retention register that includes the name of each competing employee who performed the function. Id. Competing employees listed on the retention register are identified for transfer in inverse order of their retention standing. Id.

In Biter v. Giovanetti, *supra*, the MSPB reversed the appellants' RIF separations because the agency failed to properly identify the employees who performed the transferring functions and thereby adversely affected the employees' substantive entitlements. 76 M.S.P.R. at *24 (*citing* Metger v. Department of the Navy, 68 M.S.P.R. 225, 229 (1995); Hill v. Department of Commerce, 25 M.S.P.R. 205, 208 (1984)). In the instant case, where no identification of any kind has taken place, the pending separations will eventually be cancelled because they are patently in violation of the statute and regulations, and have obviously affected the employees' substantive entitlements in that the regional employees are being fired rather than transferred to D.C. at agency expense.

Importantly, in Biter the Board reprimanded the ICC for targeting a class of employees for separation based not on their duties, but solely on their geographic location:

> [E]mployees are [correctly] identified for transfer based on their duties, not their duty stations. . . . the agency's determination that the appellants were not eligible to compete for transfer to [the gaining area] on the ground that they were "field staff" was not permitted. . . .The agency was required to use the identification methods authorized by OPM's regulations governing transfers of function.

Id. at *22-23.  Biter demonstrates the utter impropriety of OSERS' stated policy of separating

all of the RSA regional office employees because they are stationed in the regional offices does

not conform to either of the two methods permitted by OPM.

> 3.    A RIF is Permissible Only After the Identified Employees
>        Reject the Offer to Transfer from the Losing Area.

A gaining agency or competitive area may determine that a RIF is necessary *only after* it

finds that a transfer of function entails the acquisition of more employees than are needed to

perform that function.  Certain Former CSA Employees, 21 M.S.P.R. at *22 (emphasis added).

In that situation, however, the incoming employees not only have a right to compete with other

employees already engaged in the performance of that function in the gaining area, but must also

be treated by the gaining area "as its own" for purposes of the RIF.  Id. at *22-23.   To protect

the rights of incoming employees, the gaining agency must merge the retention registers of the

segment that is being transferred with the retention registers of the gaining area.  Id. at *23.

Based on the agency's own representations, the "State Teams" based at the central office

after September 30, 2005 will perform many or most of the major functions currently performed

by RO employees (i.e., State Plan Approval, Monitoring, and Technical Assistance).   At base,

the reorganization consists of a recreation in HQ of the ROs in the form of State teams.  The

Teams will administer the same programs as are currently administered by the ROs, provide

technical support to the same agencies and grantees, and perform the same reviews and

monitoring, especially those required by statute.   The number of employees required to perform

these duties at the levels currently maintained is unknown, but it is unlikely that these new

functions can be performed in addition to the CO's existing functions, without most if not all of

the 65 Regional employees.    Acting Deputy Commissioner Jennifer Sheehy-Keller has

repeatedly conceded in national Staff meetings that a great deal of training will be required to try to approximate the knowledge base and functions of the ROs in CO, and that the learning curve will be steep. In a statement that was particularly disturbing to the regional employees, she said that if it should turn out in FY2006 that RSA cannot perform its duties with 81 FTE, it will simply hire more people as needed in FY2007. In other words, OSERS management decided to RIF all of the RSA regional office employees without having any idea whether it can perform its statutorily mandated functions without them.[14]   Respondent cannot proceed in this fashion.

4.     The Agency May Not Competitively Advertise or Fill the Positions Created at CO by the Transfer Because They Belong to the RO Employees By Right.

In a transfer of function, Congress has mandated that

each preference eligible employee in the function *shall be transferred to the receiving agency for employment in a position for which he is qualified before the receiving agency may make an appointment from another source to that position.*

5 U.S.C. §3503 (emphasis added).   Instead of offering transfers to the RO employees who performed the functions moving to CO, the agency simply RIF'd those whom it could not coerce into accepting the proffered early retirement or buyout incentives by fear for their continued access to health insurance.  Ex. 29.   It then advertised ED-wide the few positions that it will admit are created at CO by the need to continue performing the transferring functions.  Exs. 23-28.  These actions violate the statute.

The above discussion focuses solely on the flawed manner in which the RIF has been carried out.  Its purpose is also to establish that the agency cannot justify closure of the regional

---

[14]     Applicant Jeffrey Mitchell notes management's concession that it may well be hiring again in FY2007 if the planned dramatic staff reductions do not work out. "We were outraged [ ] in the regions, where our careers have been destroyed on grounds that our terminations were absolutely necessary, to learn that management apparently feels that it will have a great deal of flexibility, but only after we are gone." Id. ¶8.

offices and the RIF on grounds that they will provide cost savings, because the civil service law requires the agency to retain and transfer at agency expense those regional employees who wish to follow their functions to the CO.   Eventually, if a RIF is shown to be necessary after the workload issues have been resolved, the regional employees who transferred to CO should be able to compete to be retained on an equal footing with the central office employees, who do not currently perform the regional office functions of state plan approval, monitoring of unique grant programs, and technical assistance.

Below, Applicants challenge the impact of and motivation for closing the regional offices and RIF'ing the regional employees. When viewed in this context, the agency's failure to transfer the regional office employees can be seen as another instance of discrimination by OSERS against the regional office employees, a group that contains a high number of disabled and/or older workers.

B.    <u>Applicants Can Show By Direct Evidence that the Agency's Actions Are Motivated by Discrimination on the Basis of Disability.</u>

The Rehabilitation Act specifically bars federal employers from the following discriminatory acts:

(1)    Failing to make reasonable accommodation to the known physical or metal limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business, in violation of 29 C.F.R. §1630.9(a).

(2)    Limiting, segregating or classifying employees in a way that adversely affects his or her employment opportunities or status on the basis of disability, in violation of 29 C.F.R. §1630.5.

(3)    Inquiring as to whether an employee is an individual with a disability or as to the nature or severity of such disability, in violation of 29 C.F.R. §1630.13(b).

The agency has violated each of the above strictures: it has targeted the regional offices

-89-

for closure and the regional employees for a RIF rather than a transfer of function because a high percentage of the regional employees are disabled. By planning and implementing the discriminatory reorganization and RIF, the agency has terminated qualified people with disabilities in order to avoid "the need of the employer to make reasonable accommodation to the individual's physical or mental impairments," in violation of § 1630.9. By refusing to allow agency assistive employees (i.e., readers) to travel with Blind employees on business for the agency, it has failed to provide reasonable and effective accommodations for its Blind employees. It has exacerbated the difficulty created by this policy by putting in place a cumbersome process under which contract readers must first obtain certification as federal contractors before providing any services, and (by omission or design) has sometimes failed to pay the readers after services were rendered.

The agency has made illegal inquiries about the nature of employees' and job applicants' medical conditions, and has expressly (and illegally) linked the cost of such accommodations to its budget for the following year.[15] Therefore, in addition to violating the privacy rights of its employees and job applicants, the agency has also created a substantial disincentive for employees to request accommodations by making these inquiries and expressly linking them to its budget considerations.

The agency has tried to segregate all disabled employees, regardless of the individual's needs for an accommodation or their career competitive status, into Schedule A excepted service certificates for the few positions that it advertised in headquarters. At the same time, the agency has announced a new policy of counting all necessary assistive employees against each program

---

[15]    The EEOC's regulations governing federal employment of the disabled require an agency employer to demonstrate that an accommodation constitutes an undue hardship in order to avoid the obligation to accommodate. 29 C.F.R. §1614.203(c)(1). RSA has not demonstrated that it is even aware of this regulation, much less that it has complied.

component's FTE ceiling, and requiring the programs, instead of the Department's Office of Management, to pay the salaries of the assistive employees. The new policy on assitive employees alone was sufficient to create a significant disincentive to hire people with disabilities, and violates both the language and intent of the Rehabilitation Act. The agency's additional action in channeling all disabled employees out of the competitive service and into Schedule A makes it that much easier for selecting officials to determine which applicants are disabled and may require the accommodation of an assistive employee, which under the new punitive rules could easily wreck the program's bottom line. Under the circumstances, these two agency actions violate the prohibition against "limiting, segregating or classifying employees in a way that adversely affects his or her employment opportunities or status on the basis of disability." 29 C.F.R. § 1603.5

The agency has denied employment to at least one highly qualified Blind selectee for a Regional office position in violation of 29 C.F.R. §1630.9(b), and took an inordinately long time to make job offers to others, again on the basis of their disabilities. In at least two known cases, job offers were made only after a "titanic struggle" between the RSA Commissioner and OSERS management, which strongly opposed the hiring of Blind people throughout Commissioner Wilson's four-year tenure.

Finally, by targeting the disabled regional employees for termination via the broad brush of a geographically-determined RIF, the agency violated not only the civil service law (discussed in section I.A, *supra)* but also 29 C.F.R. §1630.8, which prohibits "denying [non-disabled individuals] jobs or benefits . . . because of the known disability of an individual with whom the qualified individual is known to have a family business, social *or other relationship or association.*"

-91-

1.     The Closures and RIF Are Motivated By The Prejudice of
       OSERS' Executive Administrator Against Disabled People, Especially
       the Blind.

