# Exhibit 4



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE DEPUTY SECRETARY

# MEMORANDUM

TO:      Jacquelyn Tellier
Boston Regional Office
Rehabilitation Services Administration
Office of Special Education and Rehabilitative Services

FROM:   C. Todd Jones   9/13/05
Associate Deputy Secretary
Office of the Deputy Secretary

SUBJECT:  Grievance Decision

    This responds to the Grievance you filed on July 21, 2005 under Article 42, Section 42.07 of the Collective Bargaining Agreement (CBA). In your grievance, you claim that the Department of Education (Employer) had failed to comply with the CBA, specifically Articles 21, 27 and 28, and certain civil service statutes and regulations, regarding the Reduction In Force (RIF) Specific Notice the Employer mailed you on July 18, 2005.

## The Grievance

    In the grievance, you allege that: 1) the RIF of the Rehabilitation Services Administration's (RSA) regional offices employees is a transfer of functions to the central office (CO or headquarters), and that management did not follow proper procedures by failing to offer you a transfer to headquarters with your position (a GS-101-12, Rehabilitation Services Program Specialist); 2) the RIF has a disparate discriminatory impact on regional employees over the age of 40 and with disabilities in violation of the Age Discrimination in Employment Act and the Rehabilitation Act of 1973 (Rehabilitation Act) ; and 3) the Employer intentionally violated the Rehabilitation Act in order to avoid accommodating disabled employees.

    As relief, you seek a 1) cancellation of the RIF; 2) retention of current grade and duties; and 3) other relief as specified.

## Background

    In February 2005, the President released his FY 2006 budget, and it provided for "a net decrease of 66 FTE resulting from the consolidation of the functions of the regional offices of RSA into the CO and reallocation of staff to reflect program workload." The Office of Special Education and Rehabilitative Services (OSERS) concluded that it could not reach the FY 06 budgeted ceiling through normal attrition.

    On April 21, 2005, OSERS proposed a reorganization of RSA, including the closing of the RSA regional offices. This reorganization was approved, and OSERS Assistant Secretary

400 MARYLAND AVE., S.W., WASHINGTON, D.C. 20202-0500
www.ed.gov

*Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.*

John Hager announced it would be implemented on October 1, 2005. The new RSA organizational structure is designed to improve the administration of RSA programs through greater program efficiencies, consistent program and policy implementation, and integrated program planning. By centralizing RSA's monitoring functions in headquarters, RSA will ensure uniform on-site review procedures and facilitate RSA's timely issuance and distribution of monitoring reports to state agencies and consumers. The range of expert guidance that RSA provides to state agencies will be increased because a team of at least five program staff will be assigned to work closely with each state. Each team will consist of program staff with expertise in one of the following five areas: VR program services, fiscal management, data collection and analysis, independent living, and technical assistance. The new organizational structure integrates RSA's data collection with monitoring activities so that the process of review and improvement is continuous and eliminates time lags between assessing performance and conducting review activities. The new monitoring process will result in more effective monitoring, greater accountability, improved technical assistance to state agencies, and increased collaboration with RSA's stakeholders.

The quality of RSA's support to state agencies will be improved because the new organizational structure promotes collaboration between RSA's monitoring staff and its discretionary grant specialists. The monitoring staff will identify the improvements that need to be made in a state's VR system and share this information with the discretionary grants specialists. The consolidation of the functions will strengthen and streamline monitoring, technical assistance, fiscal management, and program implementation. It will provide for focused accountability over work now being performed in the regional offices, including management of certain direct grants and fiscal management of state agency formula grant programs.

In order to reach the 2006 budget ceiling, OSERS asked the Office of Personnel Management (OPM) for authority for voluntary separation incentive payments (VSIP) and voluntary early retirement authority (VERA). OPM granted authority for VSIP and VERA on May 10, 2005. The window period for staff to apply for buyout/early out was from May 23, 2005 through June 15, 2005, and 25 RSA staff members, including 18 from the regions, took the buyout/early out incentives.

OSERS management concluded that they would not transfer regional employees to the CO because there would be no "transfer of functions" between the regional offices and headquarters. Specifically, in order for a transfer of functions to occur, the gaining office must take on new, additional functions that it did not have before. In this case, both headquarters and the regional offices carry out the same broad class of functions, such as providing technical assistance, grant management and monitoring, and reviewing state agency formula grant programs (See RSA chart – Attachment). Therefore, OSERS management concluded that the law did not require that it transfer employees from the regional offices to RSA headquarters.

OSERS management issued RIF notices to the remaining RSA regional employees on July 14, 2005. In the RIF notice, OSERS notified the employees that they "do not have an assignment right to another position in [their] competitive area because all positions in your competitive area are being abolished (5 CFR 351.605)." In addition, the Department concluded that there would be no management directed reassignments of regional staff to other Department Principal Offices within the commuting area. As provided for by OPM regulations, the

competitive areas for the RIFs are the OSERS components in each regional office. See 5 CFR 351.402(b). In other words, because this RIF involved liquidation of each regional office, there were no "bump or retreat" rights under the OPM regulations. See 5 CFR 351.605.

