# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **RICHARD ANDERSON, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 05-1855 (RMC)** |
| | ) | |
| **MARGARET SPELLINGS, Secretary,** | ) | |
| **U.S. Department of Education** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' APPLICATIONS FOR A TEMPORARY RESTRAINING ORDER/ PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

The Defendant, through counsel, the United States Attorney for the District of Columbia, hereby respectfully submits the following combined memorandum both in opposition to Plaintiffs' applications for a temporary restraining order and/or a preliminary injunction and in support of her motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and (6). Contrary to Plaintiffs' claims of disability and age discrimination, and retaliation, as set forth in their Complaint, Application for a Temporary Restraining Order/Preliminary Injunction and Memorandum in Support Thereof, Plaintiffs without justification have failed to exhaust administratively their claims of discrimination and are founding their requests for a temporary restraining order and/or a preliminary injunction on what are at best ordinary claims of discrimination that can be redressed fully without resort to preliminary injunctive relief. Plaintiffs, moreover, clearly cannot establish the familiar four-prong test supporting such requests.

## INTRODUCTION

On September 21, 2005, Plaintiffs served their twenty-third hour Applications for a Temporary Restraining Order and/or Preliminary Injunction in this case in an effort to bring to a screeching halt their impending separation by reduction-in-force (RIF), resulting from the impending closure of the ten regional offices of the Department of Education ("the Department" or Defendant), Rehabilitation Services Administration (RSA). The closure is the result of a reorganization and separation affecting all regional office employees, due to take effect on September 30, 2005. The reorganization was first proposed in April 2005, involved efforts to spur early retirement in May and June 2005 and finally led to a reduction in force (RIF) initiated in July 2005. In their Applications, Plaintiffs claim that the reorganization and RIF adversely and unfairly impact them based on their age (over 40) and disability and that the reorganization is motivated by discriminatory animus against, and a desire to avoid accommodating, the disabled. Plaintiffs also contend that they have a right to transfer with their functions to Headquarters under 5 U.S.C. § 3503 rather than be separated by RIF. Plaintiffs' contentions are without merit.

Plaintiffs naturally focus on the personal consequences to themselves of the reduction in force – concerns to which the Department has been sympathetic. The Department has been proud of its record as a model employer of a rich diversity of employees, including a number of employees with disabilities. The Department is also attentive to its obligation as a steward of tax dollars to manage them in the most effective and efficient manner possible. The Department believes that these interests need not be mutually exclusive and has reorganized RSA to provide for greater efficiency and effectiveness in delivering services while simultaneously minimizing the effect of the reorganization on individual employees. Unfortunately, the impact of the reorganization process will

2

result in the loss of some jobs.  However, RSA has structured the reorganization such that its impact falls equally on all employees – regardless of age, disability, or other status.  Accordingly, the reorganization does not discriminate against any category of employee.  Plaintiffs cannot use the Department's record as a model employer as a basis for advancing claims of discrimination where no discrimination exists.

Specifically, since the RSA's Headquarters office carries out the same class of operations as the regional offices, the reorganization does not constitute a "transfer of function" such that regional employees would have to be shifted *en masse* to the Headquarters office.  Under long-standing federal regulations, each region is considered a separate competitive area for RIF purposes. Accordingly, the decision to close all regional offices was properly structured under governing civil service principles.

Plaintiffs admit that they are in the midst of pursuing administratively the avenues at law provided by Congress to address their Equal Employment Opportunity (EEO) concerns. Notwithstanding that Congress has designed these administrative avenues, and additional opportunities for litigation in federal court, to afford comprehensive make-whole relief, Plaintiffs ask the Court to intervene in the management of the Department's resources.  Plaintiffs' failure alone to exhaust their administrative remedies under Title VII means that their claims are not actionable. Further, the fact that the decision falls on all employees in an equal and nondiscriminatory manner, together with the need to implement managerial decisions to achieve necessary efficiency, demonstrates that Plaintiffs are unlikely to suffer irreparable harm or to prevail on the merits, as required to justify their requests for preliminary injunctive relief.  On this basis, the Defendant also moves to dismiss this case under Fed. R. Civ. P. Rule 12 (b)(1) and (6).

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2005, the President of the United States released his Fiscal Year ("FY") 2006 budget, which, for the U.S. Department of Education, specified "a net decrease of 66 [Full-Time Equivalent ("FTE") hours,] resulting from the consolidation of the functions of the regional offices of [Rehabilitation Services Administration's (RSA)] into the [central office (hereinafter "CO" or "Headquarters")] and reallocation of staff to reflect program workload." In the exercise of its discretion, the Office of Special Education and Rehabilitative Services (OSERS), of which RSA is a component, concluded that it could not reach the FY 06 budgeted ceiling through previously experienced rates of attrition.

Consequently, on April 21, 2005, OSERS proposed a reorganization of RSA, including the closing of the RSA regional offices. Complaint, Exhibit 9. The Assistant Secretary for the Office of Management approved this reorganization, and OSERS Assistant Secretary John Hager announced it would be implemented on October 1, 2005. In addition to increasing Headquarters staffing levels, the new RSA organizational structure is designed to improve the administration of RSA programs through greater program efficiencies, consistent program and policy implementation and integrated program planning. Officials anticipated that, by centralizing RSA's monitoring functions in Headquarters, RSA would ensure uniform on-site review procedures and facilitate RSA's timely issuance and distribution of monitoring reports to State agencies and consumers. One of the other expected benefits is that RSA will provide an increased range of expert guidance to State agencies because a team of at least five program staff will be assigned to work closely with each State. Each team will consist of program staff with expertise in one of the following five areas: vocational rehabilitation ("VR") program services, fiscal management, data collection and analysis,

4

independent living and technical assistance. Officials designed the new organizational structure to integrate RSA's data collection with monitoring activities so that the process of review and improvement would be continuous and eliminate time lags between assessing performance and conducting review activities. Further, officials expected that the new monitoring process would result in more effective monitoring, greater accountability, improved technical assistance to State agencies, and increased collaboration with RSA's stakeholders.

In terms of management effectiveness, officials expect that the quality of RSA's support to State agencies will be improved because the new organizational structure enhances collaboration between RSA's monitoring staff and its discretionary grant specialists. Under the new approach, monitoring staff will identify needed improvements in a State's VR system and share this information with discretionary grants specialists. Officials anticipate that the consolidation of these functions will strengthen and streamline monitoring, technical assistance, fiscal management and program implementation. The restructured system is designed to provide for focused accountability over work now being performed in the regional offices, including management of certain direct grants and fiscal management of State agency formula grant programs.

In order to reach the 2006 budget ceiling, the Department asked the Office of Personnel Management (OPM) for authority for voluntary separation incentive payments (VSIP) and for voluntary early retirement authority (VERA). OPM granted authority for VSIP and VERA on May 10, 2005. The window period for affected staff to apply for buyout/early out benefits was from May 23, through June 15, 2005. Complaint, Exhibit 19. Twenty-five RSA staff members, including eighteen from regional offices, accepted the buyout/early out incentives.

As part of the reorganization and anticipated need to implement a reduction in force (RIF) initiative, OSERS management officials concluded that it would be legally permissible not to transfer regional staff to Headquarters because there would be no "transfer of functions" between the regional offices and Headquarters. Specifically, for a "transfer of functions" to occur, the office receiving the transferred functions must be deemed to be taking on completely new, additional functions. In this case, both Headquarters and the regional offices carry out the same broad class of functions, such as providing technical assistance, grant management and monitoring, and reviewing State agency formula grant programs. See Exhibit 1, Comparison Chart. Therefore, OSERS management concluded that federal laws and regulations did not require that it transfer employees from the regional offices to RSA Headquarters.