Applicants can show by direct evidence that the reorganization and the RIF are motivated by discriminatory animus against people with disabilities.  "Direct evidence" is evidence "which reflects a discriminatory animus 'on its face'." Hung Vang Dang v. Inn at Foggy Bottom, 85 F.Supp.2d 39, 42 (D.D.C. 2000) (Flannery, J.), *citing* Evans v. Atwood, 38 F. Supp. 2d 25, 30 (D.D.C. 1999) (Urbina, J.) (citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985)).  Evidence that the biased remarks were made by the individual responsible for the adverse action and were related to the actions at issue is sufficient to establish the required nexus. Id. *(citing* Kalekiristos v. CTF Hotel Management Corp., 958 F. Supp. 641, 665 (D.D.C. 1997) (Attridge, Mag.Judge)).  The U.S. Supreme Court has held that where the plaintiff presents direct evidence of discrimination, use of the McDonnell-Douglas burden-shifting evidentiary framework is inappropriate. Thurston, *supra*, 469 U.S. at 121.   Under the EEOC's decisional law, once the trier of fact has accepted the direct evidence, liability is established. "EEOC Policy Guidance on Recent Developments in Disparate Treatment Theory," No. 915.002, July 14, 1992, Section III.

RSA is a program component of OSERS, which means that the RSA Commissioner reports to the Assistant Secretary for OSERS, and OSERS controls RSA's budget and can intervene in RSA personnel actions.   The Executive Administrator (and deputy to the Assistant Secretary) for OSERS is Dr. Andrew Pepin, a career federal employee who has day-to-day responsibility for running OSERS and its components, including RSA.   As discussed above and as former RSA Commissioner Joanne Wilson testifies, during her four years at RSA, Dr. Pepin was openly hostile to OSERS' initiatives to hire disabled employees and openly opposed RSA's

hiring of several Blind employees. According to Dr. Wilson:

> Mr. Pepin told me to my face on numerous occasions and in front of witnesses that we have "too many blind people" on staff at RSA. He gave me charts and sheets where he put it all in writing and marked them up to make his points about how many [blind employees] we had on staff at RSA.

Wilson Aff ¶ 8.

Under Dr. Pepin's management, OSERS has repeatedly engaged in illegal inquiries to determine what a "disabled" employee or job applicant's disability "is," and has based employment decisions on whether or not the individual in question is Blind. Under Dr. Pepin's leadership, OSERS has failed to accommodate its blind employees by hiring sufficient assistive employees, and has established a burdensome process whereunder Blind employees must hire contract readers every time they go on the road.

In the year leading up to the reorganization and the RIF, there was an openly-discussed "backlash" by OSERS leadership against Dr. Wilson and the Blind employees she hired. This backlash was framed solely in terms of a reaction against her because she herself was Blind and persisted in hiring qualified Blind individuals to staff the regional offices despite Dr. Pepin's opposition. OSERS staff also communicated the belief that Blind people cannot perform the "technical" duties associated with the VR program specialist positions in the Regional offices.

To be fully appreciated, Dr. Pepin's attitude must be placed in perspective: he is the career deputy to the politically-appointed head of a federal agency. His opposition to hiring people with disabilities is the functional equivalent of opposing hiring people because of their race or gender. His attitude, which would be unacceptable and unlawful in any context, is even more outrageous given his position in OSERS, which exists to empower and enable people with disabilities. Dr. Wilson notes

Obviously, Mr. Pepin's attitude runs completely counter to everything that OSERS

-93-

should stand for, as well as the principles and requirements of the Rehabilitation Act and the President's own New Freedom Initiative, which is supposed to encourage the federal government to hire more people with disabilities and serve as a model for the private sector.

Wilson Aff ¶ 12.

Dr. Pepin's influence has clearly poisoned OSERS as a work environment for disabled people, starting with individual personnel decisions.   RC Cordova, who is Blind, was excluded from the "most qualified" list by OSERS when he applied for the position of deputy commissioner.   At least one regional vacancy announcement was cancelled after OSERS learned that the selectee was blind.  Other highly qualified applicants have had to minimize or underplay their blindness and membership in blind consumer organizations in order to be hired.

There can be no doubt of the linkage between Dr. Pepin's personal prejudice of people with disabilities and OSERS' unlawful and self-productive plan to close the regional offices and terminate the regional employees – 43% of whom are disabled - *en masse*. Dr. Pepin has been instrumental to every decision that has been made regarding this reorganization and RIF. Assistant Secretary Hager said in his first meeting with the RSA Staff on February 3, 2005 that the plan to close the regional offices preceded his arrival in December 2004.    Prior to Mr. Hager's confirmation, Dr. Pepin was in control of OSERS.[16]  During Spring 2005, it was Dr. Pepin who chaired the "Workplace" committee which, according to Assistant Secretary Hager, performed

> an analysis of work in the regions and headquarters to determine how regional office functions can best be consolidated into headquarters and how the RSA headquarters staff will be reorganized and re-energized to accomplish these functions.

---

[16]    When Mr. Hager is gone, Dr. Pepin will be the acting head of OSERS until the appointment of the next Assistant Secretary.

Ex.17, Hager email of March 8, 2005. Pepin also served on the reorganization's "Steering"

committee, which, again according to Hager, was

> monitoring the progress of the overall project and providing support, guidance and
> assistance. . . the Steering Committee will serve to help guide the effort and reassure
> those most affected that the process is inclusive, objective and professional.

Id. The third, "Personnel," committee was headed by Dr. Paul O'Connell, who reports to Dr.

Pepin and has bowed to his discriminatory dictates for years. Id. According to management's

own representations, these committees were responsible for the agency's decisions (1) defining

each RSA regional office as a competitive area and thus negating the employees' "bump and

retreat" rights; (2) denying directed reassignments for regional employees to existing vacancies

in other ED components in the Department's regional offices, all of which will remain open and

are hiring; (3) denying out-stationing or flexi-place arrangements under which regional

employees selected for CO positions could continue to reside in their home regions; (4) failing to

announce how many positions would be available at headquarters until after the deadline for

opting to retire; and (5) terminating the regional employees who did not take the early retirement

"incentive."

"When one with a discriminatory animus participates in the decision making process

together with others, the court cannot say conclusively that those others were completely

insulated from this influence." Threadgill v. Spellings, 2005 U.S. Dist. Lexis 14141, *21

(D.D.C. July 15, 2005)(citing Griffin v. Washington Convention Ctr., 142 F.3d 1308, 1311 (D.C.

Cir.1998); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 153-54 (2000);

Hernandez v. City of Ottowa, Kan., 991 F. Supp. 1273, 1278 (D. Kan.1998)(finding that the

legitimacy of the entire interview process could be undermined if some or all of the panelists

skewed their interview scores for discriminatory reasons)). Given Dr. Pepin's seminal role in

the RIF and his well-established opposition to hiring and accommodating people with disabilities, the agency's otherwise inexplicable failure to transfer the RO employees to HQ with their functions becomes comprehensible.   The seemingly self-destructive impetus to terminate a vital segment of RSA's workforce takes on new meaning in light of Dr. Pepin's long-festering prejudices and opposition to everything OSERS and RSA should stand for.   These agency actions violate the Act, the regulations, the contract, and all bounds of decency, and are the product of intentional discrimination.

C.    The Agency's Actions Will Adversely Impact Disabled Regional Employees On The Basis Of Their Disabilities.

Even if Applicants were unable to present direct evidence that the agency's reorganization and RIF were motivated by intentional discrimination, they can also show that they will be disproportionately injured by the impending actions.   It is well-established that facially neutral employment rules, policies, practices or procedures which have significant adverse effects upon members of a statutorily protected group, or which otherwise cause members of a protected group to be denied access to equal employment opportunities, are unlawful regardless whether they are motivated by intentional discrimination.   Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986-87 (1988); Connecticut v. Teal, 457 U.S. 440 (1982). Such practices are said to have a "disparate impact" upon members of a protected class, and it does not matter whether those practices are objective or subjective in nature.   Watson, 487 U.S. at 991.   The EEOC's Enforcement Guidance on the ADA (and, therefore the Rehabilitation Act) recognizes that disparate impact claims may be brought on the basis of disability.   Appendix to 29 C.F.R. Part 1630, §§1630.15(b) and (c).

In order to prevail in a claim of disparate impact, a Plaintiff need only show (1) the occurrence of a certain outwardly neutral employment practice and (2) a significantly adverse or

disproportionate impact on persons of a particular protected category due to the facially neutral act or practice. [17] Watson, 487 U.S. at 994.  The employer then has the burden of showing that the challenged practice or act is truly a "business necessity" and consistent with the employer's duty to provide reasonable accommodations.  Id. at 997; see also Appendix to 29 C.F.R. §1630.15(c)("there may be uniformly applied standards, criteria and policies not relating to selection that may also screen out or tend to screen out an individual with a disability or a class of individuals with disabilities.  Like selection criteria that have a disparate impact, non-selection criteria having such an impact may also have to be job-related and consistent with business necessity, subject to considerations of reasonable accommodation.")  Plaintiffs can then prevail by showing that other methods or practices "without a similarly undesirable effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship." Watson,  487 U.S. at 998 (citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975)).