## Discussion

### Transfer of Functions

In your grievance, you claim that the Department has not followed applicable civil service laws in conducting a RIF (Reduction in Force) of the RSA regional offices. In particular, you allege that OSERS did not follow the procedures set out in the OPM regulations when the office failed to identify the regional employees eligible for transfer to the CO.

The starting point for my analysis of the transfer of function allegation is Article 21 (Reduction in Force) of the CBA. Section 21.20(a) of the CBA provides that –

> When a transfer of function results in a reduction in force, RIF procedures, as outlined by applicable law, regulations, and this Article, will be used.

OPM's regulations governing RIFs are found in 5 CFR Part 351. Section 351.203 of the regulations defines a "Transfer of Function" as the --

> a) Transfer of the performance of a continuing function from one competitive area and **its addition** to one or more other competitive areas, except when the function involved is the same class of activity as functions already being performed in the other competitive area(s); or,
>
> b) The movement of the competitive area in which the function is performed to another local commuting area. (Emphasis added.)

OPM's regulations define "Function" to include all or a clearly identifiable segment of an agency's mission (including all integral parts of that mission), regardless of how it is performed. 5 CFR 351.203.

In other words, in a transfer of function, the function must:

1.) Cease in the losing competitive area(s) at the time of transfer (5 CFR 351.301(b)); and

2.) Be performed in an identifiable form in a different competitive area (or areas) where the function was not being performed at the time of transfer (5 CFR 351.301(b)).

The agency has the right, and responsibility, to properly determine whether the transfer of function regulations apply to the movement of work from one competitive area to another, and management must determine whether the transfer of function regulations apply. See 5 U.S.C. 7105(a); 5 CFR 351.201(a)(1); 5 CFR 351.302(a). Further, the reference point for a transfer of function determination is the *organizational manual and delegations of authority* for the losing and gaining competitive areas, supplemented if necessary by references to enabling legislation that serves as the basis for the performance of the function. These documents evidence whether

3

the work that is being transferred meets the definition of a function, and serve as the basis for a decision on whether the transfer of function regulations are applicable. See 5 CFR 351.201; 5 CFR 351.203.

In your submission, you have cited the position description for your GS-101-12, Vocational Rehabilitation Specialist (VRS) position, and have provided a detailed listing of your day-to-day responsibilities as a VRS. The OPM regulations cited above, however, make clear that this detailed level of information is irrelevant to the transfer of functions analysis. The regulations require that the Department determine whether a function -- a clearly identifiable segment of the agency's mission such as monitoring or technical assistance -- has been added to a competitive area that did not previously perform the function.

Based on my review of the facts, and of the current RSA functional statement (see attachment) and delegations of authority, I have concluded that the RSA RIF does not involve a transfer of functions. I reach this conclusion because in this case, both headquarters and the regional offices carry out the same broad class of functions, such as providing technical assistance, grant management and monitoring, and reviewing state agency formula grant programs. As such, there is no transfer of functions because both the regional offices and the CO currently carry out the same broad functions -- a clearly identifiable segment of the RSA's mission such as technical assistance or monitoring. In support of this conclusion, please refer to the attached chart prepared by RSA. The chart contains language from the current functional statements, and demonstrates that both regional offices and headquarters carry out the same identifiable segments of RSA's mission.

For example, in the functional area of monitoring, the current functional statement for RSA states that the CO has the responsibility to "develop and maintain monitoring systems for all formula grant programs." While the ROs monitor formula and discretionary grant programs, Headquarters develops and applies standards for state program reviews working with the regional offices, and approves and issues all monitoring reports. In short, I conclude that both the regional offices and headquarters carry out the broad function of monitoring and as such, there is not a transfer of functions because both offices are responsible for different parts of the same function.

In addition, the current RSA functional statements make clear that both the CO and RO provide technical assistance to the same entities. The functional statement states that Headquarters provides "technical consultation, policy interpretation and advice to State VR agencies, Client Assistance Programs, Independent Living Part B programs and to Regional staff." The ROs offer technical assistance and consultation to formula grant programs recipients such as State VR agencies. Headquarters also "develops nationwide policies, standards and procedures for the guidance of State VR agencies." Clearly, both the RO and the CO work together to provide technical assistance to grant recipients, and there is no transfer of functions to CO with the closure of the ROs.

My conclusion is also supported by Merit System Protection Board (MSPB) case law that governs the transfer of functions. In two 1984 decisions, the MSPB found that an employee has no right to transfer with a function when the gaining competitive area is performing the "*same class of activity*" as the losing competitive area. In Kentner v. National Transportation Safety Board, 20 M.S.P.R. 595 (1984), and in Neilson v. Federal Highway Administration, 21 M.S.P.R.

4

178 (1984), the MSPB concluded that when a function is transferred to another competitive area, a transfer of function occurs only when the gaining competitive area undertakes a class of activity it did not have before. While the term "class of activity" is not defined in OPM's regulations, both Kentner and Neilson, citing Childress v. United States, 222 Ct. Cl. 557 (1980) (Childress), defined "class of activity" by concluding that **"identity of function does not require identity of work."** (emphasis added.)