On July 14, 2005, OSERS management issued RIF notices to the RSA regional employees who had not accepted the buy out/early out incentives. In the RIF notice, OSERS notified affected employees that they "do not have an assignment right to another position because all positions in [their] competitive area [were] being abolished (5 CFR 351.605)." In addition, the Department concluded that there would be no management directed reassignments of regional staff to other Department Principal Offices within the commuting area. As provided for by OPM regulations, the competitive areas for the RIFs are the OSERS components in each regional office. See 5 CFR 351.402(b). In other words, because this RIF involved the closing of each regional office, there were no applicable "bump or retreat" rights under OPM regulations. See 5 CFR 351.605.

Subsequently, affected RSA staff filed various administrative and Equal Employment Opporunity (EEO) challenges to the planned reorganization and RIF. These claims included alleged violations of a Collective Bargaining Agreement (CBA) in place between some RSA staff and the

Department.  Under the CBA, these claims are still pending and have not reached a point of resolution permitting litigation in federal court.  Moreover, the non-CBA, EEO claims are still pending and therefore do not permit federal court litigation at this time under applicable EEO regulations.

Specifically, on June 28, 2005, seven of the Plaintiffs (RSA Managers' Group) filed a consolidated EEO complaint against the defendant alleging discrimination and retaliation. Complaint, Exhibit 30.  The RSA Managers' Group amended their complaint on July 29 and 30th, 2005.  On July 20, 2005, 14 Plaintiffs (RSA bargaining unit employees) filed a consolidated EEO complaint alleging discrimination on a variety of bases including disability, age, gender and religion.[1]  The Department accepted the RSA Managers' Group consolidated complaint on September 8, 2005.   Complaint, Exh. 32.  Because these complaints are mixed cases, Plaintiffs have appeal rights that are specifically defined by statute – they may either file with the Equal

---

[1]  Two of the Plaintiffs (Mr. Beichner and Mr. Evans) also filed grievances under the Defendant's negotiated grievance procedure. Mr. Beichner filed an EEO complaint on July 15, 2005, and a grievance on July 19, 2005, but withdrew it on August 4, 2005; he then filed an appeal with the Merit Systems Protection Board (MSPB) on August 10, 2005, which the MSPB dismissed on August 23, 2005. See Exh. 3.  Mr. Evans' grievance decision is being held in abeyance pending a decision on whether or not Defendant will accept his EEO complaint for processing. Plaintiffs have not provided any evidence that EEO complaints have been filed by Plaintiffs Koreski and Davis. Ms. Tellier filed a grievance on July 21, 2005, but did not file an EEO complaint. Exh. 1.  The Defendant issued a grievance decision to Ms. Tellier on September 13, 2005, and the Union subsequently invoked arbitration. See Exh. 4.  Because the Federal Service Labor Management Relations Act, the agency's Collective Bargaining Agreement (CBA) and EEOC regulations require a federal employee alleging discrimination to pursue a claim under either a statutory procedure or a union-assisted grievance procedure, but not both, and requires the employee to exhaust the administrative process that the employee chooses first, Ms. Tellier has not exhausted her administrative remedies either.  See 5 U.S.C. 7121(d); CBA Section 42.03; 29 CFR 1614.301(a); see also NTEU v. FLRA, 774 F.2d 1181 (D.C.Cir. 1985).

Employment Opportunity Commission (EEOC) or the Merit Systems Protection Board (MSPB or "the Board").  See 29 CFR  1614.302.

On September 7, 23 and 27, 2005, RSA extended nineteen job offers to eighteen employees to fill vacancies posted within RSA headquarters. See Exhibit 2, Declaration of Thomas Johnston (attached).   Thirteen of those regional employees are Plaintiffs in this case.  At least thirteen of the offerees are disabled (four are blind, and a fifth employee is vision impaired); all but one are at least forty years of age, and one (Noel Nightingale) has alleged in her affidavit (Pl. Exh. 19) that the agency is hostile toward blind employees and has retaliated against her for opposing the RIF as discriminatory, by failing to give her a Quality Salary Increase (QSI).

## ARGUMENT

### I.    Plaintiffs' Claims Are Not Actionable Absent Administrative Exhaustion

### A.    Title VII Exhaustion

A federal employee alleging employment discrimination under Title VII must file a timely administrative claim with the employing agency and exhaust his administrative remedies before filing a civil action in District Court.  Brown v. General Services Administration, supra, 425 U.S. at 832-33; see also, Jarrell v. U.S. Postal Service, 753 F. 2d. 1088, 1091 (D.C. Cir 1985) (A timely administrative charge is a prerequisite to initiation of a Title VII action in District Court); McKenzie v. Sawyer, 684 F 2d 62, 72 (D.C. Cir 1982) (a crucial feature of the plaintiff's case is a showing that the alleged Title VII charge is timely); Cones v. Shalala, 945 F.Supp. 342, 348 (D.D.C. 1996) (failure to pursue administrative claims bars subsequent federal court action).  Accord, Bowden v. United States, 106 F. 3d 433, 437 (D.C. Cir 1996)(same); Childers v. Slater, 44 F. Supp 2d 8, 16 (D. D.C. 1999) (same).  Summary judgment or dismissal is appropriate in cases, such as this, where the

plaintiff has failed to exhaust administrative remedies, <u>Jensen v. Frank</u>, 912 F.2d 517 (1st Cir. 1990);

<u>Saltz v. Lehman</u>, 672 F.2d 207 (D.C. Cir. 1982); <u>EEOC v. Boorstin</u>, 751 F.2d 1405 (D.C. Cir. 1985);

<u>DeMedina v. Reinhardt</u>, 444 F. Supp. 573 (D.D.C. 1978).

## II.    Standards for Issuance of Temporary Restraining Orders and Preliminary Injunctions

It is well established that injunctive relief is an extraordinary remedy and that the party

seeking it has a substantial burden of proof.   <u>American Coastal Line Joint Venture v. United States</u>

<u>Lines</u>, Inc., 580 F. Supp. 932, 935 (D.D.C. 1983).   The criteria that govern the issuance of

temporary and preliminary injunctive relief in the District of Columbia are well-settled.  In order for

the Court to exercise its power to grant this extraordinary relief, the Plaintiffs must show:  (1) a

strong likelihood of prevailing on the merits of their claims; (2) that without injunctive relief they

will suffer irreparable harm; (3) that, balancing hardships, the issuance of an injunction will not

substantially harm other interested parties; and (4) that the public interest favors the requested

injunction.  <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985); <u>Virginia Petroleum</u>

<u>Jobbers Ass'n v. FPC</u>, 259 F.2d 921, 925 (D.C. Cir. 1958) (<u>per</u> <u>curiam</u>); <u>Washington Metropolitan</u>

<u>Area Transportation Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841, 843-44 (D.C. Cir. 1977).  This

balancing test is a flexible one, permitting a court to issue injunctive relief when the likelihood of

success is high, although probability of irreparable harm may be low, and vice versa.  <u>See</u> <u>Population</u>

<u>Institute v. McPherson</u>, 797 F.2d 1062, 1078 (D.C. Cir. 1986).  Nevertheless, although it is a flexible

standard, both elements of likelihood to prevail and irreparable harm must be shown.  <u>District 50,</u>

<u>United Mine Workers of Am. v. International Union, United Mine Workers of Am.</u>, 412 F.2d 165,

167 (D.C. Cir. 1969) ("A party seeking injunctive relief must show both that it will suffer irreparable

harm if an injunction is not issued and that there is a substantial likelihood it will prevail on the

merits when the case is tried."). Preliminary relief is a drastic and extraordinary form of relief that should not be granted absent a clear and convincing showing by the moving party, Yakus v. United States, 321 U.S. 414 (1944); Kahane v. Secretary of State, 700 F.Supp. 1162, 1165 (D.D.C. 1988). This is an exacting standard that Plaintiff cannot meet. "The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). Moreover, to constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical." Id.