      1.   The Reorganization and RIF will Disproportionately Harm the Regional
          Office Employees Because a High Percentage of Same are Disabled.

     As an initial matter, the Applicants are entitled to the protection of the Rehabilitation Act because they are either qualified individuals with disabilities, or are associated therewith by virtue of being stationed in the regional offices with a high percentage of qualified disabled

---

[17]  In order to establish a prima facie case of discrimination based on a disparate impact theory, the appellant must adduce statistical evidence that the ostensible neutral employment practice has a disparate impact on the statutorily protected group.  Brown v. U.S. Postal Service, EEOC Appeal No. 01931216, * 10 (April 13, 1994).  The purpose of statistical evidence is to establish causation, i.e, to show that the practice in question has harmed the members of the protected group because of the membership therein.  Watson, supra, 487 U.S. at 994.

persons. As discussed above, many of the Applicants were initially hired under Schedule A because they were determined by the agency to be "severely disabled", and thus have a "record" of being disabled.[18] 29 C.F.R. § 1630.2(k). Others were never Schedule A hires but have physical or mental conditions that substantially limit one or more major life activities, or records of same.[19] See Appendix to 29 C.F.R. Part 1630 at § 1630.2(i). All of the disabled Applicants are "qualified" disabled persons in that they continue to perform the essential functions of their positions with or without reasonable accommodations. 29 C.F.R. § 1630.2(m). Indeed, in order to convert from Schedule A status to the competitive service, an employee must provide two years of "satisfactory service" in an excepted service position. 5 C.F.R.§ 3.1(b)

The employer's facially neutral policies of (1) closing the RSA ROs in the context of a reorganization and (2) the resulting RIF of all regional employees violate the Rehabilitation Act because they disparately impact disabled persons. See Pottenger v. Potlatch Corp., 329 F.3d 740, 749 (9th Cir. 2003)(a RIF action constitutes a specific business practice for purposes of a disparate impact claim). Prior to the reorganization, at least 43% of RO personnel were disabled for purposes of the Rehabilitation Act. (The actual percentage may be much higher because many disabilities do not require accommodations and/or do not entitle an employee to be hired under Schedule A, and may escape the employer's detection.) This is much higher than the 25% incidence of disabled persons among RSA's CO staff. Indeed, no other ED component has such a high proportion of disabled employees and none were targeted for abrupt closure and total elimination of the staff therein. The department has 4,500 employees, of which 1400 are

---

[18]  See Bashin Aff.¶3; Evans Aff ¶2; Linster Aff ¶3; Miller Aff ¶3; Nelson Aff ¶3; Nightingale Aff ¶3; Shell Aff. ¶2.

[19]  A list of the disabled applicants and the substantially limited major life activities for each may be found at pages 62-75, *supra*.

stationed in its ROs.  ED's FY 2006 budget indicates that it as necessary for the department as a whole to reduce headcount by 66 persons.  Yet the departmental budget targets solely the RSA's ROs and staff – a workforce of sixty-five people - for elimination.  Meanwhile, OSERS is slated to receive more than $300 million in additional program funds in FY2006.  It is inexplicable why one agency, which will only have greater responsibilities in FY 2006, is being summarily deprived of half of its work force.  It is further inexplicable why the vital and highly efficient service delivery units of that agency – the ROs – should bear the brunt of the ED-wide need, if indeed need there is, to reduce headcount.

As a result of the agency's actions, disabled persons and those associated with them by virtue of being assigned to the same offices will suffer adverse employment actions and irreparable harm, in the form of either (1) termination from federal service and loss of benefits associated therewith or (2) constructive discharge, the loss of employment and significantly reduced retirement annuities.  Many of the targeted employees are the sole breadwinners for their families and are heavily reliant by virtue of their own medical conditions or those of dependents on continuing access to the health insurance available to Federal employees.  The agency cannot plausibly argue that being terminated pursuant to a RIF is not an adverse employment action.  Applicants have successfully made their prima facie case.

2.    These Actions Are Not Justified by Business Necessity.

RSA management has repeatedly stated its convictions that the reorganization will result in a "streamlining" or "consolidation" of functions in HQ which in turn will reduce agency overhead and free up additional funds for the delivery of increased services to the States and other consumers.  The decision to close the ROs has been characterized repeatedly as a straight "business decision," and there has been much talk about how the services RSA provides will be

delivered "better" from HQ.    However, in a March 8, 2005 teleconference , then-Acting Commissioner Troy Justesen admitted that management has no studies, business plans, impact studies or simulations supporting these assertions.    Given the dubious business basis for the reorganization and the fact that the reorganization is a transfer of function which requires the relocation – at agency expense - of many and perhaps all of the RO employees to HQ (discussed in Section I.A., *supra*), it cannot be characterized as even hypothetically necessary for business reasons or likely to improve RSA's performance or reduce its operating expenses and overhead. Even if the closure of the regional offices was not discriminatory, it is a transfer of functions which will require the outlay of substantial funds to relocate the RO employees to the Washington, D.C. commuting area.  In the alternative, if the reorganization is not a transfer of function, the planned RIF of the regional employees will impair the RSA's ability to deliver services, harming not only the impacted employees but millions of disabled individual throughout the United States who are dependent upon the expert administration and delivery of RSA-funded independent living and other services.

Rather than inflict upon RSA all of the allegedly necessary headcount reduction, the Department should either have imposed a hiring freeze or attained its headcount reduction goals through a nationwide offer of early retirement and buy-outs.  This would have satisfied the purported business necessity of the headcount reduction without (1) destroying the RSA's ability to deliver services and administer grants, (2) incurring the huge relocation costs associated with transferring the RSA RO functions to HQ, and (3) harmfully impacting the most vulnerable population in the agency in terms of reemployment prospects.  In short, this reorganization and RIF are impermissibly harmful to disabled employees in the ROs, cannot be justified by any business necessity, and will be cancelled by the Board, the Commission, or the courts.

D.     The Reorganization and RIF Will Disproportionately Impact
       Applicants on the Basis of their Age.

Applicants further allege that the reorganization and RIF, which are aimed solely at the

RSA ROs, will harmfully and unlawfully impact the employees thereof, who are

disproportionately over the age of 40 and most of whom are fifty or older.   The U.S. Supreme

Court recently held that the ADEA authorizes recovery in disparate impact cases.   Smith v. City

of Jackson, Miss., 125 S.Ct. 1536, 1545-46 (2005).

On the same theory of disparate impact as outlined above in section I.C, the RIF

disproportionately impacts RO staff, 92% of whom, based upon the agency's representations, are

over 40.   Only 84% of the RSA CO employees are over 40.  Ex.15.   The regional employees

who were offered and accepted early retirement or buyout packages under duress will suffer

harm in the forms of (1) a significant reduction in their expected retirement income due to the

contributions period being shortened; (2) their "high three"-earnings years occurring much

earlier than expected; and (3) the penalty for early withdrawal of benefits from the federal

retirement system – a penalty the agency refused to waive herein, though it has done so in other

cases.   Those who will be terminated under the RIF will face the loss of income, the loss of

health insurance, and substantial difficulty in obtaining new employment in a society in which

age discrimination is alive and well.

1.  No Reasonable Factors other than Age Can Justify the Closures or the RIF.

In disparate impact cases based on age, an employer can justify its actions which

harmfully impact older workers only by demonstrating that its actions were based on some

reasonable factor other than age.  29 U.S.C. §623(f)(1); Smith, *supra*.   The agency herein cannot

meet this burden any better than it could justify the harmful impact of the RIF on disabled

persons, see Section I.C, *supra*.

-101-

As noted above, the 65 RSA RO employees were the only workforce within ED targeted for wholesale elimination, despite the fact that overall ED headcount in January 2005 was already at a level *below* that required by the president's FY 2006 budget.  Furthermore, they were targeted as the result of what the employer  terms "a straight business decision" aimed at "reducing overhead" by using "twenty-first century technology" to perform the functions previously assigned to the ROs from HQ in future.   As an initial matter, it is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age.  Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

Leaving aside the question of motivation, the statistics herein are alone sufficient to show that the reorganization and RIF are disproportionately harmful to older workers. Furthermore, the employer's actions are not reasonable given the harm that will be inflicted on RSA's ability to perform its mission and the cost of relocating the RO employees to HQ consistent with the agency's obligations under the contract and the law on transfers of function. As noted above, the reasonable and far less costly approach would have been to seek to reduce ED headcount by 65 FTE nationwide through a round of early retirement and early out offers. The department's failure to take this commonsense step and its bizaare determination on this destructive and counterproductive expedient cannot stand, in light of the harmful impact of the RIF on the older workforce of the ROs.

E     The Agency Has Already Retaliated Against One or More of the
       Applicants for Opposing the Discriminatory Reorganization and RIF.

The Applicants have a substantial likelihood of success on the merits of their claim of

retaliation before the Commission. To prevail, they must first make out a prima facie case of retaliation. Bonds v. Heyman, 950 F. Supp. 1202, 1208 (D.D.C. 1997)(*citing* Mitchell v. Baldridge, 759 F.2d 80, 87 (D.C. Cir.1985)). The agency then has the burden of putting forth a nondiscriminatory reason for its actions. Id. Applicants may then attempt to show the employer's proffered explanation is pretextual. Id.