The Childress case is especially relevant to the RSA RIF. In Childress, NASA closed its Electronics Research Center (ERC) in Cambridge, Massachusetts. The ERC had carried out research work, and most, but not all, of that work ended; some of the research tasks, however, were transferred to other NASA research centers including one at the Langley Research Center (Langley) in Hampton, Virginia. The seven RIFed employees argued that the type of work performed by them at the ERC and the research conducted at Langley were not identical. In short, the RIFed employees argued that a transfer of functions had taken place because the research performed at Langley was not the same as the research being carried out at ERC before its closure.

The Court of Claims affirmed the trial judge's conclusion that even though ERC conducted advanced basic research and Langley undertook applied research, there was a functional overlap *regarding research* between the two agencies, and that research was a clearly identifiable segment of NASA's mission. The court added that "Langley's tasks might have been seen as unique, but they still fell under the rubric of basic research." The court added that because "identity of function does not require identity of work," even though Langley added a different type of research to its portfolio, there was no transfer of function because Langley did not undertake a new class of activity. As with Childress, in this grievance, the CO is not undertaking a new class of activity. A careful review of the current functional statement demonstrates that the CO already carries out the same classes of activities – monitoring, technical assistance, grants administration, VR and IL State plans, and planning.

I also rely on another, more recent MSPB decision in reaching my decision. In Blevins v. Tennessee Valley Authority, 46 M.S.P.R. 239 (1990), the Board found that no transfer of function took place when, after a merger of function from one competitive area to a different competitive area, the gaining competitive area had a function that did not change, but instead expanded in scope with the class of activity remaining the same. Based on my review of the functional statement and the proposed RSA reorganization plan, I believe that is exactly what is happening is this case – the CO will expand the scope of its efforts while the broad class of activity will remain the same.

Moreover, I find your reliance on the decision in Certain Former Community Services Administration Employees v. Department of Health and Human Services, 21 M.S.P.R. 379 (1984), to be misplaced. In this case, Congress passed legislation abolishing the Community Services Administration (CSA) as a separate agency, and HHS created a new Office of Community Services within the Department of Health and Human Services (HHS) to carry out many of the responsibilities of the old CSA. In contrast, the functional statements and the attached chart demonstrate that RSA's CO already carries out the same broad class functions that the regional employees carry out as well. As such, there is no transfer of functions because both offices currently perform the same class of functions.

5

In sum, I conclude that no transfer of functions has taken place under the RSA RIF because a careful review of the functional statement demonstrates that both the CO and the regional offices work on the same broad class of functions – monitoring, technical assistance, grants administration and planning – and as a result, there is no transfer of any function, but rather an expansion in the scope of the functions being carried out by headquarters. Consequently, there can be no violation of Article 21, Section 21.20 of the CBA.

Discrimination Claims

Your grievance appears to allege that the RSA RIF discriminates against you on the basis of your disability (scoliosis and occupational asthma) and your age (over 40). You have the initial burden of establishing a prima facie case of discrimination. If you meet this burden, then the burden shifts to the agency to articulate some legitimate, nondiscriminatory reason for its challenged action. You must then prove, by a preponderance of the evidence, that the legitimate reason articulated by the agency was not its true reason, but was a pretext for discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). You must be able to prove "both that the reason was false and that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 2752 (1993).

These burdens of proof apply to disability discrimination. See Norcross v. Sneed, 755 F.2d 113 (8th Cir. 1985); Prewitt v. U.S. Postal Service, 662 F.2d 292 (5th Cir. 1981). In order to establish a prima facie case of disparate treatment disability discrimination, you must prove that you are a member of a protected group, that you are similarly situated to an individual who is not a member of the protected group, and that you were treated more harshly or disparately than the individual who was not a member of your protected group. LeBlanc v. United States Postal Service, MSPB Docket No. DA-0752-04-0607-I-2, 2005 MSPB LEXIS 1130 (Mar. 8, 2005); Buckler v. Federal Retirement Thrift Investment Board, 73 M.S.P.R. 476 (1997). In order for two or more employees to be considered similarly situated for the purpose of creating an inference of disparate treatment, you must show that all relevant aspects of your employment situation are nearly identical to those of the comparative employees whom you allege were treated differently. Smith v. Monsanto Chemical Co., 770 F.2d 719, 723 (8th Cir. 1985). LeBlanc, supra. To make a prima facie case of disability discrimination, you must first prove that you are a qualified individual with a disability as defined in 29 C.F.R. 1614.203(a)(6). LeBlanc, supra.

This analysis is equally applicable to claims of age discrimination brought under the Age Discrimination in Employment Act (ADEA). Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir. 1979). In order to establish a prima facie case of age discrimination, you must show that: (1) you are at least forty (40) years old; (2) you are similarly situated to an individual who was not a member of the protected group, and (3) you were treated more harshly or disparately than the individual who was not a member of the protected group or who is considerably younger than you. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996). You must show that your age was a determinative factor in the action at issue. Southerland v. United States Postal Service, MSPB Docket No. DA-0752-04-0529-I-1, 2005 MSPB LEXIS 2979 (May 26, 2005); Waksman v. Department of Commerce, 37 M.S.P.R. 640 (1988), aff'd sub nom., Harris v. Department of Commerce, 878 F.2d 1447 (Fed. Cir. 1989) (Table).

6

I find that you have not established a prima facie case of age and disability discrimination because you have not shown that you were treated differently than nondisabled employees or employees under 40 years of age or who are considerably younger than you in RSA's regional offices. To the contrary, all positions in RSA's regional offices are being abolished due to a reduction-in-force (RIF) effective September 30, 2005, and all employees in RSA's regional offices, regardless of disability status or age, will be separated from their positions on that date due to the RIF.