Finally, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). Where the public interest may be affected, the Court may withhold issuance of an injunction even at the cost of hardship to the petitioner. Id.; see also, Marine Transport Lines, Inc. v. Lehman, 623 F. Supp. 330, 335 (D.D.C. 1985).

"Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, is not enough . . .. But injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits." Virginia Petroleum Jobbers Ass'n, 259 F.2d at 925. "An injunction may be justified for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (1995). Wisconsin Gas Co. v. FERC, 758 F.2d at 674, sets forth the guiding principles for determining whether irreparable harm exists that (1) the injury must be both certain and great, not something merely feared as likely to occur at some indefinite time; (2) the injury must be of such imminence that there is a "clear and present" need for

relief to prevent it; and (3) economic loss is insufficient to constitute irreparable harm unless the plaintiff's very existence is threatened.  See also Sampson v. Murray, 415 U.S. 61, 88-90 (1974). An essential prerequisite to injunctive relief is a sufficient showing by the plaintiffs that they will suffer irreparable harm if the injunctive relief is not granted.  See, e.g., Davenport v. International Brotherhood of Teamsters, 166 F.3d 356, 360 (1999).

The deference owed to governments in personnel actions is, in this Circuit, the rule and not the exception.  Any grant of injunctive relief comes only upon a showing of extraordinary circumstances amounting to total employment preclusion resulting from the termination and no harm to the agency so compelled to retain the employee who, in turn, must show, even preliminarily, a high likelihood of success on the merits.  Compare Taylor v. R.T.C., 56 F.3d 1497, 1506, n.1 (D.C. Cir. 1995); Nichols v. A.I.D., 18 F. Supp. 2d 1, 5 (D.D.C. 1998); Moore v. Summers, 113 F. Supp. 2d 5, 28 (D.D.C. 2000) with Bonds v. Heyman, 950 F. Supp. 1202, 1214-1215 (D.D.C. 1997). Where, as here, Plaintiffs seek to enjoin a government agency from taking a personnel action against them, Plaintiffs "at the very least must make a showing of irreparable injury sufficient in kind and degree to override . . . factors cutting against the general availability of preliminary injunctions in Government personnel cases."  Sampson v. Murray, 415 U.S. at 84.  Plaintiffs have utterly failed to do so.

As stated by the Court in Moore v. Summers, 113 F. Supp.2d 5 (D.D.C. 2000),

Even if plaintiffs had made a stronger showing on the merits of their retaliation claims, preliminary injunctive relief enjoining future retaliation would still be inappropriate under the circumstances. It is well-settled that preliminary injunctive relief is not usually available in employment cases because "[e]ven under the traditional standards of Virginia Petroleum Jobbers, supra, it seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." Sampson, 415 U.S. at 90, 94 S.Ct. 937. Thus, even if it is

> assumed that the plaintiffs will face future retaliation, the harm they would presumably suffer as a result is not irreparable because "[m]ere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Virginia Petroleum Jobbers, 259 F.2d at 925.

Moore v. Summers, 113 F. Supp.2d 5, 25-26 (D.D.C. 2000). This holding highlights the ephemeral nature of the alleged irreparable harm identified by Plaintiffs in their quest for injunctive relief. In fact, nothing Plaintiffs have suggested in fact establishes that there is any irreparable harm in this matter.

As we establish below, Plaintiffs have not met their burden to establish that injunctive relief is appropriate in this matter because they cannot show irreparable harm, they have little likelihood of success on the merits, it is against the public interest to disrupt the functioning of a government agency, and the public interest clearly requires the use of the Title VII process and procedures in any complaint about workplace discrimination.

### A.    Plaintiffs Cannot Show Irreparable Harm

Plaintiffs' Application focuses, naturally enough, on their argument that Plaintiffs will suffer irreparable injury because they will lose their salary when the RIF is effective on September 30, 2005, and, as individuals who are disabled and/or at least forty years of age, they may have difficulty finding another job and their health insurance costs may increase, irreparably affecting their income. Pl. Application, Affidavits, Exh. 1-24. Thus, the merits of Plaintiffs' Application derives from their claim of unjust personnel actions. Id. The United States Supreme Court, in Sampson v. Murray, 415 U.S. 61, 88-90 (1974), held that preliminary injunctions generally are not available in government personnel cases. As described above, where, as here, Plaintiffs seek to enjoin a government agency

from taking a personnel action against them, Plaintiffs "at the very least must make a showing of irreparable injury sufficient in kind and degree to override . . . factors cutting against the general availability of preliminary injunctions in Government personnel cases." Sampson v. Murray, 415 U.S. at 84.

Plaintiffs fail to make the requisite showing of irreparable harm. Injunctive relief is limited, and "[a] n injunction should not be issued unless the threat of injury is imminent and well-founded, and unless the injury itself would be incapable of being redressed after a final hearing on the merits." Weick, supra, 350 A.2d at 388 (emphasis added). See also Wisconsin Gas Co. v. FERC, 244 U.S. App. D.C. at 354, 758 F.2d at 674. Plaintiffs' claim of irreparable harm clearly fails to meet the requirements therefor set forth in well-settled case authority.

Certainly, the agency is aware that individual employees will suffer loss of income, and it regrets this result. However, these individual consequences, to which all RIF'ed employees are subject, should not divert the Court's attention from the broader view that the reorganization is part of a Department-wide, Executive budget initiative and that the Plaintiffs have failed to utilize fully administrative remedies designed to provide comprehensive make-whole relief. Further, the Supreme Court and U.S. Court of Appeals for the District of Columbia Circuit (and most all other Circuits) have concluded that there can be no irreparable harm from the loss of income alone. Under this precedent, loss of income and its attendant financial consequences do not, as a matter of law, constitute irreparable harm. Sampson v. Murray, 415 U.S. at 90-91; Virginia Petroleum Jobbers Ass'n, 259 F.2d at 925; Davenport v. International Brotherhood of Teamsters, 166 F.3d at 367; National Treasury Employees Union v. United States, 288 U.S. App. D.C. 398, 401, 927 F.2d 1253, 1256 (1991); Chilcott v. Orr, 747 F.2d 29 (1st Cir. 1984); Jayaraj v. Scappini, 66 F.3d 36 (2nd

Cir.1995); <u>Guitard v. Sec'y of Navy</u>, 967 F.2d 737 (2nd Cir.1992); <u>Guerra v. Scruggs</u>, 942 F.2d 270

(4th Cir. 1991); <u>Smallwood v. Jefferson County, Ky.</u>, 1996 U.S. App. LEXIS 24221 (6th Cir. 1996);