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) the employer took an adverse personnel action; and (3) that a causal connection exists between the two. Id. (*citing* Barnes v. Small, 840 F.2d 972, 976 (D.C. Cir.1988)).

    1.    The Regional Commissioners Engaged in Conspicuous Protected Activity.

The regional commissioners were the first regional employees to retain counsel as a group and formally oppose the reorganization as it developed throughout Spring 2005. Undersigned counsel sent letters to the Secretary and Assistant Secretary by certified mail on March 22, May 26, and June 16, 2005, noting the illegality of the Department's failure to transfer the regional employees with their functions and describing the adverse impact on the regional employees of the proposed closures. See Exs 45, 46 and 47.[20] On June 26, 2005, the Regional Commissioners filed their consolidated EEO complaint. Ex. 30. These actions constitute protected activity and should have insulated the regional commissioners from retaliation by the agency. 29 C.F.R. § 1614.101(b); see also, e.g., Keller v. U.S. Postal Service, EEOC Appeal No. 01A03119, *15 (2003).

    2.    The Agency Took Material Adverse Actions Against Two
        Of the Regional Commissioners.

---

[20]    The March 22 letter received a response from the Assistant Secretary.

-103-

Shortly after they engaged in protected EEO activity by (a) repeatedly opposing the agency's discriminatory reorganization and RIF and (b) filing EEO complaints, two Regional Commissioners who were on the short list of RSA employees eligible to receive a Quality Step Increase (QSI) did not receive them. A QSI is "a permanent increase to an employee's base pay with a cumulative benefit throughout the career, and ultimately the retirement, of the employee." See Ex. 43, Education Personnel Manual Instruction (PMI) 451-1, section V.A.1. Allen Kropp was eligible without question because he had received an Outstanding performance rating, and had not received a QSI within the previous 52 weeks. See Ex __, 2004-2005 QSI Distribution. Noel Nightingale also received an Outstanding rating, but had received a QSI in the last 52 weeks. See id. Because nineteen QSIs were available, and only fifteen employees, including Mr. Kropp, were eligible under the Department's PMI, i.e., had both an Outstanding performance ratings and no previous QSI, he should have received one. Id. Despite this, and in violation of the PMI, the agency bypassed Mr. Kropp while awarding six of the nineteen available QSIs to central office employees who were not in fact eligible under the rules because they had received a QSI within the previous year. See Ex. 44 (showing that CO employees Hayes, Mitchell, Ashby, McMahon, Pepin, and Fountain each received a "QSI Last Yr?" and a "QSI Award" for FY2005).

If the agency simply waived the requirement that no QSI have been received in the last year in order to justify giving QSIs to the six otherwise-ineligible central office employees, then Ms. Nightingale was also rendered eligible by this waiver. However, the agency bypassed her as well. See Ex. 44.

Materially adverse employment actions causing objectively tangible harm include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or

decision causing a significant change in benefits." Brown v. Brody, 199 F.3d 446, 457 (D.C.Cir. 1999) (quoting Burlington Industries v. Ellerth, 524 U.S. 742, 761 (1998)).   The denial of a "permanent increase to an employee's base pay with a cumulative benefit throughout the career, and ultimately the retirement, of the employee" satisfies the requirement that Applicants show a materially adverse action.

3.    Any Non-Discriminatory Rationale Offered by the Agency is Pretextual.

The QSIs were issued during late July or early August 2005, within a month or less of the Commissioners' filing an EEO complaint.   The Commission has found sufficient evidence of a nexus or casual connection between protected activity and subsequent retaliation when there is temporal proximity, i.e., when one follows the other within a short time period.  Stokes v. Defense Logistics Agency, EEOC Appeal No. 01933573, *17 (1994)(citing Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir.1980)).  The Commission has held that an inference of reprisal is indisputably justified when an adverse action follows protected activity by only one month.  Jiminez v. U.S. Postal Service, EEOC Appeal No. 01870265, *12 (1988).

The agency violated its own rules to avoid giving QSIs to the eligible Regional Commissioners .  An agency's violation of its own policies can be indirect evidence of discrimination.  See e.g. Causey v. U.S. Postal Service, EEOC Appeal No. 01994078, *12 (February 11, 2003).

Under the circumstances, including the patent violation of well-established civil service protections and Dr. Pepin's instrumental role in the way the entire reorganization and RIF were structured, Applicants have an extraordinarily high likelihood of prevailing in their transfer of function, disparate impact, disparate treatment, and retaliation claims.  Below, Applicants establish that they will suffer irreparable harm if an injunction does not issue.

## II.    APPLICANTS AND THE PUBLIC WILL SUFFER MULTIPLE IRREPARABLE INJURIES IN THE ABSENCE OF AN INJUNCTION

### Applicable Standard

The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.  Sampson, *supra*, 415 U.S. at 87 (1974) (*citing* Beacon Theaters v. Westover, 359 U.S. 500, 506-07 (1959)).  The courts have developed "several well-known and indisputable principles to guide them in the determination of whether this requirement has been met." Id.

There is some question as to the applicable standard for irreparable harm. Traditionally, applicants for preliminary injunctions needed only show that they will suffer irreparable injury, i..e, harm which cannot be remedied by an award of money damages after the fact.   However, in Sampson, the U.S. Supreme Court held that applicants seeking to enjoin federal personnel actions are required to make "a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in government personnel cases." Id. at 83-84.   However, the D.C. Circuit has not ruled that the heightened irreparable harm standard articulated in Sampson is applicable to Title VII and other federal anti-discrimination cases, and there are several important reasons that Sampson may not be the applicable standard.   See Wagner v. Taylor, 836 F. 2d 566, 575 & n.66 (D.C. Cir.1987) (holding that a district court has the power to grant injunctive elief during the pendency of Title VII administrative proceedings without citing the increased requirements of Sampson).  See also Bonds, 950 F. Supp. at 1211 (*citing* Wagner, 836 F.2d at 575 n.66; Callicotte, 698 F. Supp. at 949; McElrath v. Kemp, 714 F. Supp. 23, 26 (D.D.C. 1989)).  In the absence of a definitive ruling on this issue, courts in this Circuit may find that the balance of the equities is more

favorable to the grant of an injunction preserving the status quo when Title VII is the cause of action.

It is also important to note that in Sampson, the Court was working without a well-developed factual record on the issue of irreparable harm. 415 U.S. at 88 ("the record before us indicates that no witnesses were heard on the issue of irreparable injury, that respondent's complaint was not verified, and that the affidavit she submitted to the District Court did not touch in any way upon considerations relevant to irreparable injury"). Indeed, part of the holding in Sampson was that an evidentiary hearing and a complete record are vital to making a determination of the equities of a given case. Id. At least one court has held that irreparable harm can be found where a full factual record has been developed and evidentiary hearings held regarding "examples of irreparable injury to these plaintiffs." See e.g., AFGE v. Callaway, 398 F. Supp. 176, 193 (N.D. Ala.1975). Applicants have done their best to provide the Court with sufficient facts to permit a finding of irreparable harm and avoid the pitfall of the Applicants in Sampson.

The likelihood of irreparable injury is less of a factor when the probability of success on the merits is greater. WMATC v. Holiday Tours, Inc. et al, 559 F.2d 841 (D.C. Cir.1977)(a "possible" irreparable injury has been held to suffice if there is a strong probability of success on the merits). See District 50, United Mine Workers v. United Mine Workers, 412 F.2d 165, 168 (1969); Packard Instrument Co. V. ANS, Inc., 416 F.2d 943 (2d Cir.1969); Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 923 (3d Cir.1974); Blackwelder Furniture Co. Of Stateville, Inc. v. Seilig Manuf'g Co. Inc., 550 F.2d 189, 195 (4th Cir.1977); Wright & Miller, Federal Practice and Procedure: Civil, § 2948, p. 455.

Finally, it is important to note that Applicants have not yet been terminated; their terminations pursuant to the noticed RIF will take effect on September 30, 2005. Where the equitable relief sought includes interim reinstatement or hiring, the plaintiff's showing of irreparable harm must be sufficient to overcome the courts' traditional reluctance to command specific performance in the form of reinstatement. Legault v. Russo, 842 F. Supp. 1479, 1489 (D.N.H.1994)(citing Sampson, 415 U.S. at 83). However, "implicit in . . . Sampson is the notion that reinstatement is an extraordinary remedy, and that preliminary relief affording that remedy must be based on a showing of extraordinary circumstances above and beyond those which might support an order preserving the status quo." Jessen v. Village of Lyndon Station, 519 F. Supp. 1183, 1189 (W.D. Wisc.1981). In Jessen, the court continued:

> The distinction between relief granting reinstatement and relief preserving the status quo is significant in this case where plaintiff presently remains on the job. It appears that relief aimed at preserving the status quo is in some measure less "extraordinary" than relief ordering reinstatement.

Id. (citing EEOC v. City of Janesville, 630 F.2d at 1259).

Because (1) the record herein provides ample information regarding the extent of irreparable harm that applicants will suffer in the absence of an injunction, (2) the applicants oppose unlawful discrimination under the ADEA and the Rehabilitation Act; and (3) they seek to maintain the status quo rather than reverse a completed RIF, the traditional standard for irreparable harm should be applied.