Even if you had established a prima facie case of discrimination based on disability and/or age, RSA has articulated legitimate, nondiscriminatory reasons for the RIF, and you have not presented any credible evidence that those reasons are pretextual. I find that RSA decided to close the regional offices as part of a reorganization. Moreover, RSA decided to conduct a RIF as a result of the President's proposed FY 2006 budget, which provided for "a net decrease of 66 FTE resulting from the consolidation of the functions of the regional offices of RSA into the CO and reallocation of staff to reflect program workload," and the fact that OSERS could not reach the FY06 budgeted personnel or FTE ceiling through normal attrition and through offering voluntary separation incentives and voluntary early retirement. OPM regulations at 5 C.F.R. §351.201(a)(2) clearly state that shortage of funds, insufficient personnel ceiling or reorganization is a legitimate reason justifying a RIF. Once the agency invokes the RIF regulations for one of the management reasons specified in 5 C.F.R. §351.201(a)(2), the Merit Systems Protection Board (the Board) has no authority to review the management considerations which underlie that exercise of agency discretion. Griffin v. Department of Agriculture, 2 M.S.P.B. 335 (1980). I believe that the same principle applies to grievances and grievance arbitration.

Specifically with regard to the reasons RSA conducted the RIF, "The Board has held that an agency, facing a deficit situation, has broad discretion to take action to avoid such an event, including conducting a RIF, and that the Board will not second guess an agency's decision to reorganize its work force as it lacks authority to review the management considerations that underlie the exercise of discretion. Waksman v. Department of Commerce, 37 M.S.P.R. 640, 645-56 (1988), aff'd sub nom., Harris v. Department of Commerce, 878 F.2d 1447 (Fed. Cir. 1989) (Table)." Armstrong v. International Trade Commission, 74 M.S.P.R. 349 (1997). In addition, "Only the agency can decide what positions are required and when they are to be filled, abolished or vacated." La Bonte v. Department of Commerce, 23 M.S.P.R. 534 (1984); see also Buckler v. Federal Thrift Retirement Investment Board, 73 M.S.P.R. 476 (1997).

I also find that you have not presented any credible evidence that this legitimate management action is merely a pretext for discrimination. For the most part, you make broad, sweeping statements that you claim are evidence of discrimination, such as, "the agency made illegal inquiries regarding the need for reasonable accommodations to one or more RO employees, in direct violation of the employees' right to medical privacy"; "Management officials have also stated that OSERS' disabled employees take too much leave"; "OSERS management also informally but strongly disfavors employing persons who are openly affiliated with the NFB [National Federation for the Blind]"; and "OSERS has repeatedly delayed hiring readers as accommodations for blind employees in the ROs." However, you do not state when these statements or actions occurred, who made the statements or took the actions, which RSA employees heard these statements or were affected by these actions, and in what context they

occurred, and therefore I find them to constitute mere unsupported surmises. Nor have you alleged that these statements were directed at you, and in this regard, I note that you are not blind.

With regard to your more specific allegations, which I address below, I first note that they are either taken out of context or simply incorrect, and, in any event, do not evidence disability discrimination. First, with regard to your claim that, "The decision to close the ROs has been characterized repeatedly as a straight "business decision," and there has been much talk about how the services RSA proves will be delivered "better" from HQ. However, in a March 8, 2005 teleconference, then Acting Commissioner Troy Justesen admitted that management has no studies or even a coherent plan to justify these assertions," you do not indicate how the Acting Commissioner's statement is evidence of discrimination, assuming the statement was even made. In any event, as I indicated above, I find that RSA decided to close the regional offices and conduct a RIF for legitimate business reasons; that it was not required to conduct a study to decide how to reorganize, and that its new organizational structure will strengthen and streamline monitoring, technical assistance, fiscal management, and program implementation; and that holding a conference to get input from its stakeholders on how to improve its monitoring system does not evidence a lack of business necessity. To the contrary, the conference is evidence of a thoughtful plan and process for improving the delivery of RSA services.

Next, with regard to your claim that in August 2004 the agency made illegal inquiries regarding the need for reasonable accommodations to one or more RO employees who had not previously requested accommodations, in direct violation of the employees' right to medical privacy, no one in OSERS recalls making such calls. However, consistent with its mission, OSERS seeks to maximize the number of disabled employees it hires, and takes its responsibility to provide accommodations for disabled employees very seriously, so if such calls were made to assess the budget needs for reasonable accommodations during the following year, this was done for sound budget planning reasons to ensure that sufficient funds were available to meet its legal responsibility to provide accommodations. I also note that your claim that such questions violate 29 C.F.R. §1630.13 is without merit, as that regulation only prohibits inquiries as to whether an employee is an individual with a disability or the nature or severity of such a disability.

Your claim that OSERS has consistently refused to upgrade the text pagers provided to deaf and hard-of-hearing employees as accommodations, despite the fact that the newer and more effective technology requested by at least one hearing-impaired employee is provided by the employer to members of its management team for their convenience, is similarly without merit. It is my understanding that OSERS grants requests for reasonable accommodations if the request is submitted in accordance with the provisions in the Department's Reasonable Accommodations Handbook and deemed by the employee's supervisor to be needed for the employee to carry out the essential functions of his/her job. Because you do not identify the individual in question, I am unable to address this claim further.