<u>Hetreed v. Allstate</u>, 135 F.3d 1155 (7th Cir. 1998); <u>Adam-Mellang v. Apartment Search, Inc.</u>, 96

F.3d 297 (8th Cir. 1996); <u>Christie v. Garrett</u>, 1992 U.S. App. LEXIS 7108 (9th Cir. 1992).[2]   In fact,

notwithstanding Plaintiffs' claims that they will each suffer if they are separated due to RIF because

they may have a hard time finding other jobs because they are disabled and/or at least 40 years old,

and have increased health insurance costs, in <u>Sampson v. Murray</u>, 415 U.S. at 92, n.68, the Supreme

Court noted:  "We have held that an insufficiency of savings or difficulties in immediately obtaining

other employment - - external factors common to most discharged employees and not attributable

to any unusual actions relating to the discharge itself - - will not support a finding of irreparable

injury, however severely they may affect a particular individual."   Significantly, thirteen of the

Plaintiffs have been selected for positions at RSA headquarters, which, contrary to their

---

[2] As noted in <u>Varicon Intern. v. Office of Personnel Management</u>, 934 F.Supp. 440, 447 - 448 (D.D.C. 1996):

> It is well ... settled that economic loss does not, in and of itself constitute irreparable harm. . . [m]onetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business. . . Moreover, the movant must "provide proof ... indicating that the harm is certain to occur in the near future" and that "the alleged harm will directly result from the action which the movant seeks to enjoin."

<u>Id.</u>, citing <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C.Cir.1985)(other citations omitted).  <u>See</u> <u>also</u> <u>Vencor Nursing L.P. v. Shalala</u>, 63 F. Supp. 2d 1 (D.D.C. 1999) (monetary loss alone accorded little or no weight in analyzing irreparable harm); <u>Nichols v. A.I.D.</u>, 18 F. Supp. 2d 1 (D.D.C. 1998) (loss of job and salary without more insufficient to demonstrate entitlement to injunctive relief).  If the actual loss of a job is not sufficient to show irreparable harm, the mere transfer to another position at the same pay is certainly not irreparable.

protestations, demonstrates their immediate employability and further indicates the lack of irreparable harm.

Therefore, Plaintiffs cannot establish that their separation due to RIF will subject them to irreparable harm.

**B.      Plaintiffs Do Not Have A Strong Likelihood of Success on the Merits**

Because of the Plaintiffs' failure to exhaust their administrative remedies in this matter, this complaint is not properly before the Court and should be dismissed. Even if Plaintiffs had completed the administrative exhaustion requirements necessary to give this Court jurisdiction, they do not have a strong likelihood of success on the merits because there is no transfer of functions and therefore no violation of 5 U.S.C. 3503, and because Plaintiffs' discrimination claims have no merit.

1.      Plaintiffs Failed to Exhaust Their Administrative Remedies

A complainant who files a mixed case complaint such as this one with an agency has the right to file a civil action after 120 days from the date of filing a formal complaint if there is no final action or appeal to the MSPB. 29 CFR §1614.310; 5 U.S.C. 7702(e)(1)(A); Butler v. West, 164 F.3d 634 (D.C. Cir. 1999).

Plaintiffs who have failed to exhaust their administrative remedies in a timely fashion should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. An EEO plaintiff must exhaust administrative remedies before the complaint is actionable in district court. See, e.g., Bayer v. U.S. Dept. of Treasury, 956 F.2d 330, 332 (D.C. Cir. 1992); Siegel v. Kreps, 654 F.2d 773, 776 (D.C. Cir. 1981). And, a plaintiff who abandons the EEO process fails to satisfy the exhaustion requirement. "A plaintiff may not cut short the administrative process prior to its final disposition, for upon abandonment a claimant fails to exhaust administrative relief and may not thereafter seek

15

redress from the courts." Greenlaw v. Garrett, 59 F.3d 994, 997 (9th Cir. 1995); see also Powell v. Reno, No. 98-2299 (TFH), 1999 U.S. Dist. LEXIS 18134, at *6 (D.D.C. Nov. 12, 1999) ("A plaintiff who abandons the administrative process mid-stream 'prevents exhaustion and precludes judicial review of those claims.'") (quoting Greenlaw, 59 F.3d at 997).  The reason is that "an administrative exhaustion rule is meaningless if claimants may impede and abandon the administrative process and yet still be heard in the federal courts."  Vinieratos v. United States, 939 F.2d 762, 772 (9th Cir. 1991).

In the present case, seven Plaintiffs filed a consolidated formal complaint of discrimination on June 28, 2005 (amended July 30, 2005) (Pl. App., Exh. 30 and 32), and fourteen Plaintiffs filed a consolidated complaint of discrimination on July 20, 2005 (Pl. App., Exh. 42).  Another Plaintiff filed an EEO complaint separately on July 15, 2005.  It is unclear from the Plaintiffs' Applications whether or when the other two Plaintiffs actually filed EEO complaints, and one plaintiff, Ms. Tellier, has invoked arbitration on a grievance decision. Therefore, Ms. Tellier has not exhausted her administrative remedies.[3]  This lawsuit was filed on September 20, 2005.  Under these circumstances, Plaintiffs cannot demonstrate in any way that they have exhausted their administrative procedures because the EEO office has not had the required 120 days to process Plaintiffs' complaints.  Under Title VII, an aggrieved person who has filed a mixed case complaint may file suit in district court only after 120 days have elapsed from the filing of his or her complaint. 29 CFR §1614.310; 5 U.S.C. 7702(e)(1)(A); Butler v. West, 164 F.3d 634 (D.C. Cir. 1999).  By their own admission, Plaintiffs do not meet this requirement.

---

[3] Plaintiffs' Memorandum in support of Application, p. 48, n. 9, states that Ms. Tellier, was erroneously listed as filing an EEO complaint.

2.    <u>Plaintiffs' Discrimination Claims Have no Merit</u>

The complaint alleges that the RSA reorganization and RIF discriminate against Plaintiffs

on the basis of their disability and/or their age (over 40) (disparate treatment), that the actions have

a disparate impact on Plaintiffs because of the disability and/or age, and that the agency has retaliated

against some of the Plaintiffs for opposing the RIF.   None of these claims have merit.

a.    <u>Plaintiffs' Disparate Treatment Claims Are Unsupported</u>

Plaintiffs have the initial burden of establishing a <u>prima</u> <u>facie</u> case of discrimination.   If

they meet this burden, then the burden shifts to the agency to articulate some legitimate,

nondiscriminatory reason for its challenged action.   Plaintiffs must then prove, by a preponderance

of the evidence, that the legitimate reason articulated by the agency was not its true reason, but was

a pretext for discrimination.   <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and <u>Texas</u>

<u>Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981).   Plaintiffs must be able to prove "<u>both</u>

that the reason was false <u>and</u> that discrimination was the real reason."   <u>St. Mary's Honor Center v.</u>

<u>Hicks</u>, 509 U.S. 502, 113 S. Ct. 2742, 2752 (1993).