Notwithstanding the above, below Applicants present facts which satisfy both the traditional standard for irreparable harm and the heightened standard articulated in Sampson and its progeny.

A.    Civil Rights Complainants have a Per Se Irreparable Injury.

-108-

Several trial courts have concluded that the harm caused by discrimination creates a presumption of irreparable injury. Callicotte v. Carlucci, 698 F. Supp. 944, 949 n.3 (D.D.C. 1988) (Parker, J.) (citing AFGE Local 51 v. Secretary of the Treasury, 40 Fair Empl. Prac. Cas. (BNA) 395 (N.D. Cal. 1986)(irreparable harm "may be presumed from likelihood that a violation of the Rehabilitation Act has occurred" resulting in handicapped persons facing immediate dismissal); EEOC v. City of Bowling Green, 607 F. Supp.524 (W.D. Ky. 1985)(injunctive relief granted where employee faces dismissal solely due to his age); Gibson v. U.S. Immigration and Naturalization Service, 541 F. Supp. 131 (S.D.N.Y. 1982). The Applicants here are alleging discrimination under the disparate impact and disparate treatment theories and on the bases of age and disability.   If this principle has any currency in this Circuit, Applicants have suffered irreparable injury in at least three ways.

B.   The Applicants and their Families Will Suffer Extraordinary and Irreparable Harm if the Reorganization and RIF are Not Halted During the Pendency of their Complaint.

In Sampson, the Supreme Court stated that most of the "external factors common to most discharged employees" will not support a finding of irreparable injury, however severely they may affect a particular individual.  However, the Court qualified this, noting

We do not wish to be understood as foreclosing relief in the genuinely extraordinary situation.

415 U.S. at 92.   Presumably, where an employee can show more than the short-term loss of income and difficulty in obtaining employment - the usual "external factors" incident to being discharged - injunctive relief is available.  Indeed, the D.C. Circuit has held that irreparable harm exists if (1) the injury is both certain and great, not merely feared as likely to occur; (2) the injury is of such imminence that there is a clear and present need for relief to prevent it; and (3)

the injury consists of economic loss so severe that plaintiff's very existence is threatened.

Wisconsin Gas Co. v. FERC, 758 F.2d 669, 673-74 (D.C. Cir.1985).  Irreparable harm has been

found where economic loss threatens the applicant's very existence, whether as an individual or

a business entity.  WMATC v. Holliday Tours, 559 F.2d at 843 & n.2; Wisconsin Gas Co. v.

FERC. 758 F.2d at 674;  Callicotte v Carlucci, 698 F. Supp. at 951 (doctor's testimony that

impoverishment resulting from removal will, "in all probability severely increase her depression

and lead to her suicide").   Courts have also granted injunctive relief where a spouse or child's

health is endangered by the loss of an employee's medical benefits.  For example, in Gonzalez v.

Chasen et al., the district court granted an injunction on the following showing of irreparable

harm:

> Upon plaintiff's dismissal, [his] medical insurance will be cancelled and life
> insurance policy terminated.  Plaintiff's five year old son suffers from asthma
> and has been hospitalized on two occasions.  Plaintiff's medical plan covers the
> treatment for his son's condition.  Furthermore, Plaintiff's two daughters, ages
> 12 and 13, will be removed from the school they have attended at Ft. Buchanan,
> PR since kindergarten, which is for children of federal employees.  Plaintiff's
> wife has been a housewife for the last thirteen years, hence plaintiff is the sole
> family income source.  Plaintiff has debts amounting to $40,000.00 of which
> $27,000.00 constitutes a mortgage on his home which will be foreclosed for
> failure to make payments. . . . Unlike the speculative loss in Morgan v Fletcher,
> plaintiff, whose son has serious medical history, will be deprived of health
> insurance coverage that was available through his job.  Furthermore, two of his
> children who are presently attending a school will be removed from aid school.
> Also unlike Morgan, where plaintiff's income represented 45% of the total
> family income, plaintiff herein is the sole breadwinner in the family.  This the
> loss of plaintiff's income will certainly lead to the foreclosure of his home.

506 F. Supp. 990, 997 (D.P.R.1980)(distinguishing Morgan v. Fletcher, 518 F.2d 236 (5th

Cir.1975)).  See also Schrank v. Bliss, 412 F. Supp. 28, 37 (M.D. Fla.1976)(enjoining

termination where Applicant was the sole breadwinner, his wife "has a serious medical history,"

and the loss of their home was a certainty without his income).

Unfortunately, the impending loss of jobs under the RIF will have effects of sufficient severity on many members of the Applicants group and the above standards can be met.

1.   The Loss of Income and Medical Insurance for Several Months or Years Will Be Catastrophic for the Disabled Applicants and Those with Disabled Dependents.

Several of the most severely disabled Applicants are the sole breadwinners for their families, and have home mortgages which cannot be paid without their income. Allen Kropp, Noel Nightingale, Joe Cordova, and Keith Beichner provide the only income for their families. Kropp Aff ¶ 6 , Nightingale Aff ¶ 10, Cordova Aff ¶12, Beichner Aff. ¶14.  Mr. Kropp and Ms. Nightingale each have three young children. Kropp Aff ¶ 6, Nightngale Aff ¶10.  Mr. Kropp's young son has a serious heart condition requiring three open heart surgeries before the age of six. Kropp Aff ¶ 6. Ms. Nightingale and Mr. Cordova are Blind. Nightingale Aff ¶2; Cordova Aff ¶2.  Mr. Beichner has several medical conditions which limit his ability to see, hear, breathe and bend.  Beichner Aff ¶2. His daughter and grandchild live with him and his wife and thus all three generations are in imminent danger of losing their home if he cannot make mortgage payments. Id. ¶14.

Brian Miller and John Nelson are in similarly dangerous predicaments: each is disabled (Miller is Blind, Nelson is quadriplegic) and each has a spouse with serious medical history and thus an urgent need to maintain health insurance and access to care.   Miller Aff ¶2, Nelson Aff ¶2.  Mr. Miller's wife is a Type I diabetic and is a recent kidney transplant recipient.  Miller Aff ¶ 17.  Mr. Nelson's wife has Lyme disease and fibromyalgia.  Nelson Aff ¶10. Joe Farrell, who is 65 and has Diabetes Mellitus, just adopted with his wife their three young grandchildren, who are just beginning school in their grandparents' neighborhood and becoming part of the social and educational fabric of the community.  Farrell Aff ¶ 2, 6.  One of Mr. Farrell's grandchildren

-111-

is disabled and has continuing medical needs. Id. ¶6. In the absence of an injunction, the children are placed at health risk and are in danger of being uprooted yet again if Mr. Farrell is selected for one of the illusory positions at headquarters which will be announced shortly. Mr. Farrell and his wife need to continue to work because they have three new mouths to feed. Id. ¶6. Mr. Farrell is 65 and can expect significant difficulty in finding a new job. Id.

Each of the above disabled individuals expects to have to survive an extended period of unemployment because of their severe disabilities. In the meantime, their families are placed at unacceptable risk of harm by the agency's discrimination and the lengthy administrative process that must be exhausted before they can obtain resolution of their claims. Many of the Applicants themselves have serious medical conditions and they too cannot go without medical insurance. In addition to the aforementioned situations, Sue Rankin-White is wheelchair-bound and is a polio survivor. Rankin-White Aff ¶ 5. Ms. Rankin-White's COBRA premium will exceed her reduced retirement annuity if she is forced to retire to preserve her access to health care in the event the RIF and the selections are not stayed. Id. Bryan Bashin is Blind and has other medical conditions which make him uninsurable without COBRA, which is prohibitively expensive. Bashin Aff ¶2, 15. Mr. Bashin is not entitled to transfer because he is still a probationary employee, thus the only way his access to health care can be preserved while this case proceeds is through a stay of the his termination. Id. ¶3. Bruce Rose has congenital cerebral palsy and must have access to health care, yet he cannot apply for any of the positions announced because he is a GS-11. Rose Aff ¶¶ 2, 8.   He therefore will be forced either to go without insurance during a period when he needs to undergo major surgery or to exhaust his resources to make COBRA payments. Id. ¶7. Mr. Rose's condition substantially limits his ability to speak and his physical strength, and he notes that "Given my age and disability, it

would be next to impossible for me to secure employment in the private sector that also includes health insurance." Id. ¶6.

Several of the Applicants are in danger of losing their homes if they are not selected for one of the vacancies, and of being forced to sell their unique family homes and move away from elderly and dependent parents if they are selected for one of the CO positions: Janette Shell is a single mother who recently purchased a home on Lake Michigan and would have to sell it to move to D.C. Shell Aff ¶11. Once the house is sold it is not recoverable by administrative or court order. Jackie Tellier owns two homes and would have to sell them both to move to D.C. Tellier Aff. ¶5. She has a power-of-attorney for her elderly mother and if forced to move away would lose her ability to provide regular supervision of her mother's care and activities. Id. ¶6. Mary Davis (age 55) is legally Blind and her husband is 70 years old. Davis Aff. ¶¶2, 3, 8. They recently refinanced their farm in Georgia expecting that she would continue to work for a few more years before retiring. Id. ¶8. All of her support systems are near her home and they would be forced to sell their farm if she has to move to D.C. to continue to work. Id. Marian Fuller provides regular assistance to an elderly parent and parent-in-law near her home in Colorado, and if selected for one of the positions available at CO would be forced to sell her home outside of Denver and move to D.C., only to have the selection eventually cancelled and vacated because, as described in Sections I.A-D, *supra*, it violates the civil service law and the Rehabilitation Act. Fuller Aff ¶6. John Nelson would have to leave his newly purchased home in Massachusetts and move far from his 90-year old mother, whom he can presently visit via a day trip and for whom he has a power-of-attorney. Nelson Aff ¶7. Richard Anderson will be forced to sell his cooperative apartment in New York to move to D.C. if selected for one of the vacancies at issue and his wife would have to give up her local teaching job. Anderson Aff ¶ 9.