Next, I find that your allegation that, "Management officials, including Paul O'Connell, have voiced a conviction that the agency has hired 'too many blind people'", does not reflect the position of OSERS, which seeks to maximize the number of employees with disabilities it hires. I note that after Joanne Wilson, the former RSA Commissioner, hired three employees who were blind (one special assistant and two regional commissioners), and one of the newly hired regional commissioners then hired two more staff who are blind, several RSA staff in the regions

8

(including at least one regional commissioner) and headquarters told management officials that some disability constituency groups were stating that RSA was "hiring too many blind people" in leadership positions to the exclusion of others with disabilities, and that these groups feared that their concerns and issues would not get the same priority as those of agencies representing the blind.

I also find that your claim that in the San Francisco office, the agency has refused to hire more than one reader despite the presence of two blind employees, with the result that the employees must share a reader in performing their duties, is inaccurate. In fact, when these employees were hired, they were both asked if one reader would suffice. It is my understanding that neither employee identified a problem at the time, and they were told that if it got to the point that they believed two readers were required, RSA would hire another reader.

You also claim that the agency has established a pattern of delaying the hiring process for blind applicants, and that RSA Commissioner Joanne Wilson had to personally intervene to ensure that two highly qualified Schedule A applicants were eventually properly processed and offered positions in the ROs. I find this assertion to be without merit, because it is my understanding that in the last few years, OSERS was substantially over its hiring budget because the former RSA Commissioner overspent the budget by a considerable amount and, accordingly, the hiring of the two individuals in question was delayed because the Assistant Secretary was considering whether to direct the transfers of other staff already employed by OSERS to fill these positions.

Similarly, your claims regarding RSA readers for blind employees have no merit. That the agency asked blind RSA employees to hire local readers instead of traveling with their own readers while on the road, and that in order for the readers to be paid by the government, the individual [reader] would have to become an individual federal contractor, does not evidence disability discrimination. First, it is my understanding that blind employees in the RSA ROs have not objected to hiring local readers instead of traveling with their own readers. It is also my understanding that prior to 2004, the process required merely that the employee needing a "contract reader" would inform RSA of the reader's name, address, and banking routing/account number, HQ would prepare a purchase order for the reader services, and when the reader submitted an invoice, RSA would process it for payment. However, in 2004, the Federal Government changed the process by requiring all vendors, including "contract readers", to register in the Central Contractor Registration (CCR). This was done on-line and there is a 24-hour 800 hotline to assist registrants. When at least two blind RSA employees complained that the process was too cumbersome and that a reader might not have access to a computer to register on line, a member of the OSERS budget team devised a plan to allow an OSERS employee to include the cost of the reader on his/her travel authorization and pay the reader for the services, and then reimburse the employee for the cost when he or she submitted the voucher. This process allowed an employee to get an ATM advance on a government credit card to pay the reader so the employee would not be "out of pocket" for the reader cost. Rather than obstructing the efforts of RSA employees and/or contract readers in the contract-approval process, as noted above, RSA staff developed a solution to substantially simplify the process for employees who employed a contract reader when they traveled, and at least one employee thanked RSA for its initiative.

9

Contrary to your claim that at the beginning of the new fiscal year, ED will require program offices to include readers for blind employees, sign language interpreters for deaf and hard-of-hearing employees and personal assistants for physically disabled employees as FTEs against their total allowed headcount, when previously, employees hired as accommodations for disabled employees were covered as FTEs of the Office of Management, ED program offices have always been required to include all "reasonable accommodations employees" as members of their office. These employees have never been included on the staff of the Office of Management, and there is no change to this policy in the upcoming year.

In fact, in the past several years OSERS took two steps to ensure that there is no "ceiling disincentive" to hiring applicants with disabilities who may need reasonable accommodations such as readers, interpreters, etc. First, several years ago, OSERS devised a plan to create a "pool" of funds in the Department to pay for hiring staff to provide reasonable accommodations, which was approved and implemented by the Department. This ensured that even though staff members hired to provide reasonable accommodations count against FTE levels in the program office, the funds for those hires were transferred by the Department to the program office above the program office's initial annual salary allocation. Second, OSERS has routinely and willingly exceeded its FTE ceiling because it employs many staff members who provide reasonable accommodations to OSERS employees. Rather than the disability discrimination that you allege, this demonstrates OSERS' commitment to employing individuals with disabilities.

You also claim that a May 27, 2005 e-mail from Assistant Secretary Hager instructed employees with disabilities to apply for vacancies through the EdHIRES website and stated that the names of those who qualify for the position will be referred to the selecting official on a non-competitive Schedule A "certificate of eligibles;" and that by channeling all disabled employees toward a special certificate, regardless of whether they are or were ever Schedule A hires, the agency has impermissibly distinguished between persons who are disabled and non-disabled; and that in light of the new ED policy of counting "accommodation" positions against program office FTEs, this relegation to Schedule A of all disabled employee-applicants for positions at HQ will clearly remove any incentive on the part of the selecting officials to hire disabled employees.