These burdens of proof apply to disability discrimination.   See <u>Norcross v. Sneed</u>, 755 F.2d

113 (8th Cir. 1985); <u>Prewitt v. U.S. Postal Service</u>, 662 F.2d 292 (5th Cir. 1981).   In order to

establish a <u>prima</u> <u>facie</u> case of disparate treatment disability discrimination, Plaintiffs must prove that

they are a member of a protected group, that they are similarly situated to an individual who is not

a member of the protected group, and that they were treated more harshly or disparately than the

individual who was not a member of their protected group.   <u>LeBlanc v. United States Postal Service</u>,

MSPB Docket No. DA-0752-04-0607-I-2, 2005 MSPB LEXIS 1130 (Mar. 8, 2005); <u>Buckler v.</u>

<u>Federal Retirement Thrift Investment Board</u>, 73 M.S.P.R. 476 (1997).   In order for two or more

17

employees to be considered similarly situated for the purpose of creating an inference of disparate treatment, Plaintiffs must show that all relevant aspects of their employment situation are nearly identical to those of the comparative employees whom they allege were treated differently. <u>Smith v. Monsanto Chemical Co.</u>, 770 F.2d 719, 723 (8<u>th</u> Cir. 1985). <u>LeBlanc</u>, <u>supra</u>. To make a <u>prima facie</u> case of disability discrimination, Plaintiffs must first prove that they are qualified individuals with disabilities as defined in 29 CFR 1614.203(a)(6). <u>LeBlanc</u>, <u>supra</u>.

This analysis is equally applicable to claims of age discrimination brought under the Age Discrimination in Employment Act (ADEA). <u>Loeb v. Textron, Inc</u>., 600 F.2d 1003 (1st Cir. 1979). In order to establish a <u>prima facie</u> case of age discrimination, Plaintiffs must show that: (1) they are at least forty (40) years old; (2) they are similarly situated to an individual who was not a member of the protected group, and (3) they were treated more harshly or disparately than the individual who was not a member of the protected group or who is considerably younger than them. <u>See</u> <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308 (1996). Plaintiffs must show that their age was a determinative factor in the action at issue. <u>Southerland v. United States Postal Service</u>, MSPB Docket No. DA-0752-04-0529-I-1, 2005 MSPB LEXIS 2979 (May 26, 2005); <u>Waksman v. Department of Commerce</u>, 37 M.S.P.R. 640 (1988), <u>aff'd</u> <u>sub</u> <u>nom</u>., <u>Harris v. Department of Commerce</u>, 878 F.2d 1447 (Fed. Cir. 1989) (Table).

(i)  *Plaintiffs fail to establish a prima facie case of Disparate Treatment*

Plaintiffs have not established a <u>prima facie</u> case of age and disability discrimination because they have not shown that they were treated differently than nondisabled employees or employees under 40 years of age or who are considerably younger than them in RSA's regional offices. To the contrary, all positions in RSA's regional offices are being abolished due to a reduction-in-force (RIF)

18

effective September 30, 2005, and all employees in RSA's regional offices, regardless of disability status or age, will be separated from their positions on that date due to the RIF.

(ii) *RSA has a legitimate nondiscriminatory reason for its RIF*

Even if Plaintiffs could had establish a prima facie case of discrimination based on disability and/or age, RSA has articulated legitimate, nondiscriminatory reasons for the RIF, and Plaintiffs have not presented any credible evidence that those reasons are pretextual. RSA decided to close the regional offices as part of a reorganization, and decided to conduct a RIF as a result of the President's proposed FY 2006 budget, which provided for "a net decrease of 66 FTE resulting from the consolidation of the functions of the regional offices of RSA into the CO and reallocation of staff to reflect program workload," and the fact that OSERS could not reach the FY06 budgeted personnel or FTE ceiling through normal attrition and through offering voluntary separation incentives and voluntary early retirement. OPM regulations at 5 CFR §351.201(a)(2) clearly state that shortage of funds, insufficient personnel ceiling or reorganization is a legitimate reason justifying a RIF. Once the agency invokes the RIF regulations for one of the management reasons specified in 5 CFR §351.201(a)(2), the MSPB has no authority to review the management considerations which underlie that exercise of agency discretion. Griffin v. Department of Agriculture, 2 M.S.P.B. 335 (1980).

Specifically with regard to the reasons RSA conducted the RIF, "The Board has held that an agency, facing a deficit situation, has broad discretion to take action to avoid such an event, including conducting a RIF, and that the Board will not second guess an agency's decision to reorganize its work force as it lacks authority to review the management considerations that underlie the exercise of discretion. Waksman v. Department of Commerce, 37 M.S.P.R. 640, 645-56 (1988),

aff'd sub nom., Harris v. Department of Commerce, 878 F.2d 1447 (Fed. Cir. 1989) (Table)."

Armstrong v. International Trade Commission, 74 M.S.P.R. 349 (1997). In addition, "Only the

agency can decide what positions are required and when they are to be filled, abolished or vacated."

La Bonte v. Department of Commerce, 23 M.S.P.R. 534 (1984); see also Buckler v. Federal Thrift

Retirement Investment Board, 73 M.S.P.R. 476 (1997).

> (iii)   *Plaintiffs cannot establish that RSA's reasons for the RIF are a pretext for discrimination*

Plaintiffs have not presented any credible evidence that this legitimate management action

is merely a pretext for discrimination. Evidently realizing that the RIF affects all employees alike

– and thus is not discriminatory – Plaintiffs resort to broad, sweeping statements that they claim are

evidence of disability discrimination. To the extent that their evidence includes a date that an

allegedly discriminatory statement was made or action was taken, it is clear that there is no

connection to the RIF, as the proffered occurrences are events that by their own admission, took

place at least a year or more before the reorganization and RIF, and in one case, as far back as 2001.

See, e.g., Pl. Affidavit at Exh. 25.

Finally, Plaintiffs have not alleged that these statements or actions were directed at them, or

that the agency specifically failed to accommodate their disabilities during their employment with

the agency.[4] A stray remark, remote in time to the RIF, by someone whose involvement in

structuring the RIF is unclear is of little or no significance. See Rowan v. Lockheed Martin Energy

Systems, Inc., 360 F.3d 544, 549-550 (6th Cir. 2004) (remote, stray statement not evidence of age

bias). Most importantly, these allegations relating to collateral matters are a mere smokescreen

---

[4]   Even if Plaintiffs had alleged and could establish  that these statements or actions
constituted discrimination toward them, their claims would be untimely.

designed to divert attention from the central fact of the case – the RIF affects all employees equally and in a nondiscriminatory manner. Moreover, Plaintiffs counsel presented these same allegations in a grievance filed by Jacquelyn Tellier, and the deciding official found them to be without merit. See Exh. 1. As such, the Complaint consists of mere unsupported conjecture.