-113-

Martha Garber's husband has a psychiatric practice near their home in Texas and being forced to leave the area if Ms. Garber is selected for one of the vacancies would require the closure of his business. Garber Aff ¶ 8.

The barriers to reemployment are significantly higher for this group than for the average person threatened with imminent job loss. These barriers are not speculative, but real and possibly insurmountable. As detailed above, the majority are significantly disabled and over the age of fifty, in a society which regularly discriminates against people with disabilities and older workers.

There is a clear and imminent danger to the health and the lives of the Applicants and their families, from the Applicants' impending terminations. Applicants who are selected to fill the vacancies during the months it will take to process their EEO and MSPB complaints will suffer irreparable harm because they will have to move to uproot their families and move to D.C., only to have the entire scheme of competitively-filled vacancies invalidated later on when applicants prevail in their EEO and MSPB complaints about the RIF and the transfer of function. These is precisely the kind of extraordinary and irreparable injuries that the Supreme Court in <u>Sampson</u> recognized might occur, and for which it specifically left open the possibility of granting an injunction.

2.    <u>The Caps and Limitations on Damages Will Prevent Applicants From Being Made Whole for their Non-Pecuniary Harm.</u>

In the D.C. Circuit, liquidated damages are not available in ADEA claims against the federal government. <u>Endres v. Helms</u>, 617 F. Supp. 1260, 1269 n.23 (D.D.C. 1985)(*citing* <u>Smith v. Lubbers</u>, 28 F.E.P. 324 (D.D.C. 1982), *aff'd without op.*, 713 F.2d 865 (D.C. Cir.), *cert. denied*, 464 U.S. 996 (1983)). Furthermore, there is a statutory cap of $300,000 on

-114-

compensatory damages available to each prevailing Applicant under the Rehabilitation Act. See

Bonds, 950 F. Supp at 1215 n.15. Because of the extensive and irreparable harm (outlined

above) that the Applicants will suffer if the reorganization and RIF are allowed to proceed

during the pendency of their complaints, these caps and limitations on damages for non-

pecuniary harm will prevent Applicants from being made whole subsequent to the resolution of

their administrative and, if necessary, their lawsuits. An injunction is therefore needed to

prevent the Applicants from suffering injuries which cannot be remedied under the statutes and

case law.

C.     In the Alternative, if the Reorganization is Not Enjoined and the Applicants'
       Positions Are Eliminated, They Cannot Subsequently Be Made Whole on their
       Discrimination Claims.

       1.     Reinstatement Is Not Available as a Remedy
              when the Position at Issue has been Eliminated.

Successful civil rights plaintiffs who have been terminated as the result of

discrimination are entitled to reinstatement with the defendant employer absent exceptional

circumstances, e.g., where the position is no longer available or where a reduction in force has

occurred. See e.g., Valenza v. Smithsonian Institution, EEOC Appeal No. 04A20020 (2003); see

also Coston v Plitt Theatres, Inc. 831, F.2d 1321, 1331 (7th Cir.1987), vacated on other grounds,

486 U.S. 1020(1988)(citing McNeil v. Economics Laboratory, Inc., 800 F.2d 111, 118 (7th

Cir.1986), cert. denied, 481 U.S. 1041 (1987)(lack of an available position may make

reinstatement infeasible); Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728-29 (2d

Cir.1984) (reinstatement not available where there is no position available at time of judgment);

Patterson v. American Tobacco Co., 535 F.2d 257, 268-69 (4th Cir.), cert denied, 429 U.S. 920

(1976)). In other words, where employees have been wrongfully terminated from federal

-115-

employment, they can be made whole only by reinstatement. But reinstatement is not available where a reduction in force like the one at issue herein eliminates the position to which the employee should otherwise have been reinstated. See e.g., Gaddy v. Abex Corp., 884 F.2d 312, 319 (D.C. Cir.1989)(citing Coston v. Plitt Theatres, Inc., 831 F.2d 1321, 1331 (7th Cir.1987)).

Applicants challenge not only the reorganization and RIF, but also their individual terminations on grounds that these were motivated by discrimination. It is entirely possible that they will prevail on the issue of the individual terminations but not succeed in stopping or modifying the closures and RIF. Because the RIF will eliminate all RO positions as of September 30, 2005, without an injunction Applicants as prevailing complainants or plaintiffs will not be able to be reinstated to their positions because these will have been eliminated by the time the administrative process has been completed. Therefore, unless the RIF itself is stayed, preserving the positions currently occupied by the RO employees, they will suffer an injury from which they cannot be made whole - the loss of federal jobs to which they cannot be later reinstated even if they succeed in showing that the RIF was discriminatory either in intent or impact.

2.  Front Pay Cannot Make the Severely Disabled Applicants If Their Positions Are Eliminated in the Absence of an Injunction.

The U.S. Court of Appeals for the First Circuit held in Whittlesey that front pay is an adequate remedy to ADEA plaintiffs for the loss of jobs to which reinstatement is impossible. 742 F.2d at 728; see also 29 U.S.C. § 626(b). However, herein front pay is not an adequate substitute for employment for the Applicants, many of whom have triumphed over significant physical and mental disabilities in order to work, and whose ability to earn their living by performing highly complex and valuable work was a source of great pride and empowerment.

-116-

As Bruce Rose explained, who has congenital cerebral palsy, his job is about more than income:

> [N]o amount of money can make me whole for the loss of my position. This is also about dignity and self-worth as a person. I have had many, many struggles throughout my life to accomplish independence and overcome the barriers posed by my disability. I have achieved economic self-sufficiency, and am a highly skilled and contributing member of society and the federal service. I attained this at great cost and years of hard work, and being able to work is more than just income to me. Being relegated to unemployment or Social Security Disability at this stage in my life eliminates more than my income and expectations – it undoes everything I have strived for: personal independence and helping to advance vocational rehabilitation for people with disabilities.

Rose Aff ¶ 9. The disabled Applicants have fought the limitations imposed by their medical conditions and every other barrier imposed by society their entire lives, and have achieved independence and economic self-sufficiency. Paying Mr. Rose and his disabled colleagues to sit at home after their positions have been eliminated for discriminatory reasons would not begin to make them whole. Because front pay cannot make Applicants whole for the loss of jobs to which they cannot be reinstated, the reorganization that will eliminate their positions must be halted.

> D.    The Selection Process for the Announced Vacancies Should Be Halted Because the "Ground Rules" Are Discriminatory and Retaliation is Likely.
>
>    1.    The Disabled Applicants Are At A Terrible Disadvantage Under The New Policy on Counting Assistive Employees.

The FTE policy articulated by agency management makes it that much harder for the disabled applicants who need an assistive employee as an accommodation to get picked for the few positions available. As discussed above, the new "ground rules" weigh heavily against the selection of disabled applicants because in FY2006, individual programs instead of the Department will have to bear the cost of assistive employees. In confirmation of these concerns, the only two Applicants who to date have been offered positions at headquarters do not require

-117-

any reasonable accommodations, including that the agency hire any assistive employees that would add to its FTE totals.

2.    Even If The Process Were Not Biased, Retaliatory Non-Selections Are Likely.

When a plaintiff seeks preliminary injunctive relief against acts of reprisal for engaging in protected EEO activity, the plaintiff must not only prove irreparable harm, but also the imminence of further retaliation." Wagner, 836 F.2d at 576 & n.75; see also Competitive Enters. Inst. v. U.S. Department of Agriculture, 954 F. Supp. 265, 276 (D.D.C. 1996) (Lamberth, J.) (citing Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir.1985)).

Applicants have already shown that the agency retaliated against Regional Commissioners Kropp and Nightingale when it learned of their protected activity.   The selections at issue are known to be imminent because the agency has announced that it will be making supervisory and fiscal selections shortly.  The interviews for at least two of the positions were recently concluded.   Based on the denial of QSIs for the Commissioners, the agency is likely to retaliate for the EEO complaints and indeed this application by non-selecting any of the applicants for positions.   Retaliation threatens the very core of Title VII's guarantees, for it may well dissuade employees from ventilating their grievances.  Wagner, 836 F.2d at 574.  Even if the selection process were not otherwise subject to future invalidation and biased against people with disabilities, the likelihood that the agency will bypass those employees who filed EEO complaints is strong and creates a substantial disincentive for other affected regional RSA employees or those in other program components to pursue the EEO process and undertake protected activity where their later job opportunities selections will be adversely affected.