I find that there was no intention to make a distinction between persons who are disabled and non-disabled. Rather, it was the Assistant Secretary's objective to fill the vacancies through an open, fair and consistent process, particularly given management's belief that the number of applications would far exceed the number of available vacancies. In fact, the e-mail clearly emphasized that vacancies would be filled using a strict adherence to "competitive process rules." Although it is true that Schedule A employees (applicants) have the option of using EdHires or being considered *non-competitively* by submitting a paper form application, by suggesting employees with a disability apply through EdHires, it was management's intent to have all employees (those with and without disabilities) respond to the same EdHires questions so they would be assessed by the same criteria, allowing for open, fair and consistent competition throughout the recruitment process. An applicant's response to pertinent EdHires questions relating to eligibility for non-competitive consideration based, particularly, on a special hiring authority (e.g., Schedule A) would automatically generate a non-competitive certificate of eligibles in EdHires. Finally, I note that although the e-mail stated that employees with a disability *should* apply for vacancies through EdHires in lieu of submitting the application in paper form, employees with disabilities were not precluded from submitting their applications directly to the selecting official; the names of those who qualify for the position will be referred

10

to the selecting official on a non-competitive Schedule A "certificate of eligibles." I also reiterate that OSERS has been, and is, committed to maximizing the number of disabled employees it hires, and the policy you cite, which is not new, does not provide a disincentive to hire disabled employees.

Finally, I find that you do not have standing to claim that nondisabled employees in the ROs have been targeted for termination due to their association with their disabled peers, and that OSERS decided to close the ROs to avoid the need to accommodate disabled RO employees, as you are not a non-disabled employee, and you have not alleged that OSERS failed to accommodate your disability. Even if you could assert such a claim, I find it to be without merit, as the reorganization and the RIF were taken for legitimate, nondiscriminatory reasons, and, as noted above, OSERS seeks to maximize the number of disabled employees it hires, and takes its responsibilities to provided reasonable accommodations very seriously.

With respect to your disparate impact claims, I find that they are excluded from this grievance procedure. Article 41, Section 42.02(d) of the Collective Bargaining Agreement (CBA) states:

EEO Grievances

A claim by an individual employee that discrimination against him/her has resulted from the Employer's actions or conduct may also be filed under this procedure by the employee, or by the Union on behalf of the employee. Actions or conduct which are the subject of more than one employee grievance shall be considered by the Employer for consolidated processing, and will be so consolidated when to do so would expedite resolution and the grievants agree. The foregoing reservation of this procedure for individual claims is not intended to waive any rights the Union or employees may have to raise broader kinds of EEO claims (e.g., class actions, pattern or practice claims, or claims attacking the general validity of the Employer's personnel policies or practices) under other procedures as may be provided by law.

Section 41.02 (d) clearly limits grievances claiming discrimination to claims of discrimination against an employee as an individual, and states that broader kinds of EEO claims must be filed under other procedures. I believe that this exclusion applies to the disparate impact claims you have made. Further, to the extent that your disparate impact claim makes claims of discrimination affecting other RSA employees, you do not have standing to grieve on their behalf. Nevertheless, without agreeing to include the disparate impact claims in the grievance and without waiving the Employer's right to assert that the disparate impacts are not grievable or arbitrable should they be brought before an arbitrator or other third-party, I will address the claims.

I find that you have not proven your claim that the RIF had a disparate impact on disabled employees and those over 40 years of age. In order to establish a prima facie case of disparate impact discrimination based on disability, you must identify the specific employment practice that is challenged as responsible for statistically significant disparities and show that the application of the particular practice created the disparate impact. If you do so, the agency must offer a business justification for its use of the practices. The dispositive issue is whether a challenged practice significantly serves the legitimate employment goals of the agency. If the

11

agency meets its burden of production, you may establish disparate impact by showing the availability of alternative practices that achieve the same business end with less impact on the protected group. Stern v. Federal Trade Commission, 46 M.S.P.R. 328, 333 (1990).

While the standard for establishing a prima facie case is the same for age discrimination, the analysis for disparate impact claims based on age is different. In such cases, an agency need only show that its actions were based on some reasonable factor other than age. Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement. Smith v. City of Jackson, Miss., 125 S.Ct. 1536 (2005). For the reasons described below, I find that you have not made a prima facie case of disparate impact based on disability or age.

Your grievance claims that 43% of the employees in the RSA regional offices are disabled and 92 % are 40 or over and that, therefore, the RIF has a disparate impact on these protected classes. While it is true that statistical evidence alone, where persuasive, may be sufficient to prove a grossly disproportionate impact, "A more difficult question presented is whether these figures are based upon a statistical universe sufficiently large to be probative, and whether or not these statistics reflect the 'reality of the employment situation.'" Commonwealth of Pennsylvania v. Rizzo, 466 F.Supp. 1219 (E.D. PA 1979) (citation omitted). In order to prove a prima facie case, "We must find that the results were not merely due to chance or random distribution due to the small number of employment decisions and that the determination of adverse impact is statistically significant. . ." Id. at 1229.