Plaintiffs then claim that the RSA reorganization and RIF is a sham because RSA did not conduct a study to support its reorganization and as late as August 2005 was seeking input from its stakeholders on a new monitoring system; and because the regional offices were doing an excellent job. This argument is both without merit and unsupported by the evidence. RSA decided to close the regional offices and conduct a RIF for legitimate business reasons. In fact, a recently issued report by the Government Accountability Office to Congressional Committees concludes that the agency does not effectively monitor and manage the performance of State VR agencies and that better measures and monitoring could improve the performance of the VR program administered by RSA. See Exhibit 5, relevant pages of September 2005 GAO Report. RSA has determined that its new organizational structure will strengthen and streamline monitoring, technical assistance, fiscal management, and program implementation; and holding a conference to get input from its stakeholders on how to improve its monitoring system does not evidence a lack of business necessity. To the contrary, the conference is evidence of a thoughtful plan and process for improving the delivery of RSA services. Accordingly, Plaintiffs' disparate treatment claims have little likelihood of success on the merits.

b. <u>Plaintiffs' Disparate Impact Claims are Unsupported</u>

Plaintiffs Application claims that 43% of the employees in the RSA regional offices are disabled and 92 % are at least 40 years of age and that, therefore, the reorganization and RIF have a disparate impact on these protected classes.  However, Plaintiffs' cannot have not shown that their claim ofthat the RIF had a disparate impact on disabled employees and those at least 40 years of age has a strong likelihood of success on the merits.  While it is true that statistical evidence alone, where persuasive, may be sufficient to prove a grossly disproportionate impact, "A more difficult question presented is whether these figures are based upon a statistical universe sufficiently large to be probative, and whether or not these statistics reflect the 'reality of the employment situation.'" <u>Commonwealth of Pennsylvania v. Rizzo</u>, 466 F.Supp. 1219 (E.D. PA 1979) (citation omitted). In order to prove a prima facie case, "We must find that the results were not merely due to chance or random distribution due to the small number of employment decisions and that the determination of adverse impact is statistically significant. . ." <u>Id</u>. at 1229.

Where the statistical sample is small, " . . . such bases lack probative significance in drawing evidentiary conclusions." <u>Decker v. Department of Health and Human Services</u>, 40 M.S.P.R. 119 (1989).  <u>See</u> <u>also</u> <u>Fuller v. Department of Justice</u>, 5 M.S.P.B. 31 (1981); <u>Fink v. Western Electric Company</u>, 708 F.2d 909 (4th Cir. 1983).  In <u>Fudge v. City of Providence Fire Department</u>, 766 F.2d 650, 657 (1st Cir. 1985), the court found that the plaintiff's proof, which consisted solely of the different rates of acceptance for 24 black applicants and 224 white applicants, was an insufficient basis for finding disparate impact.  In addition, because a substantial majority of the RSA regional offices is composed of persons in the protected age group (92%, using Plaintiffs' figures), the fact that all persons in the protected age group will be terminated by RIF is not by itself significant.  <u>See</u>

22

Pace v. Southern Railway System, 701 F.2d 1383, 1389 (11th Cir. 1983); see also Stidham v. Minnesota Mining and Manufacturing, Inc., 399 F.3d 935, 938-939 (8th Cir. 2005) (*reh'g en banc denied*) (The fact that 15 of 16 salaried employees laid off in RIF in employee's department were over age 40 fell short of prima facie showing of discrimination, where proportion of over-40 salaried employees in department fell only from 72% to 68% in RIF); Rowan v. Lockheed Martin Energy Systems, Inc., 360 F.3d at 547-548 (in reduction in force cases, the plaintiffs must provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons).

In fact, the focus in determining whether the sample is sufficient should be the number of employees separated by RIF. Stern v. Federal Trade Commission, 46 M.S.P.R. 328 (1990). Moreover, in a RIF case, "The questions to be answered are thus what is the composition of the population subject to the reduction-in-force, what was the retention rate of the protected group compared to the retention rate of other employees, and how much of a differential in selection rates will be considered to constitute a disparate impact." Smith v. Xerox Corporation, 196 F.3d 358 (2d Cir. 1999). See also Oshiver v. Babbitt, MSPB No. DC-0351-95-0330-I-1, Petition No. 03980122 (EEOC 1999).[5]

The retention rate for employees at least 40 years of age is exactly the same as the retention rate for employees under 40 – 0%. Similarly, the retention rate for disabled employees is exactly the

---

[5]   Logically, in a discrimination case involving a RIF, Plaintiffs must present an extra measure of proof to overcome the obvious generalized impact of the adverse employment action. That is, Plaintiffs must prove a management intent to discriminate against Plaintiffs or those similarly situated. See Hess v. Avis Rent A Car System, Inc., 394 F.3d 624, 631-632 (8th Cir. 2005) (An additional showing that gender is a factor is necessary to establishing prima facie case of disparate treatment in RIF case).

same as for non-disabled employees – 0%. Put another way, 100% of each and every protected group is being terminated due to RIF, indicating no disparate impact on any group. This simple fact, standing alone, is sufficient to defeat Plaintiffs' disparate impact claims. In any event, Plaintiffs have made no effort to demonstrate that the sample size in this case is large enough to be probative or that any results are statistically significant. We further address Plaintiff's disability and age claims separately below.

(i)    Disability

To establish a prima facie case of disparate impact discrimination based on disability, Plaintiffs must identify the specific employment practice that is challenged as responsible for statistically significant disparities and show that the application of the particular practice created the disparate impact. If they do so, the agency must offer a business justification for its use of the practices. The dispositive issue is whether a challenged practice significantly serves the legitimate employment goals of the agency. If the agency meets its burden of production, Plaintiffs may establish disparate impact by showing the availability of alternative practices that achieve the same business end with less impact on the protected group. Stern v. Federal Trade Commission, 46 M.S.P.R. 328, 333 (1990).

At the outset, we must reiterate that in this case, the RIF affected 100% of both disabled and nondisabled employees, thus defeating any claim of disparate impact. Moreover, although Plaintiffs assert that the closing of the regional offices and the RIF have a disparate impact on disabled employees, 57% of the employees affected by the RIF (using Plaintiffs' figures) are not disabled, which means that fewer disabled employees are being separated by the RIF than non-disabled employees. Even if Plaintiffs had shown that the RIF will have a disparate impact on disabled

24

employees, as described above, the RIF was taken for legitimate business reasons, and Plaintiffs have not demonstrated the availability of alternative practices that achieve the same business ends with less impact on the protected group.

Plaintiffs claim that the Department should have sought to meet its headcount reduction goal through a nationwide offer of early retirement and buyouts because it would have met the business necessity of headcount reduction without destroying RSA's ability to deliver services and administer grants, and harmfully impacting the most vulnerable population in the agency in terms of reemployment prospects. These claims are without merit. First, Plaintiffs' proposed alternative of offering early retirement and buyouts throughout the entire Department of Education would not address the fact that the President's proposed FY 2006 budget provided for "a net decrease of 66 FTE resulting from the consolidation of the functions of the regional offices of RSA into the CO and reallocation of staff to reflect program workload," and therefore, RSA will absorb the shortfall, not other offices in the Department. Moreover, it would not address RSA's need to centralize RSA's functions in headquarters to strengthen and streamline monitoring, technical assistance, fiscal management, and program implementation. More importantly, this argument is of the "coulda, shoulda, woulda" genre – interesting but totally besides the point. Plaintiffs simply invite the Court to substitute its judgment on how best to organize an Executive Branch agency to carry out its mission – an invitation that the courts have traditionally declined.

In any event, it is clear that there is ample business justification for the RIF: the reorganized RSA has the ability to deliver services and administer grants, improve productivity, and provide consistent advice nationwide from a centralized office, and that closing the regional offices will save approximately $7 million, a significant savings in this time of scarce resources. Exhibit 6, 2006

Budget Submission (attached).  Finally, the application of the RIF regulations was neutral with respect to disability and age, and the RIF regulations at 5 CFR Part 351 prohibit consideration of equal employment opportunity factors in conducting a RIF.  <u>Drucker v. Department of the Interior</u>, 14 M.S.P.R. 436 (1983).

        (ii)    Age

While the standard for establishing a prima facie case is the same for age discrimination, the analysis for disparate impact claims based on age is different.  In such cases, an agency need only show that its actions were based on some reasonable factor other than age.  Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement.  <u>Smith v. City of Jackson, Miss.</u>, ___ U.S. ___, 125 S.Ct. 1536 (2005).