E.    Applicants Will Be Irreparably Harmed if the Agency Is Not Enjoined from
      Destroying Records that are Relevant to the EEO and MSPB Cases.

If documents are destroyed or transferred it will make it significantly harder if not

impossible for the Applicants to make their transfer of function arguments. These are based on

the duties previously performed by the RO employees; those duties that are transferring to

headquarters; which of the transferring duties are those that were performed by the RO staff; and

which employees are "identified with," i.e., previously performed, the transferring duties and are

thus entitled to move at agency expense to headquarters with their jobs. Furthermore, in the

event Applicants succeed in halting the reorganization, the destruction of the regional office files

and histories will make it impossible to reconstitute them. Finally, the agency has destroyed

many of the documents that contain the history of continuing programs and could be of great

value to whomever is administering the programs in future. The agency's destruction of its own

history is more evidence of the haste and carelessness of this reorganization and one more

immediate prospect for irreparable harm to the agency and the programs it administers. Neither

the Applicants nor the recipients of the grants administered by RSA nor the taxpayers can rely

on the agency's discretion in this matter, and the destruction of any further regional office

documents should be enjoined forthwith.


III.   **AN INJUNCTION WOULD CAUSE LITTLE OR NO SUBSTANTIAL INJURY
       TO THE AGENCY**

A.    The Agency Has No Legitimate Interest in Completing a Discriminatory and
      Poorly Conceived and Implemented Reorganization.

While the Department of Education may well need to reduce headcount by 65 persons,

there is no requirement that it be done solely at the expense of older and disproportionately

-119-

disabled workforce of the RSA regional offices, nor that it be done in such a way that the agency will in fact be unable to administer the VR monies that are its reason for being. An injunction would not prevent the agency from exercising its legitimate authority to make personnel decisions and other kinds of necessary restructuring. It would merely prevent the agency from making such decisions and taking such actions through discriminatory means and for discriminatory reasons. Again, we note that the agency has forced the RO employees to reapply for positions that should have been their non-competitively through a transfer of function. The Assistant Secretary himself tried to channel all disabled employees in the RO to Schedule A in applying for the few available positions. The new ED policy of making program offices accountable for the FTE and the salary of employees hired as accommodations for the disabled is a strong disincentive for any selecting official to hire anyone known to have a disability, because should they require an accommodation after being hired, it will be a double burden on their programs. It was never explained why ED insisted on this change of policy, but it is certain that this policy has created a barrier to the employment of the disabled, when it should be removing them. In short, everything the Department has done in this case seems calculated to get rid of disabled employees. The agency has no legitimate interest in carrying out any of the above policies, or in filling vacancies that should never have been advertised, or indeed in terminating employees because they are disabled or in a way that disproportionately harms them because they are disabled and older.

> B.    Any Harm to the Agency is the Result of its Own Discriminatory Actions.

The agency was already below FY2006 headcount at the beginning of 2005. As noted above, there was no need for anyone to lose their jobs for ED to fit within the

budgeted FTE ceilings, particularly when the agency had the option of doing an ED-wide round of early retirement and buyouts, as it did with great success in the past when staff reductions were necessary.  Instead, ED aggravated its own manageable situation by hiring in other areas while unnecessarily – and discriminatorily -  terminating en masse the RSA RO employees. Wilson Aff ¶ 15.  See Bonds, 950 F.Supp. at 1216 (holding that "the government cannot exacerbate its own harm, then seek to use that excuse to defeat the plaintiff's case for injunctive relief").  The Department created this situation and should not be permitted to escape responsibility for jeopardizing the livelihoods and indeed the lives of the RSA RO employees and their families by some cold-blooded shell game to justify getting rid of a class of employees.

C.    The Agency Will Benefit From Retaining The Applicants, Because They Will
       Continue To Perform Required Monitoring And Technical Assistance Functions.

While the Applicants will suffer irreparable harm in the absence of an injunction, the agency will barely notice that they have been retained – except, of course, insofar as it is able to continue to effectively administer the Rehabilitation Act and Randolph Sheppard programs. Given the ill-conceived, poorly thought out, and unworkable plan to get more highly specialized work out of half of its staff – and the wrong half  - the agency is actually better off keeping the RO staff on.  With all due respect to the CO staff, who are in an unenviable position, too, the agency cannot get blood from a stone – the eighty-one CO employees cannot perform the work that 65 overstretched RO employees were able to perform out in the regions close to their assigned agencies without extensive training and a long and painful learning curve, in addition to their own continuing duties.   In the interim, there is a strong likelihood of taxpayer dollars appropriated to help the disabled going to waste through this massive loss of institutional

knowledge and expertise.  This serves neither the public interest, or nor the agency's.

      D.    <u>Compared to the Harm to the Applicants that Would Result from a Denial, Any Harm to the Agency is Minimal and Self-Inflicted.</u>

The agency is infinitely better situated to bear the cost of this process than the individual Applicants, who, thanks to the agency, will otherwise be unemployed or living on reduced incomes and dealing with huge barriers to reemployment.  The balance of the equities clearly favors the grant of an injunction.

## IV.    AN INJUNCTION WOULD CLEARLY SERVE THE PUBLIC INTEREST.

This request requires a balancing of the public's interest in (1) eradicating discrimination on the basis of disability and age, (2) the enforcement of rules that ensure a professional civil service; and (3) the delivery and adequate administration and monitoring of taxpayer funded services to the disabled in the fifty states against an agency's right to make blatantly discriminatory personnel decisions and the apparent determination of its own leadership to cripple its ability to perform its several statutory missions.

      A.    <u>The Public Has A Strong Interest in Eradicating Employment Discrimination.</u>

The public has a strong interest in the effective enforcement of the ADEA.  <u>Western Air Lines, Inc. v. Croswell</u>, 472 U.S. 400, 422 (1985).  None of the agency's interests trump the national interest in combating disability and age discrimination.  The public has a similarly strong interest in the effective enforcement of the Rehabilitation Act.  <u>Callicotte v. Carlucci</u>, 698 F. Supp. at 951 (*citing* <u>Shirey v. Devine</u>, 670 F. 2d 1188 (D.C.Cir. 1982)).  Indeed, in <u>Callicotte</u>, the District Court noted

[T]he regulations enforcing the Act direct that "the federal government shall become a

model employer of handicapped individuals." 29 C.F.R. §1613.703. This interest outweighs the government's claim that the public would be harmed if forced to retain an unproductive employee. The balance tips decidedly in plaintiff's favor when, as here the discrimination charge is well-supported.

Id. at 951. Herein, there is no allegation that the regional office employees are unproductive or that the proposed reorganization is based upon the performance of the regional offices. Meanwhile, Applicants' charges of disparate impact on the bases of age and disability and disparate impact on the basis of disability are supported by strong direct and indirect evidence that the RIF of the regional employees *en masse* has been formulated by an agency official who is openly hostile to Blind and other disabled agency employees and constituent groups and has opposed hiring employees who require accommodations.

In confirmation of the Applicants' arguments that the "rules of the game" governing the selection process for the few vacancies at headquarters, so far no employee who requires an accommodation has been selected for a position at headquarters.

Third, there is a strong public interest in requiring the Department and OSERS to obey the law and implementing regulations. AFGE v. Callaway, 398 F. Supp. 176, 196 (N.D. Ala. 1975). As explained above, the agency has violated the statute and rules governing its obligation to transfer employees with their functions when these move from one competitive area to another. Applicants have further shown that this commission was most likely motivated by discrimination.

B.    Staying the Agency's Plans Will Benefit People with Disabilities
        who are the Beneficiaries of Aid Administered and Monitored by the RSA.

The public, in the form of the state VR agencies, the disabled community, and the members of congress with appropriations and oversight authority over OSERS and RSA, have

-123-

uniformly expressed their opposition to closing the regional offices and the resulting dismantling

of a proven system of grant administration that has repeatedly drawn praise from independent

auditors including the Government Accountability Office.  See Exs. 1-2 and contents of

Appendix II.

## V.     A NOMINAL SECURITY BOND WOULD SATISFY THE REQUIREMENTS OF RULE 65(C) OF THE FEDERAL RULES OF CIVIL PROCEDURE.

Fed. R. Civ. P.  65(c) requires that applicants for preliminary injunctive relief post a

bond as security before obtaining the relief.  See Fed. R. Civ. P. 65(c); Thermex Co. v. Lawson,

25 F. Supp. 414, 415 (D.C. Ill. 1938)(stating that until the court actually grants the injunction, no

security is required). The specific amount of the bond required as security in a given case is

within the discretion of the court.  See F.R.C.P 65(c)("no restraining order or preliminary

injunction shall issue except upon the giving of security by the applicant, in such sum as the

court deems proper . . .").

It is also well-established, however, that bonds are "not necessary where requiring

security would have the effect of denying the plaintiffs their right to judicial review of

administrative action." Natural Res. Def. Council, Inc., et al. v. Morton, 337 F. Supp. 167, 168

(D.D.C.1971).  In deciding on an appropriate amount, relevant considerations include the

hardship the posting of security would impose on the applicant, the public interest in the

litigation, and the likelihood of success on the merits, at least where it is extraordinarily high.