Where the statistical sample is small, ". . . such bases lack probative significance in drawing evidentiary conclusions." Decker v. Department of Health and Human Services, 40 M.S.P.R. 119 (1989). See also, Fuller v. Department of Justice, 5 M.S.P.B. 31 (1981); Fink v. Western Electric Company, 708 F.2d 909 (4th Cir. 1983). In Fudge v. City of Providence Fire Department, 766 F.2d 650, 657 (1st Cir. 1985), the court found that the plaintiff's proof, which consisted solely of the different rates of acceptance for 24 black applicants and 224 white applicants, was an insufficient basis for finding disparate impact. In addition, because a substantial majority of the RSA regional offices is composed of persons in the protected age group (92%, using your figures), the fact that all persons in the protected age group will be terminated by RIF is not by itself significant. See Pace v. Southern Railway System, 701 F.2d 1383, 1389 (11th Cir. 1983).

In fact, the MSPB has held that the focus in determining whether the sample is sufficient should be the number of employees separated by RIF. Stern v. Federal Trade Commission, 46 M.S.P.R. 328 (1990). Moreover, in a RIF case, "The questions to be answered are thus what is the composition of the population subject to the reduction-in-force, what was the retention rate of the protected group compared to the retention rate of other employees, and how much of a differential in selection rates will be considered to constitute a disparate impact." Smith v. Xerox Corporation, 196 F.3d 358 (2d Cir. 1999). See also, Oshiver v. Babbitt, MSPB No. DC-0351-95-0330-I-1, Petition No. 03980122 (EEOC 1999).

I note that you have not provided any expert analysis to prove how likely the results here are merely due to chance or to demonstrate that the results are statistically significant. I find that in this case, the statistical universe is too small to be probative. Moreover, even if the sample

12

size were large enough to be probative, the retention rate for employees at least 40 years of age is exactly the same as the retention rate for employees under 40 – 0%. Similarly, the retention rate for disabled employees is exactly the same as for non-disabled employees – 0%. Put another way, 100% of each and every protected group is being terminated due to RIF, indicating no disparate impact on any group.

However, I note that although you assert that the closing of the regional offices and the RIF have a disparate impact on disabled employees, 57% of the employees affected by the RIF (using your figures) are not disabled, which means that fewer disabled employees are being separated by the RIF than non-disabled employees. Even if you had shown that the RIF will have a disparate impact on disabled employees, as described above, I find that the RIF was taken for legitimate business reasons. I also find that you have not demonstrated the availability of alternative practices that achieve the same business ends with less impact on the protected group.

You claim that ED should have sought to meet its headcount reduction goal through a nationwide offer of early retirement and buyouts because it would have met the business necessity of headcount reduction without destroying RSA's ability to deliver services and administer grants, incurring the huge relocation costs associated with transferring the RSA RO functions to HQ, and harmfully impacting the most vulnerable population in the agency in terms of reemployment prospects. I find this claim to be without merit. First, your proposed alternative of offering early retirement and buyouts throughout the entire Department of Education would not address the fact that the President's proposed FY 2006 budget provided for "a net decrease of 66 FTE resulting from the consolidation of the functions of the regional offices of RSA into the CO and reallocation of staff to reflect program workload," and therefore, RSA will absorb the shortfall, not other offices in the Department. Moreover, it would not address RSA's desire to centralize RSA's functions in headquarters to strengthen and streamline monitoring, technical assistance, fiscal management, and program implementation.

Next, I am confident that the reorganized RSA has the ability to deliver services and administer grants, improve productivity, and provide consistent advice nationwide from a centralized office. Although you assert that there are huge relocation costs associated with transferring RSA RO functions to HQ, as I found above, there is no transfer of function because RSA HQ performs the same broad class of activities as the regional offices, and therefore, no "huge relocation costs" are involved. To the contrary, RSA has estimated that closing the regional offices will save approximately $7 million, a significant savings in this time of scarce resources. Finally, I note that the application of the RIF regulations was neutral with respect to disability and age, and that the RIF regulations at 5 C.F.R. Part 351 prohibit consideration of equal employment opportunity factors in conducting a RIF. <u>Drucker v. Department of the Interior</u>, 14 M.S.P.R. 436 (1983).

Your claim of disparate impact based on age is similarly unsupported. First, as described above, the sample size is too small to be statistically significant. Next, as the Board has noted,

> The fact, then, that qualified over-age-40 employees are selected for RIF and demotion is not alone inherently suspect for '[t]here is no automatic presumption that every termination of an employee between the ages of 40 and 70 results in a violation of the [ADEA]." <u>Locke v. Commercial Union Insurance Co.</u>, 676 F.2d 205, 206 (6th Cir. 1982). This is so because aging is a universal process. By operation of this process, an agency's

13

workforce will steadily achieve the statutorily protected age category, absent unusually high turnover, particularly in higher graded positions where it is likely that a majority of incumbents will fall within the protected age group. . . It follows from this situation that protected age employees are more likely than under-age-40 employees to be selected for RIF from higher graded positions. Because this consequence can be explained naturally by operation of the aging process, we are unable to draw any probative inference of age discrimination from statistics showing that the employees selected for RIF were all in the protected group, or that the percentage of age protected employees in higher graded positions exceeded the total percentage of the agency's employees in the protected age group in all positions.

<u>Decker v. Department of Health and Human Services</u>, 40 M.S.P.R. 119 (1989).