Plaintiffs' claim of disparate impact based on age is similarly unsupported.  First, as described above, the retention rate for employees at least 40 years of age is exactly the same as the retention rate for employees under 40 – 0%.  Simply put – both groups were subjected to the same impact.  Secondly, as also noted above, the sample size is too small to be statistically significant.  Consequentially, as the MSPB has noted,

> The fact, then, that qualified over-age-40 employees are selected for RIF and demotion is not alone inherently suspect for '[t]here is no automatic presumption that every termination of an employee between the ages of 40 and 70 results in a violation of the [ADEA]." <u>Locke v. Commercial Union Insurance Co.</u>, 676 F.2d 205, 206 (6th Cir. 1982).  This is so because aging is a universal process.  By operation of this process, an agency's workforce will steadily achieve the statutorily protected age category, absent unusually high turnover, particularly in higher graded positions where it is likely that a majority of incumbents will fall within the protected age group. . . It follows from this situation that protected age employees are more likely than under-age-40 employees to be selected for RIF from higher graded positions.  Because this consequence can be explained naturally by operation of the aging

process, we are unable to draw any probative inference of age discrimination from statistics showing that the employees selected for RIF were all in the protected group, or that the percentage of age protected employees in higher graded positions exceeded the total percentage of the agency's employees in the protected age group in all positions.

Decker v. Department of Health and Human Services, 40 M.S.P.R. 119 (1989).

Other than raw numbers, Plaintiffs have offered no evidence of age discrimination, except their conclusory belief that employees 40 and over " . . .were targeted as a result of what the employer terms 'a straight business decision' aimed at 'reducing overhead' by using 'twenty-first century technology' to perform the functions previously assigned to the ROs . . . ," which Plaintiffs assert means that RSA is terminating older employees because it believes that productivity and competence decline with age.  Pl. Memorandum, p. 102.  However, Plaintiffs' conclusion that using twenty-first century technology indicates a belief that productivity and competency decline with age is ludicrous.  In any event, even if the sample size is considered to be statistically significant, and Plaintiffs are considered to have made a prima facie case of disparate impact discrimination based on age, the agency effected the RIF for reasonable factors other than age, namely, a budget shortfall and reorganization.

In short, because Plaintiffs cannot prove that the reorganization and RIF had a disparate impact on disabled employees and employees 40 years of age and over, they have little likelihood of success on the merits.

c.    Plaintiffs' Claim of Retaliation is Unsupported

Plaintiffs' claim of retaliation also has little likelihood of success on the merits.  In order to make out a prima facie case of retaliation, Plaintiffs must show  (1) that they engaged in statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal

connection existed between the two. <u>Brown v. Brody</u>, 199 F.3d 446, 452, 339 U.S. App.D.C. 223, 239 (1999).

Two Plaintiffs assert that the agency has retaliated against them for opposing the RIF and reorganization because they did not receive quality step increases (QSIs). However, as the agency's PMI demonstrates, a QSI is not an entitlement just because an employee receives an Outstanding performance rating in a particular rating period, and "<u>It should be awarded infrequently and only in exceptional circumstances and only for long-term sustained exceptional performance or contributions</u> throughout the appraisal period." Pl. .  (emphasis in original).

The recent job offers made by RSA further demonstrate that Plaintiffs' claims of discrimination and retaliation are without merit and have little likelihood of success on the merits. Plaintiffs assert that the agency discriminates against disabled employees and violently dislikes blind employees, decided to reorganize and RIF regional employees to get rid of disabled employees and to avoid accommodating them, and retaliated against regional employees for opposing the RIF as discriminatory. However, eighteen RSA regional office employees have been offered nineteen jobs at CO to fill the advertised vacancies, and thirteen of the nineteen offerees are Plaintiffs in this case. At least thirteen of the offerees are disabled (four are blind, and a fifth employee is vision impaired), all but one is at least forty years of age, and one (Noel Nightingale) has alleged in her affidavit (Pl. Exh. 19) that the agency is hostile toward blind individuals and retaliated against her for opposing the RIF as discriminatory by failing to give her a QSI. These job offers make clear that Plaintiffs' discrimination and retaliation claims are baseless.

d.    Plaintiffs' Claim of Document Destruction is Moot

Plaintiffs' claim that the Court should enjoin the agency from destroying documents is moot, since the agency instructed its key employees to retain all documents in any form whatsoever related to the operations of RSA on August 3 and 8, 2005 (See Exhibit 7, Email messages.).  Accordingly, their claim with regard to destruction of documents has no merit.

3.    Defendant's Actions do not Violate 5 USC §3503 Because There is no Transfer of Functions

Plaintiffs claim that the Department has not followed applicable civil service laws in conducting a RIF (Reduction in Force) of the RSA regional offices.  In particular, Plaintiffs allege that RSA violated civil service law because it did not follow the procedures set out in the OPM regulations when the office failed to identify the regional employees eligible for transfer to the CO.

The OPM regulations establishing the procedures for RIFs are found in 5 CFR Section 351.203.  The regulations define a "Transfer of Function" as the --

a)    Transfer of the performance of a continuing function from one competitive area and **its addition** to one or more other competitive areas, except when the function involved is the same class of activity as functions already being performed in the other competitive area(s); or,

b)    The movement of the competitive area in which the function is performed to another local commuting area.  (Emphasis added.)

OPM's regulations define "Function" to include all or a clearly identifiable segment of an agency's mission (including all integral parts of that mission), regardless of how it is performed.  5 CFR 351.203.  In other words, in a transfer of function, the function must:

29

1.)    Cease in the losing competitive area(s) at the time of transfer (5 CFR 351.301(b)); and

2.)    Be performed in an identifiable form in a different competitive area (or areas) where the function was not being performed at the time of transfer  (5 CFR 351.301(b)).

The agency has the right, and responsibility, to determine properly whether the transfer of function regulations apply to the movement of work from one competitive area to another, and management must determine whether the transfer of function regulations apply.  See 5 U.S.C. 7105(a); 5 CFR 351.201(a)(1); 5 CFR 351.302(a).  Further, the reference point for a transfer of function determination is the *organizational manual and delegations of authority* for the losing and gaining competitive areas, supplemented if necessary by references to enabling legislation that serves as the basis for the performance of the function.  These documents evidence whether the work that is being transferred meets the definition of a function, and serve as the basis for a decision on whether the transfer of function regulations are applicable.  See 5 CFR 351.201; 5 CFR 351.203.

Based on a review of the functional statement, OSERS concluded that there was no transfer of functions in this instance because both headquarters and the regional offices carry out the same broad class of functions, such as providing technical assistance, grant management and monitoring, and reviewing state agency formula grant programs.  See Exh. 1, Comparison Chart.  Derived from the current functional statements, the chart (exh. 1) makes clear that both regional offices (RO) and Headquarters carry out the same identifiable segments of RSA's mission.