Malcolm v. Reno, 129 F. Supp. 2d 1, 11-12 (D.D.C. 2000)(citing Crowley v. Local No. 82, 679

F.2d 978, 1000&n.25 (1st Cir.1982), rev'd on other grounds, 467 U.S. 526 (1984); Temple

University v. White, 941 F.2d 201, 219-20 (3d Cir.1991), cert.denied, 502 U.S. 1032 (1992);

Borough of Palmyra v. Hurley, 2 F. Supp. 2d 637, 646 (D.N.J. 1998)). In Malcolm, the Court

noted that

> First . . . the plaintiff has been unemployed and has minimal assets. Thus, requiring the
> plaintiff to post security in any amount will be a significant hardship. Second, the
> public has a strong interest in the effective enforcement of the Rehabilitation Act. . .
> Finally, the plaintiff has an extraordinarily high likelihood of success on the merits.

129 F.Supp.2d at 12 (citing Callicotte v. Carlucci, 698 F. Supp. 944, 951 (D.D.C. 1988)). The

court accordingly set the bond at $1500. Id.

The exercise of judicial discretion in setting a nominal bond is particularly warranted

true in cases of public interest which involve individuals or groups that are attempting "to enjoin

the government . . . from engaging in activities that allegedly will cause irreparable injury to

some general social policy -for example, to public safety or the environment." See 11A Wright

& Miller, Fed. Prac. & Proc., 2d ed. §2954. Therefore, though the purpose of the security

requirement is "to cover the costs and damages suffered by the party wrongfully enjoined . . . it

would be a mistake to treat revenue loss to the Government the same as pecuniary damage to a

private party." N.R.D.C. v. Morton, 337 F. Supp. at 169; see also Armstrong v. Bush, 807 F.

Supp. 816, 823 (D.D.C. 1992). Moreover, courts have held that a nominal bond may be the only

requirement when balancing the possible loss to the enjoined party with the hardship that the

bond requirement would impose on the applicant. See Wright & Miller, §2954; see e.g., Warner

v. Ryobi Motor Prods. Corp., 818 F. Supp. 907, 909 (D.S.C. 1992)(setting nominal bond at $250

where plaintiffs would potentially suffer life-threatening consequences where an injunction not

granted). For example, this court required a class of tenants challenging the conversion of a low-

rent apartment complex under the Fair Housing Act to pay a bond of only $500). Brown v.

Artery Org., Inc., 691 F. Supp. 1459, 1462 (D.D.C. 1987). Like the plaintiffs in Brown, without

an injunction, the RSA RO employees may be precluded from obtaining judicial review of the agency's actions until after irreparable injuries have occurred and the status quo ante cannot be restored.  Id.   Requiring anything greater than a nominal bond will effectively deny them the relief to which they may be entitled.  Id.  Plaintiffs have limited means, and seek this injunction in order to protect their livelihoods and the programs they administer for the benefit of millions of disabled persons across the United States.  A bond which is not nominal would deny them their day in court.

**CONCLUSION**

Based on the foregoing points and authorities, and in the interest of balancing the equities of this unfortunate situation, the Applicants respectfully move this Honorable Court to grant the requested injunction(s) and preserve the status quo in order to save them from irreparable injuries and to permit them to vindicate their rights under the rehabilitation Act, the ADEA, and the Civil Service laws.

**REQUEST FOR HEARING**

Pursuant to Local Rule 65(c), Applicants respectfully request that the Court set an Oral Hearing on the merits of this application within five days of its submission.  LCvR 65(d).  An early hearing will not prejudice the respondents, while a delayed hearing will harm Applicants, whose positions will be abolished effective September 30, 2005.

Respectfully Submitted,

_____/s/ June D.W. Kalijarvi_____
June D. W. Kalijarvi, Esq.  (D.C. Bar No. 183863)
George M. Chuzi, Esq. (D.C. Bar No. 336503)
KALIJARVI, CHUZI & NEWMAN, P.C.
1901 L Street, NW
Suite 610
Washington, D.C. 20036
Tel: (202) 331-9260
Fax: (202) 331-9261
Counsel for Applicants


Also on this memorandum:  Heather G.White, Esq., Admitted in New York

## LIST OF EXHIBITS TO APPLICATION FOR
## TEMPORARY RESTRAINING ORDER AND/OR
## PRELIMINARY INJUNCTION

1.   Excerpts from H.R. REP. 109-143 (2005).

2.   Excerpts from S. REP. 109-103 (2005).

3.   RSA Mission Statement, available at

     http://www.ed.gov/about/offices/list/osers/rsa/programs.html.

4.   May 19, 1981 RSA memorandum regarding Randolph-Sheppard-compliant Staff

     Assignments in the regional offices.

5.   RSA Regional Offices functional statement, available at

     http://www.ed.gov/about/offices/list/osers/rsa/ro.html.

6.   RSA Regional Offices Functional Statement Prepared by the Regional

     Commissioners, December 2004.

7.   February 2005 RSA Restructuring Proposal.

8.   RSA Regional Offices Staffing Roster.

9.   May 2005 RSA reorganization Plan submitted to the Council of Education

     Locals 252, American Federation of Government Employees (AFGE) President

     Jennifer Harris-Reid.

10.  Position Description for GS-101-12 Regional Vocational Rehabilitation Program

     Specialist.

11.  Position Description for GS-101-13 Regional Vocational Rehabilitation Program

     Specialist.

-128-

12. Position Description for GS-501-13 Financial Management Specialist.

13. Excerpts from GAO Report GAO/HEHS-96-178 (September 1996) entitled "Education and Labor: Information on the Departments' Field Offices."

14. AFGE Letter to Senator Durbin (March 30, 2005).

15. Email from James Keenan, ED Labor Relations, to Heather G. White, Esq.

16. Email from Assistant Secretary Hager to RSA Employees (May 27, 2005).

17. Email from Assistant Secretary Hager to RSA Employees (March 8, 2005).

18. "Fact Sheet" on the RSA Reorganization, available at http://www.ed/gov/about/offices/list/osers/rsa/rsa_consolidation_fact_sheet.pdf.

19. Email of May 20, 2005 from Paul O'Connell to RSA Employees

20. Memorandum from Veronica Trietsch regarding the terms of the Voluntary Early Retirement offer

21. Executive Summary of the proposed RSA Reorganization

22. Functional Statement for the RSA after proposed changes

23. Vacancy Announcement OSERS-2005-0016 (Vocational Rehabilitation Program Specialist) GS-101-13.

24 Vacancy Announcement OSERS-2005-0018 (Supervisory Vocational Rehabilitation Program Specialist) GS-101-14/15.

25. Vacancy Announcement OSERS-2005-0025 (Management/Program Analyst) GS-434-14.

26. Vacancy Announcement OSERS-2005-0017 (Supervisory Management/Program Analyst) GS-343-14/15.

27. Vacancy Announcement OSERS-2005-0021 (Supervisory Management/Program

Analyst) GS-343-15.

28.   Vacancy Announcement OSERS-2005-0024 (Financial Management Specialist), GS-501-13.

29.   Reduction in Force Notification to Plaintiff and Applicant Janette Shell

30.   Formal EEO Complaint filed by the Regional Commissioners (June 27, 2005).

31.   Formal EEO Complaint filed by the Bargaining Unit employees (July 20, 2005).

32.   Agency's Letter Accepting Regional Commissioners' consolidated complaint (Sept. 8, 2005).

33.   AFGE-prepared summary of proposed FY2006 Budget and Current Staffing Levels

34.   Vacancy Announcement OIG-2005-0084 (Auditor) GS-511-14.

35.   Letter from U.S. Senators to Secretary Spellings (March 8, 2005).

36.   Letter from Secretary Spellings to U.S. Senators (April 8, 2005).

37.   Memorandum from Regional Commissioners to Acting RSA Commissioner Edward Anthony (May 20, 2005).

38.   Brian Faler, *Disabled Programs Changes Decried*, WASH. POST., April 25, 2005 at A17.

39.   Brian Friel, *Ex-Chief Protests Changes for Disabled*, NAT'L J., March 12, 2005.

40.   RSA PART ratings, available at http://www.ed.gov/about/overview/budget/budget06/summary/appendix2.pdf.

41.   Council of State Administrators of Vocational Rehabilitation, News Update for Friday, August 5, 2005.

42.   Letter from Heather G. White, Esq. to James R. White, EEO Group Director,

-130-

regarding evidence preservation (July 22, 2005).

43.    Excerpt from ED Personnel Manual Instruction 451-1.

44.    RSA 2004-2005 QSI Distribution List.

45.    Letter from June Kalijarvi, Esq. To Secretary Spellings (March 22, 2005).

46.    Letter from June Kalijarvi, Esq. To Secretary Spellings (May 26, 2005).

47.    Letter from June Kalijarvi, Esq. To Secretary Spellings (June 16, 2005).

48.    Stephen Barr, *Plan to Reorganize Agency Serving Disabled Draws Protests*, WASH. POST, May 27, 2005 at B02.

49.    Gordon Y. K . Pang, *Plan could endanger rehab services*, HONOLULU ADVERTISER, May 20, 2005, available at http://the.honoluluadvertiser.com/article/2005/May/20/ln/ln03p.html.  .

50.    Appendix of Letters from State and Constituent Groups Opposing RSA Reorganization.