Other than raw statistics, you have offered no evidence of age discrimination, except your belief that employees 40 and over " . . .were targeted as a result of what the employer terms 'a straight business decision' aimed at 'reducing overhead' by using 'twenty-first century technology' to perform the functions previously assigned to the ROs . . . ," which you assert means that RSA is terminating older employees because it believes that productivity and competence decline with age. However, you do not identify who, if anyone, made such a statement, and I do not conclude that using twenty-first century technology indicates a belief that productivity and competency decline with age. In any event, as I found above, even if the sample size is considered to be statistically significant and you are considered to have made a <u>prima facie</u> case of disparate impact discrimination based on age, the agency effected the RIF for reasonable factors other than age, namely, a budget shortfall and reorganization.

In conclusion, I find that you have not proven that the reorganization and RIF had a disparate impact on disabled employees and employees 40 years of age and over, and therefore you have not proven violations of the Rehabilitation Act, the ADEA, or the CBA.

With respect to your claims of violations of Articles 27 and 28 of the CBA, you have no standing to grieve the Employer's failure to meet obligations to cooperate with the union under Sections 27.01 and 28.02; and any alleged violations of Section 28.05 that occurred in the past are untimely and unrelated to the RIF Specific Notice except to the extent that they might be used to support your claim that the RIF is discriminatory. However, even if these matters were properly grieved, I would find on the basis of the discussion above that there was no violation of the CBA.

### Decision

In conclusion, it is my decision to deny your grievance and the relief sought.

### Appeal Rights

If you are not satisfied with this decision, you may ask the Union to invoke grievance arbitration, pursuant to Article 42, Sections 42.07(b) and 42.10 and Article 43, Section 43.07(a) and (b) of the CBA. The Union has five (5) work days from the date this decision is issued to invoke arbitration.

## Acknowledgment of Receipt

_____        _____
RECEIVED BY                         DATE

# Keenan, James

| | |
|---|---|
| **From:** | Allison, John |
| **Sent:** | Wednesday, September 21, 2005 5:07 PM |
| **To:** | Keenan, James |
| **Subject:** | RE: Re: Jacquelyn Tellier -Invocation of Arbitration |
| **Importance:** | High |

Thanks Jim. The required information will be provided on or before 9/27.

John

-----Original Message-----
From:      Keenan, James
Sent:      Wednesday, September 21, 2005 4:36 PM
To:        Allison, John
Subject:   RE: Re: Jacquelyn Tellier -Invocation of Arbitration

John, I accept the arbitration invocation provided that you provide the information required by the CBA by 9/27. It must be postmarked or sent by FED EX or some similar carrier no later than 9/27 to meet this condition. Thanks. jk

  -----Original Message-----
  From:      Allison, John
  Sent:      Tuesday, September 20, 2005 5:56 PM
  To:        Keenan, James
  Subject:   RE: Re: Jacquelyn Tellier -Invocation of Arbitration
  Importance: High

  Jim,

  The message below was not intended to be considered as our invocation rather I was seeking to provide additional information concerning the Council responsibility for moving this matter forward and whether you had any objections with the Council invoking arbitration. Therefore, I am seeking a waiver of the provisions contained in Article 43, Section 43.07(b) by requesting that you consider this email notification as our official request to arbitrate this matter. I will provide by certified mail, the information required by the CBA following this notification. Thank you for your cooperation.

  John

    -----Original Message-----
    From:      Keenan, James
    Sent:      Tuesday, September 20, 2005 5:35 PM
    To:        Allison, John
    Subject:   RE: Re: Jacquelyn Tellier -Invocation of Arbitration
    Importance: High

    John,

    I can't tell if you consider the message below an arbitration invocation or not. If yes, it is not in compliance with the CBA. If you wish to request a waiver of the provision governing how an arbitration invocation is made, you will need to request it. I have sometimes agreed to accept e-mail filings, but require that a timely request be made to me. Thanks. jk

      -----Original Message-----
      **From:** Allison, John
      **Sent:** Tuesday, September 20, 2005 5:26 PM
      **To:** Keenan, James
      **Subject:** Re: Jacquelyn Tellier -Invocation of Arbitration
      **Importance:**    High

      Jim:

1

As a follow-up to our conversation regarding whether AFGE Council 252 or Local 3893 (Boston) should be the responsible party for invoking arbitration concerning the grievance filed on behalf of Jacquelyn Tellier of the Boston Regional Office.  As an initial matter, Council 252 designated Ms. Heather White of the law firm of Kalijarvi, Chuzi, and Newman, located in Washington, D.C., to represent Ms. Tellier concerning the closing of the RSA regional offices.  Furthermore, since Local 3893 has not had any relationship with the employee nor the designated representative concerning this matter, the Council has the contractual responsibility to ensure that the employee in question is fairly represented by the union.  Although, the grievance in question was filed on behalf of a single employee, the issues regarding the closing of RSA regional offices involves a number of employees throughout the RSA organization and therefore, the Council as the exclusive representative, is exercising its right to invoke arbitration on behalf of the affected employee.   Please inform me as to whether there is any objections to the manner of invocation concerning the requirements pursuant to Article 43, Section 43.07 (b) of our Collective bargaining Agreement.    Thanks,

John Allison
National Chief Steward
AFGE Council 252
(215) 656-6419