Plaintiffs' motion cites the workforce profile for the various staff positions of the ROs. Complaint, p. 20 -25.  The OPM regulations cited above, however, make clear that this detailed level of information is irrelevant to the transfer of functions analysis.  The regulations require that the Department determine whether a function – a clearly identifiable segment of the agency's mission

30

such as monitoring or technical assistance – has been added to a competitive area that did not previously perform the function.[6]

The MSPB has repeatedly held that an employee has no right to transfer with a function when the gaining competitive area is performing the "*same class of activity*" as the losing competitive area. In Kentner v. National Transportation Safety Board, 20 M.S.P.R. 595 (1984), and in Neilson v. Federal Highway Administration, 21 M.S.P.R. 178 (1984), the MSPB concluded that when a function is transferred to another competitive area, a transfer of function occurs only when the gaining competitive area undertakes a class of activity it did not have before.  While the term "class of activity" is not defined in OPM's regulations, both Kentner and Neilson, citing Childress v. United States, 222 Ct. Cl. 557 (1980) (Childress), defined "class of activity" by concluding that "**identity of function does not require identity of work.**"  (emphasis added.)

In Childress, NASA closed its Electronics Research Center (ERC) in Cambridge, Massachusetts.  The ERC had carried out research work, and most, but not all, of that work ended;

---

[6] For example, in the functional area of monitoring, the current functional statement for RSA states that the CO has the responsibility to "develop and maintain monitoring systems for all formula grant programs."  Complaint, Exh. 9.  While the ROs monitor formula and discretionary grant programs, Headquarters develops and applies standards for state program reviews working with the regional offices, and reviews and approves all monitoring reports.  In short, both the regional offices and headquarters carry out the broad function of monitoring and as such, there is not a transfer of functions because both offices are responsible for different parts of the same function.

In addition, the current RSA functional statements make clear that both the CO and RO provide technical assistance to the same entities.  Id.  The functional statement states that Headquarters provides "technical consultation, policy interpretation and advice to State VR agencies, Client Assistance Programs, Independent Living Part B programs and to Regional staff."  The ROs offer technical assistance and consultation to formula grant programs recipients such as State VR agencies.  Headquarters also "develops nationwide policies, standards and procedures for the guidance of State VR agencies."  Clearly, both the RO and the CO work together to provide technical assistance to grant recipients, and there is no transfer of functions to CO with the closure of the ROs.

some of the research tasks, however, were transferred to other NASA research centers including one at the Langley Research Center (Langley) in Hampton, Virginia. The seven RIFed employees argued that the type of work performed by them at the ERC and the research conducted at Langley were not identical. In short, the RIFed employees argued that a transfer of functions had taken place because the research performed at Langley was not the same as the research being carried out at ERC before its closure.

The Court of Claims affirmed the trial judge's conclusion that even though ERC conducted advanced basic research and Langley undertook applied research, there was a functional overlap *regarding research* between the two agencies, and that research was a clearly identifiable segment of NASA's mission. The court stated that "Langley's tasks might have been seen as unique, but they still fell under the rubric of basic research." The court concluded that because "identity of function does not require identity of work," even though Langley added a different type of research to its portfolio, there was no transfer of function because Langley did not undertake a new class of activity. As with Childress, in this case, the CO is not undertaking a new class of activity. A careful review of the current functional statement demonstrates that the CO already carries out the same classes of activities – monitoring, technical assistance, grants administration, VR and IL State plans, and planning – as the regional offices.[7]

---

[7] Plaintiffs contend that the decision in Certain Former Community Services Administration Employees v. Department of Health and Human Services (HHS), 21 M.S.P.R. 379 (1984) should govern here but their reliance on this case is misplaced. In the HHS case, Congress passed legislation abolishing the Community Services Administration (CSA) as a separate agency, and HHS created a new Office of Community Services within the Department of Health and Human Services (HHS) to carry out many of the responsibilities of the old CSA. In contrast, the functional statements and the attached chart demonstrate that RSA's CO already carries out the same broad class functions that the regional employees carry out as well. As such, there is no transfer of functions because both
(continued...)

In sum, no transfer of functions has taken place under the RSA RIF because a careful review of the functional statement demonstrates that both the CO and the regional offices work on the same broad class of functions – monitoring, technical assistance, grants administration and planning – and as a result, there is no transfer of any function, but rather an expansion in the scope of the functions being carried out by Headquarters. Consequently, there can be no violation of 5 U.S.C. section 3503 or 5 CFR Part 351.

**C. The Public Interest Would Not Be Served by an Injunction in This Matter**

Before granting an injunction in this case, the Court must find that the injunction will not substantially harm other interested parties and that the public interest favors the requested relief. Again, Plaintiffs offer nothing in the way of argument or provable facts that this case justifies the complete abandonment of the procedure established by Congress through Title VII to remedy workplace discrimination. Moreover, Plaintiffs have failed to establish any reason why the Congressionally mandated jurisdictional requirements of Title VII, which require administrative exhaustion, should be disregarded here. In fact, enjoining the agency from reorganizing and conducting a RIF, or lesser efforts associated with these efforts, when those actions have not been shown to discriminate based on disability and age would cause an undue disruption in the agency's operations and force it to pay salary to individuals contrary to the President's budget. As noted in

---

[7](...continued)
offices currently perform the same class of functions.

Plaintiffs also rely on <u>Biter and Giovanetti v. Interstate Commerce Commission</u> (<u>Biter</u>), 76 MSPR 82 (1997). In <u>Biter</u>, as in the <u>HHS</u> case, Congress directed the closure of a government office with limited functions transferring to a new office. Here, broad classes of functions such as monitoring and technical assistance are not transferring because they are already being carried out at Headquarters. Thus, the Department concluded that the RIF regulations are inapplicable because there is no formal transfer of functions.

the 2005 GAO Report, RSA must take measures to improve the performance of the vocational rehabilitation program which it administers. RSA's reorganization into headquarters-based, full service teams will meet GAO's concerns by strengthening and streamlining program monitoring, by providing technical assistance to RSA's customers and by standardizing the delivery of services under centralized quality control and enhancing fiscal management and financial savings. "[W]hile the public interest is served by enjoining unlawful discrimination, it is against the public interest to disrupt the functioning of a government agency . . . without a strong showing that the discrimination is real rather than perceived." <u>Moore v. Summers</u>, 113 F.Supp.2d 5, 22 (D.D.C. 2000). In this case, the strong public interest is in deferring to the sound discretion of the agency's management of its operations and the consistent application of Title VII procedures provided by law.

## CONCLUSION

WHEREFORE, Defendant submits that Plaintiffs's Applications for a Temporary Restraining Order or Preliminary Injunction should be denied and that Defendant's motion to dismiss should be granted, with out prejudice.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney

_____
R. CRAIG LAWRENCE, D.C. BAR # 171538
Assistant United States Attorney

_____
OLIVER W. McDANIEL, D.C. Bar #377360
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 616-0739

OF COUNSEL:

GAIL F. BAUM
DAVID A. BERTHIAUME
Department of Education
Office of the General Counsel

35

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September, 2005, I caused the foregoing Defendant's

Motion to Dismiss and Combined Memorandum in Opposition to Plaintiffs' Applications for a

Temporary Restraining Order/ Preliminary Injunction and in Support of Defendant's Motion to

Dismiss to be served on Counsel for the Plaintiffs via the Electronic Case Filing System (ECF) or,

if this means fails, then by mail, postage prepaid, addressed as follows:

**George Chuzi**
**Heather G. White**
**June D.W. Kalijarvi (Plaintiff's Counsel of Record)**
**Kalijarvi, Chuzi & Newman, P.C.**
**1901 L Street, NW**
**Suite 610**
**Washington, D.C.  20036**

_____
OLIVER W. MCDANIEL, D.C. BAR # 377360
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 616-0739